ELECTRONIC

**August 28, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# 09-CV-81255-DIMITROULEAS/SNOW

**Marsha G. Rivernider**
**Robert H. Rivernider**
**9426 Delemar Court**
**Wellington, Florida 33414**
**Charles Edward Lincoln, III**
**c/o Peyton Yates Freiman**
**603 Elmwood Place, Suite #6**
**Austin, Texas 78705**
Plaintiffs *in propia persona, pro se*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA---PALM BEACH

| | | |
|---|---|---|
| MARSHA G. RIVERNIDER, | § | |
| ROBERT H. RIVERNIDER, | § | |
| CHARLES EDWARD LINCOLN, III, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| U.S. BANK NATIONAL ASSOCIATION, | § | |
| AS TRUSTEE FOR THE C-BASS | § | |
| MORTGAGE LOAN ASSET-BACKED | § | |
| CERTIFICATES, SERIES 2006-CBS, | § | COMPLAINT FOR DAMAGES |
| And all JOHN & JANE DOES 1-50 | § | Trial-by-Jury Demanded |
| Defendants. | § | according to FRCP Rule 38 |
| | § | and the Seventh Amendment |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

## COMPLAINT FOR QUIET TITLE

1.     Comes now the Plaintiffs MARSHA G. RIVERNIDER, ROBERT H. RIVERNIDER, and CHARLES EDWARD LINCOLN, III, with this their First Complaint For Quiet Title, complaining for declaratory judgment in respect of the same, and demanding damages arising from fraudulent conveyance and slander of title to inflicted by US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET –BACKED CERTIFICATES, SERIES 2006-CBS, all relating to the Plaintiff's Homestead real estate located at the above-noted address at 9426 Delmar Court in the town or city of Wellington, Palm Beach County, Florida.

2.     Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331 in that the claims alleged therein arise under the laws of the United States. Furthermore, there is

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

1

1 of 93

diversity jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties.

3.      This court has supplemental jurisdiction pursuant to 28 U.S.C. Section 1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal claims and arise out of a common nucleus of related facts and form part of the same case or controversy under Article III of the United States Constitution.

4.      Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS is named as primary Defendant because that is the name of the bank claiming interest in Plaintiff's property, despite having submitted claims in Florida State Court which definitively determine that U.S. BANK NATIONAL ASSOCIATION is not in privity with any contract or note to which the Plaintiffs were ever a party.; U.S. Bank is a national banking association with its principal place of business in Minneapolis, Minnesota. U.S. Bank operates in a number of states throughout the United States. U.S. Bank is a subsidiary, parent and owner or otherwise an affiliate of U.S. Bancorp, 800 Nicollet Mall, Minneapolis, MN 55402 as revealed on-line at www.usbank.com.

5.      Diligent research has so far revealed no connection whatsoever between U.S. BANK NATIONAL ASSOCIATION and New Century Mortgage Corporation or Challenge Financial Investors Corporation, the sole parties whose privity with Plaintiffs Robert H. Rivernider and Marsha G. Rivernider can be demonstrated on the face of the documents submitted in state court.

6.      This Court has Civil Rights Jurisdiction pursuant to 28 U.S.C. §1343, as well as by actions authorized for the protection of property pursuant to 42 U.S.C. §§1981, 1982, 1983, and 1988(a), and it is alleged that the Courts of the State of Florida are so utterly corrupt and controlled by the United States Mortgage Finance Industry as to be incapable of policing the banking industry in the environment of the current mortgage

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                2

2 of 93

foreclosure crisis and the associated financial meltdown, and that all foreclosure matters should be federalized by judicial fiat.

7.      The *Younger v. Harris* doctrine of abstention which is so often invoked to override *Dombrowski v. Pfister* intervention by Federal Courts in State Court actions is utterly irrelevant and inapplicable here.  At least with regard to the mortgage foreclosure crisis, the Courts of the State of Florida are utterly incapable of policing themselves and have fallen prey to special interests, in particular the special interests of those who seek to gloss over the horrendous abuses brought on by securitization of mortgages and endorsement of promissory notes "without recourse"---both of which factors have impacted heavily on the posture of the present case.

8.      The Court has jurisdiction over Plaintiffs' action for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 (as well as 42 U.S.C. §§1983, 1988(a), and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S. C. §2203 and Rule 65 of the Federal Rules of Civil Procedure and accordingly asks for such relief in a separate Application for TRO.

9.      Plaintiffs accordingly asserts causes of action against Defendants U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS predicated on, inter alia, apparent violations of 42 U.S.C. §§1981, 1982, 1983, justifying relief pursuant to 42 U.S.C. §1988(a), as well as the federal Fair Debt Collections Act ("FDCA"), 15 U.S.C. § 1601 et seq. ("TILA"); Regulation Z, 12 C.F.R. § 226 et seq.; Federal Trade Commission Act ("FTC Act"), and 15 U.S.C. § 1961 et seq.

10.     Plaintiffs also reserve their right to amend and to assert derivative claims under Florida Civil Rights and Consumer Protection Statutes, as well as state laws prohibiting Deceptive Trade Practices, among others.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    3

3 of 93

**11.**     In addition, this Court has jurisdiction pursuant to 28 U.S.C. §1343 (Civil Rights) insofar as Plaintiff seeks a declaratory judgment or series of three declaratory judgments pursuant to 42 U.S.C. §§1981, 1982, 1983, and 1988(a), that facially excellent and protective Florida Statutes are being administered in the Florida Courts in such a way that the common law rights to limit collection and enforcement to "holders in due course" and other privileges inherent in the common law doctrine of "privity of contract" have been all but obliterated.

**12.**     Courts in Florida in cases such as that litigated by the Defendant against Plaintiffs in the state action still pending in the Circuit Court in and for Palm Beach County, Florida under case number CA-08-026061-AW gloss over the "holder in due course" and "privity of contract" doctrines in non-judicial foreclosures, accepting defendant servicer contentions (without any supporting law, precedent, or other authority whatsoever) such as "Defendants fault the complaint's allegation that an unnamed note holder does not possess the note in that there is no "obligation to produce originals of either the promissory note or deed of trust."

**13.**     In fact, the obligation to produce the original note and contract has always been a key requirement of the common law of contracts, expressly upheld by Florida Courts from time immemorial and even during recent history, and this requirement is enshrined by the Florida "Holder in Due Course" statute in §673.3021, although the excuses by which lost notes are re-established under §673.3091 are often no more than ridiculous "the dog ate my homework"-type explanations.

**14.**     In the state "Foreclosure" case in Palm Beach County (See Exhibit A to the Plaintiffs Application for Temporary Restraining Order, submitted with this Complaint on August 28, 2009), U.S. Bank originally "complained for the reestablishment of" an allegedly lost note but then recently (in July 2009) announced without explanation that the note had again been "discovered". The circumstances of loss and rediscovery were never

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                    4

4 of 93

explained---and in fact they cannot be explained because the requirements of the Florida statutes, aside from possession, namely that the note cannot have been SOLD or TRANSFERRED clearly have been violated by the multiple endorsements made without recourse which do NOT lead to or include U.S. BANK, N.A. (Exhibit A: Endorsed Note).

15.     The effective abandonment of the common law by the executive and judicial branches did not come about as the result of overt democratically enacted legislative modification of the law, nor pursuant to any official governmental policy of or for the public benefit, but to enable and enrich a favored group which has profited from a non-governmental financial innovation of the late 1970s-80s known as "securitization of debt", with securitized and bundled "debt" sold on the open market in complete disregard and, in fact, in flagrant violation of all common law (and Uniform Commercial Code) principles of "holder in due course" or "privity of contract".

16.     "Holder in due course" and "privity of contract" were key elements of common law jurisprudence specifically protected from interference by the state governments under Article I, §10, Cl. 1 of the United States Constitution, except where necessary to protect or advance a compelling governmental interest in the state's interest of self-protection or emergency exercise of the police power. Cf., e.g., *Allied Structural Steel Co. v. Spannaus, Attorney General Of Minnesota, et al.,* 438 U.S. 234; 98 S.Ct. 2716; 57 L.Ed.2d 727 (1978).

17.     Plaintiffs reserve the right to amend and add additional causes of action to this complaint by regular amendment pursuant to Rule 15 of the Federal Rules of Civil Procedure as may be necessary to bring all issues before the Court concerning the properties for which quiet title is sought in Florida.

18.     Venue is proper in the Southern District of Florida in that the property at 9246 Delemar Court owned by the Plaintiffs and subject to this Complaint is located in the Southern District of Florida.   Furthermore, most if not all of the transactions and

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                                          5

5 of 93

occurrences giving rise to this dispute took place in Palm Beach County, Florida, within the territorial jurisdiction of the Southern District of Florida.

<strong>BACKGROUND & THEORY OF THE CASE</strong>

**19.** The Original Note, dated January 18, 2006 was originated by CHALLENGE FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION, and this note was endorsed "without recourse" to several other parties, but finally, subsequently somehow was transferred to or received by Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, although there is no evidence of actual endorsement or payment of even nominal value by U.S. BANK, N.A. (Exhibit A: Note).

**20.** Plaintiffs MARSHA G. RIVERNIDER, and ROBERT H. RIVERNIDER, as husband and wife transferred title to the property in question (a marital estate) to Charles Edward Lincoln, III, subject to their obligation to pay the mortgage to which their properties might be subject if Lincoln could verify that the servicing entity (e.g. U.S. BANK, N.A.) was actually a "holder in due course" of their note, or that they were somehow or otherwise parties in privity with CHALLENGE FINANCIAL INVESTORS CORPORATION, A FLORIDA CORPORATION, (the originating "lender").

**21.** In fact, it has been impossible so far to verify whether Challenge Financial Investors Corporation was ever sufficiently capitalized to make a loan of any size or dimensions--- Challenge Financial Investors Corp. has been fined, had licenses revoked, and otherwise sanctioned in many state including Georgia, North Carolina, Washington, although the actions taken in Georgia, insofar as they relate to the Challenge Offices based in Florida, are probably the most relevant here:

> On March 2, 2007, the Georgia Department of Banking and Finance ("Department") entered into a Consent Order with **Challenge Financial Investors** Corporation ("Challenge"), License Number 15790, located at **360 Central Avenue, Suite 600, St. Petersburg, Florida**, to resolve allegations pertaining to violations of the Georgia Residential Mortgage Act

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*    6

6 of 93

and agency rules.
Pursuant to the terms of the Consent Order:
The revocation of **Challenge's** mortgage lender's license is effective as of March 2, 2007. **Challenge** cannot apply to the Department for another mortgage lender's license or a mortgage broker's license for at least three (3) years;
**Challenge** cannot accept any new loan applications after March 2, 2007, and will cease all of its remaining residential mortgage lender activities in **Georgia** by no later than April 15, 2007;

## http://www.mortgagefraudblog.com/index.php/weblog/permal ink/challenge_financial_investors_shut_down_in_georgia/

**22.**     The slippery tale of the mysteriously lost or destroyed note, which sometimes suddenly reappears, has already been repeated tens of thousands of times all over Florida, is nothing but a cover for SECURITIES FRAUD AND VIOLATION OF THE FLORIDA STATUTES and is entitled to no more credibility than those offered by truant schoolboys involving dogs who eat homework or great aunts who always die during finals or when term papers are due, but it is used successfully in perhaps 80-90% of all Florida Mortgage Foreclosures and accordingly in violation of the Uniform Commercial Code which leads all of these lying Mortgage company to proceed to Foreclose illegally without right under law.

**23.**     Like every one of the Oysters in Lewis Carroll's "The Walrus and the Carpenter" from *Through the looking glass and what Alice found there* (1872), the mortgagors in the United States in general and Florida in particular have been tricked by false promises and lies and asked to walk along the beach, only to be summarily eaten by the mortgage companies, their servicers, and this constitutes STATE ACTION where the Florida Courts and county sheriffs knowingly and intentionally have disregarded statutory and common law protections of procedural and substantive due process in order to supported the finance company "servicers" who do 99% of the "dirty work" of foreclosing on securitized (i.e. sold & transferred) mortgages.  In fact, without the knowing collusion of the Florida Courts, especially since 2006, without the voluntary, willful disregard of duty the supposed guardians of due process of law to rights of life, liberty, and property, however, the oysters/mortgagees would have been safe.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
  *Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    7

**24.**    "The Sun was shining on the sea, shining with all its might... and this was odd because it was the middle of the night."

**25.**    Plaintiffs now ask this Court to open the shudders and let the light of day shine on this sham, this megalithic lie repeated ten million times which has all but destroyed the US economy.

**26.**    All promissors (including U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS) implicitly, if not explicitly, promise or affirm that they will follow the common law, as well as the statutory law, guaranteeing to each contracting party promisee to comport themselves by conduct in full compliance with all the guarantees and protections of common law, including but not limited to the doctrines of "holder in due course" and "privity of contract."

**27.**    Plaintiffs seek a declaratory judgment that the endorsements without recourse violate both Florida and United States Federal Law concerning the management and securitization of promissory notes as negotiable instruments and as "money" pursuant to the definitions provided by Federal Law in 12 U.S.C. §1813l.

**28.**    Plaintiffs are entitled to void or nullify both their note to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS and his contract, based on U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS's utter failure to conform to the common strictures of contract in good faith and fair dealing, showing for causes of action as follows:

## FIRST CAUSE OF ACTION: INJUNCTIVE RELIEF AUTHORIZED BY 42 U.S.C. §§1983, 1988(a), FLORIDA DTPA, AND COMMMON-LAW EQUITY

**29.**    Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 1-28,

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                8

8 of 93

of this their Complaint, as if the same were fully recopied and restated herein.

**30.**    Plaintiffs allege that the seizure and sale of their property would constitute a violation of equal protection and due process of law concerning the right of the people to owner and enjoy all the benefits of contract secured to them by 42 U.S.C. §§1981 and 1982, which rights are actionable under 42 U.S.C. §1983 and 1988(a).

**31.**    Plaintiffs allege that Florida law, as applied and construed, as a matter of custom, practice, and policy, has (ironically enough) empowered Judges to exceed their jurisdiction so as to violate the civil rights of property owners in foreclosure disputes precisely by issuing a rule or guideline having the force and effect of law that judges should not, on their own initiative, question the standing of parties bringing foreclosure actions.

**32.**    In other words, Florida Judges are now required, by law, uncritically to accept allegations of standing by dubious foreclosing plaintiffs who have no lawful right to invoke the Court's jurisdiction.  This rule was imposed after a decision by Judge Walt Logan of the Sixth Judicial Circuit in Pinellas County, handed down in August of 2005 and has become the norm during the present foreclosure crisis:

> **MERS** alleged that it is the owner and holder of the note and mortgage, and that allegation has not been contested by responsive pleading. Assuming that the complaint properly states a cause of action to reestablish the note and that **MERS** can show prima facie proof of such allegations, **MERS** would have standing as the owner and holder of the note and mortgage to proceed with the foreclosure. We also note that the trial court's conclusion that **MERS** further lacked standing because one corporation cannot serve as the agent for another corporation is incorrect. *See* 2 Fla. Jur. 2d *Agency and Employment* § 3 (2005). Although the trial judge was particularly concerned about **MERS's** status as nominee of Aegis, in light of the allegations of the complaint, the language contained in the note and mortgage, and Azize's failure to contest the allegations, the issue of **MERS's** ownership and holding of the note and mortgage was not properly before the trial court for resolution at this stage of the proceedings. Accordingly, we reverse the dismissal and remand for further consideration.

### *Mortgage Elec. Registration Sys. v. Azize,* 965 So. 2d 151 (Fla. 2nd DCA 2007).

**33.**    Judge Walt Logan had rightly inquired on his own initiative into the standing of

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                9

9 of 93

parties who came to court consistently alleging lost notes. In so doing he exemplified the finest in American legal traditions. In establishing a rule that courts must not examine their own jurisdiction too carefully, the judge-made and applied norms of substantive and procedural analysis of mortgage-foreclosure law in Florida now function to mandate "willful ignorance and disregard" of massive violations of civil rights.

**34.** Accordingly, the Plaintiffs move and request that this United States (Federal) District Court declare and adjudge that the State Courts, attorneys, and Judges participate as fully knowing and intentional collaborators in the deprivation of private property without due process of law. The systemic preference for the mortgagees ("lenders" and "loan servicers") operates to violate 42 U.S.C. §§1981-1982 and therefore to deny property owners the full right to make and enforce contracts including the making, performance, and termination of contracts.

**35.** Further violations of §1981 in particular include denial of the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, such as, for example, the right to refuse to pay any person who cannot prove he is in legal and equitable privity of contract with an original contracting party, that is, a "holder in due course" of a contractual obligation such as a promissory note or other right to receive payments without further work or consideration (i.e., a "security" or "secured obligation"). The judicial perversion of Florida law by Florida courts has led to a civil rights crisis in addition to, adding insult to injury, regarding the financial crisis of mortgage foreclosures.

**36.** Quite simply, Plaintiffs ask that this Court declare and adjudge that the Judges and Clerks of the Florida Civil Courts, as state actors, over the past four years have decided, arbitrarily and capriciously, to uphold an illegitimate and corrupt mortgage finance system based on securitization of notes, in violation of 42 U.S.C.§1981 as well as all relevant Florida Statutes.

**37.** 42 U.S.C. §1981(a) provides that "**All persons within the jurisdiction of the**

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

10

10 of 93

**United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property" and**

38.     **further (in §1981(b) that** "For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship,"

39.     and in §1981(c) Protection against impairment that "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

40.     Plaintiffs submit that the language of 42 U.S.C. §1981 referring to "white" people or citizens of the United States is archaic, and that this court should follow the 2007 dictates of the United States Supreme Court that: "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." ***Miller v. Johnson***, 515 U.S. 900, 911, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995) (quoting ***Metro Broadcasting***, 497 U.S., at 602, 110 S. Ct. 2997, 111 L. Ed. 2d 445 (O'Connor, J., dissenting); internal quotation marks omitted)." ***Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1***, 551 U.S. 701, at 730, 127 S. Ct. 2738, at 2757-2758, 168 L. Ed. 2d 508, at 530 (2007).

41.     The point can simply not be overstated that "civil rights are for all people, in all circumstances, not just circumstances where racial discrimination is a factor---even middle class white people can be victimized by denials of equal protection and due process, even by the Courts." the Equal Protection Clause "protect[s] persons, not groups," ***Adarand***, 515 U.S., at 227, 110 S. Ct. 2997, 111 L. Ed. 2d 445 (emphasis in original). See ibid. ("[A]ll governmental action based on race--a group classification [***538] long recognized as 'in

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    11

11 of 93

most circumstances irrelevant and therefore prohibited,' *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S. Ct. 1375, 87 L. Ed. 1774 (1943)| --should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed" ((first emphasis in original); *Metro Broadcasting, supra*, at 636, 110 S. Ct. 2997, 111 L. Ed. 2d 445 (KENNEDY, J., dissenting) ("[O]ur Constitution protects each citizen as an individual, not as a member of a group" ); *Bakke*, supra, at 289, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (opinion of Powell, J.) (Fourteenth Amendment creates rights "guaranteed to the individual. The rights established are personal rights"). This fundamental principle goes back, in this context, to Brown itself. See *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S. Ct. 753, 99 L. Ed. 1083, 71 Ohio Law Abs. 584 (1955) (Brown II) ("At stake is the personal interest of the plaintiffs in admission to public schools . . . on a nondiscriminatory basis" (emphasis added)). For the dissent, in contrast, "'individualized scrutiny' is simply beside the point." 168 L. Ed. 2d, at 608. *Idem: Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. at 741, 127 S.Ct. at 2764, 168 L.Ed.2d at 536-537 (2007).

**42.**     Plaintiffs allege that the abuses now rampant in and approved as a matter of local custom, practice, and policy having the force of law in the Florida State Courts, permitting foreclosure suits by legal (artificial) persons or corporate entities who present papers clearly indicating their own lack of standing to sue constitute an impairment of the rights secured by 42 U.S.C. §1981 under color of State Law, even though the letter of Florida State Law is totally to the contrary.

**43.**     Civil Rights Intervention in the Nationwide Mortgage Foreclosure Crisis, to insure equal application of the laws and equal protection under the laws to all people, is the appropriate role of the Federal Courts, and hence an appropriate exercise of the equitable and injunctive powers recognized by the Supreme Court in each of three major cases: *Dombrowski v. Pfister, Younger v. Harris,* and *Mitchum v. Foster*.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                12

12 of 93

**44.**     At the present time Florida Courts now grant tens of thousands of foreclosures to foreclosure Plaintiffs who have no standing, in cases where there is accordingly no jurisdiction, as a direct and proximate result of the ***MERS v. Azize*** (2nd DCA and related opinions) where the traditional obligation of courts continually to examine the bases for and validity of their own jurisdiction is turned on its head, and Judge Walt Logan and others were and are still instructed not to inquire into such matters, basically because they might upset the securitized mortgage cart.

**45.**     Now, accordingly, tens of thousands of court proceedings in Florida approve allow illegal foreclosures, and they do so pursuant to a state-mandated substantive or procedural norm which is actually and directly contrary to the plain statements of State and Federal Statutory and Constitutional Law.

**46.**     Of course, individual Florida courts, judges, and clerks, remain free to protect their friends rights and the rights of clients of favored attorneys, and so the system now denies rights by cronyism and favoritism, allowing Judges merely by arbitrary election and caprice to protect the rights of some citizens (with favored lawyers, or a great deal of money to litigate) to the full protection of their rights to make and enforce or avoid contracts according to law, and such a system based on cronyism constitutes an arbitrary and capricious, irrational, and purposeless (and hence destructive) denial of substantive and procedural due process of law.

**47.**     The Defendant US BANK, N.A., has scheduled a wrongful sale of Plaintiffs' property for Monday, August 31, 2009, and announced the same by publication in Palm Beach County, Florida, must be stayed to prevent great and irreparable injury to the plaintiff should the eviction occur as scheduled. (See Plaintiffs' Application for Temporary Restraining Order, filed in this case on Friday, August 28, 2009).

**48.**     Plaintiffs Marsha and Robert Rivernider are "Consumers" within the meaning of Florida Statutes 501.203(7) and request the court for a Restraining Order enjoining and

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    13

13 of 93

restraining the named Defendants from foreclosure on plaintiffs on the subject property pursuant to **Florida Statutes 501.201-501.202 et seq.** to enjoin and restrain the Defendants from continuing to engage in Deceptive and Unfair Business Trade Practices, as more fully set forth in this Complaint their Application for TRO.

49.    The Deceptive and Unfair Business Trade Practices engaged in by Defendants include, but are not necessarily limited to, continuous promises to modify or restructure the payments of the loan and the promise of relief through arbitration.

50.    Until such time as Defendant US BANK, N.A. as Rivernider's illegal and unauthorized mortgage loan servicer can provide to the Plaintiffs a detailed analysis of the amounts it contends are due and owing on the note and deed of trust at issue, and provides a breakdown of the amounts due and owing on the note and deed of trust, Plaintiff requests the entry of an injunction to enjoin Defendant's actions pursuant to Florida Statutes 501.211.

51.    Plaintiffs will be irreparably injured if the parties are not enjoined in that they will suffer complete loss of their unique real property, which is not capable of being duplicated, loss of all of her equity, loss of the right of possession and to live in their property, including the right of quiet enjoyment, would be uprooted and have their family uprooted from their community, and would suffer great personal injury, including defamation of his credit, the infliction of emotional distress upon Plaintiffs which has already under duress due to their collective medical conditions, may well become homeless, and suffers other damages personal to Plaintiffs.

52.    Any potential harm to Defendants is slight when compared to the damage to be suffered by Plaintiffs and the equities balance and tip heavily in favor of Plaintiffs.

53.    Plaintiffs have no other adequate remedy at law.

54.    Plaintiffs seek entry of a preliminary injunction on a ex parte basis without notice to the named Defendant in that, were the defendants given advance notice of these

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    14

14 of 93

proceedings they would in all likelihood seek to accelerate the damage Plaintiff seeks to apprehend. Plaintiff has a good likelihood of prevailing on the merits of claim due to the nature and extent of Defendant's violations.

**55.**    Plaintiffs request that the restraining Order be issued without bond as Plaintiffs are unable to afford a bond of any kind or type. Plaintiffs will suffer extreme hardship in the absence of stay given their poor health and age. Defendants will not be irreparably injured by the issuance of a stay given the present economic climate and the obscene profits defendants already have made.

### SECOND CAUSE OF ACTION: RELIEF BY FORECLOSURE ACCOUNTING

**56.**    Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 1-55 of this Complaint as if the same were fully recopied and restated herein below.

**57.**    A controversy exists between Plaintiffs and Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS with respect to the correct amount of money that is actually owed by Plaintiffs MARSHA & ROBERT RIVERNIDER to Defendant (if any).

**58.**    Defendant has consistently refused to provide an accurate accounting of the HANDLING OF THE NOTE or to allow Plaintiff's representatives to audit defendant books and records as they relate to accounting of the transfers and sales of the note so clearly identified in Exhibit A, nor how these somehow lead to US BANK, N.A.,.

**59.**    Plaintiffs allege that accounting should include a submission of the Original Note that the Defendants should possess as "holders in due course" to a forensic analysis and full actuarial statement regarding EACH transaction relating to the ownership, interest, and securitization of the note.

**60.**    Plaintiffs contest that without the privity of contract or original note the sum will forever and indefinitely be disputed because without said note Plaintiffs believe that the

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

15

15 of 93

Defendants have no right to collections of any kind.

**61.** As a result the correct amount of money due and owing from Plaintiff to Defendants remains in dispute and cannot be determined without an accounting and a submission of evidence.

**62.** Therefore Plaintiffs require that Defendants make available its books and records (only as they relate to Plaintiffs alleged loans) in order that Plaintiff may have a qualified representative audit the books, records, federal reserve collateral and borrower in custody agreements to determine the accounting of the financial transaction(s) made regarding the note or the securitization of said note.

**COUNT 3: UNFAIR DEBT COLLECTION
PRACTICES & PREDATORY LENDING**

**63.** Plaintiffs reallege paragraphs 1-62 and incorporate all material allegations and legal contentions of the same as if fully set forth and recopied herein.

**64.** Plaintiffs are informed and believe and thereupon allege that the Defendants and each of them, in taking the actions aforementioned, have violated provisions of Florida Statutes, as well as the Federal Fair Debt Collections Act, 15 U.S.C., Title 41, Subchapter V. §§ 1692 et seq, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601-2617.

**65.** The Court should determine whether or not the defendants have violated Florida state securities laws by fraudulent sales of previously sold and securitized (e.g., within the meaning of Florida Statutes, sold and transferred) notes when in fact they are not selling them, merely transferring the collection rights under the servicing agreement.

**66.** A judicial determination is appropriate to determine the plaintiff's rights and duties with regards to the property loans and/or foreclosure. A declaration of rights and duties of the parties by the court is necessary to determine the actual status and validity of the loan and any rights, duties, and/or obligations to be enforced.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    16

16 of 93

**67.**     Plaintiffs are informed and believe that they alleged grounds for cancellation of the mortgage documents and deeds of trust for cause as stated herein and specifically as the character and relationship of the parties, the existence of the ground for recovery, including fraud, false representations, or impossibility of performance, defendants' failure to perform, and the inadequacy of a remedy at law.

**68.**     The court should declare that laches applies to bar the alleged debt collector, or, since the trustee failed to comply with the Fair Debt Collection Practices Act in order to proceed to trustee sale of the property, the trustee is equitably estopped from taking any further action against the subject property.

**69.**     There is no uniformly accepted definition of "predatory lending." However, the United States Department of Housing and Urban Development ("HUD") has defined predatory lending as lending "involving deception or fraud, manipulation of borrowers through aggressive sales tactics, or taking unfair advantage of a borrower.

**70.**     Since predatory lenders are constantly developing new techniques to take advantage of borrowers, it is generally accepted by the lending industry and government agencies that monitor that industry that predatory lending practices include engaging in aggressive, high pressure and/or misleading tactics. Defendants, and each of them, engaged in this kind of conduct toward the Plaintiffs.

**71.**     Defendants and each of them is directly or though agents or employees entities or persons actively involved in the extension of credit as said term is defined under the Truth in Lending Statute (TILA). Said Defendants subject to the requirements of the Truth in Lending Act have violated the requirements of the said act in that among other things:

    a. They have failed to validate and otherwise make a full accounting and
    required disclosures as to the true finance charges and fees.

    b. They have improperly retained funds belonging to Plaintiff in amounts to
    be determined.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                17

17 of 93

c. To disclose the status of the ownership of said loans.

**72.**     Plaintiffs further alleges that these violations are such as to require rescission and or cancellation of the loan herein and return of all funds received by Defendants from Plaintiffs.

**73.**     Plaintiffs alleges that Defendants and each of them are such as to fall within the requirements of the Real Estate Settlement Procedures Act (RESPA), and placed loans for the purpose of unlawfully increasing and otherwise obtaining yield spread fees, excess charges and amounts in excess of what would have been lawfully earned.

**74.**     In addition to the requirements of RESPA, LENDERS acted either individually or jointly as "Servicers as that term is used within the act and either individually or jointly violated the requirements of 26 USCA § 2605 (b) in that the servicing contract or duties there under were transferred or hypothecated with out required notice.

**75.**     Plaintiffs allege that these violations are such as to require rescission and/or cancellation of the loan herein on and return of all funds received by Defendants from Plaintiffs.

**76.**     Plaintiffs further allege that they are entitled to compensatory damages and an amount to be determined at trial.

### COUNT 4: DECLARATORY JUDGMENT: NO VALID CONTRACT EXISTS

**77.**     Plaintiffs reallege the above and foregoing paragraphs ¶¶1-76 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**78.**     Under Florida law, as defined both by common law judicial precedent and statute, a contract requires a promise which is bargained for as consideration if, but the contract will only be valid if, the promised performance would be consideration.

**79.**     The April 24, 2006, Mortgage between Marsha G. Rivernider, Robert H. Rivernider, and CHALLENGE FINANCIAL INVESTORS, CORP., is unenforceable and void as there are NO PROMISES constituting consideration made or intended by CHALLENGE

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

18

18 of 93

FINANCIAL INVESTORS, CORP., to the alleged Lender. The Alleged LENDER (somehow the mysteriously disconnected predecessor in interest to Defendant US BANK, N.A.) did not even promise to make lend money, or recite that it had ever delivered money to the RIVERNIDERS (Exhibit C).

**80.**    A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice or alternative performances. Words of promise, which by their terms make performance entirely optional with the promisor do not constitute a promise.

**81.**    Where the apparent assurance of performance is illusory, it is not consideration for the return promise. An "agreement to do or not to do a certain thing" which requires mutual promises of detrimental undertaking between at least two parties; the detrimental undertakings are the bargained for exchange known as "consideration." ***Office Pavilion S. Fla., Inc. v. ASAL Prods., Inc.,*** **849 So. 2d 367 (Fla. 4th DCA May 21, 2003).**

**82.**    CHALLENGE FINANCIAL INVESTORS CORP, did not promise anything to the RIVERNIDERS. Accordingly, even if there IS privity of contract between Challenge, US BANK, N.A., and the RIVERNIDERS, which the Plaintiffs categorically deny, based on the evidence in Exhibit A, there is no enforceable contract because there were no BARGAINED FOR consider or detrimental promises which would constitute the same.

**83.**    In that vain the Court may search the pleadings for any promise made on behalf of CHALLENGE, which would constitute consideration TO as opposed to FROM the Rivernider's. A promise, which is bargained for is consideration if, but only if, the promised performance would be consideration.

**84.**    A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice or alternative performances. Words of promise which by their terms make performance entirely optional with the promisor do not constitute a promise. Where the apparent assurance of performance

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    19

19 of 93

is illusory, it is not consideration for the return promise. *Office Pavilion S. Fla., Inc. v. ASAL Prods., Inc.,* 849 So. 2d 367.

**85.**    Plaintiffs further allege that the RIVERNIDERS' obligation to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS constituted and was treated as an asset to U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS providing only detriment from the Plaintiffs but incurring no detriment on their part nor without any benefit flowing from U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS and therefore not constituting valid consideration within the meaning of binding Florida precedent.

**86.**    A contract concerning real property is not binding on either party unless its obligations are mutual and reciprocal.

**87.**    An unenforceable contract as between the two original parties transfers no right to title or interest in said property; MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER's contract with U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS lacked bilateral detriment and mutuality and is therefore unenforceable by U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS.

**88.**    Where one party elicits promises from another but neither promises nor undertakes any action detrimental to itself, that party has not "contracted" with the other.

**89.**    Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS neither promised nor did transfer its own money to the RIVERNIDER'S.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

20

**90.** In the definitions and on page 3 of the Mortgage, Exhibit C, tendered by US BANK in the state action below, it is recited that "Borrower Covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the property and that the property is unencumbered, except for encumbrances of record...."

**91.** On page 1, item (F) of the same Mortgage the term "loan" is defined as "the debt evidence by the note, plus interest, any prepayment charge and late charges due under the note, and all the sums due under this Security instrument, plus interest", nowhere is it affirmed or explained that the loan proceeds come from the "Lender";

**92.** Indeed it is specifically stated (again on page 1, this time in item (E)) that "the Note states that Borrower owes Lender SEVEN HUNDRED TWENTY-NINE THOUSAND AND 00/1000 dollars, plus interest" nowhere does "THE MORTGAGE" (Exhibit C) state that Challenge Financial Investors Corp ever delivered, or that Challenge Financial Investors was the lawful owner of the money some unidentified third party (E.g. Fannie Mae or Freddie Mac or the Federal Reserve Banking System) was delivering to Robert H. Rivernider or Marsha G. Rivernider, nor even that the money was advanced from any assets or capital funds actually owned by nor any "Draw" against the credit of Challenge Financial Investors Corp, nor any other indication Of Detrimental Action Promised or Undertaken by CHALLENGE OR any of its alleged successors in interest---U.S. Bank National Association, as Trustee for The C-Bass Mortgage Loan Asset-Backed Certificates, Series 2006-Cbs, as the apparent new Holder (whether entitled under Florida Law to "Holder in Due Course" status or not.....

**93.** It is a separate but valid question whether there is a real or reasonable Declaration of Trust or other valid grant by which "The C-Bass Mortgage Loan Asset-Backed Certificates, Series 2006-CBS" were placed into trust with U.S. BANK, N.A.;

**94.** Plaintiffs allege that U.S. BANK, N.A., will not be able to show any valid delivery of Mortgage Loan Asset-Backed Certificates as an act creating this trust, and Plaintiffs ask

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*      21

21 of 93

this Court to declare and adjudge that the "Trust" described in the title of the Florida Plaintiffs' case caption is nothing but another fraudulent disguise of the violation of Florida law perpetrated and perpetuated by the Florida "lenders" and "originators" who have securitized their mortgages improperly and for purposes of defrauding the consumer.

**95.**     Plaintiff ask this Court to order the production of the grantor's declaration or other initial, Trust-creating instrument binding the Defendants together with the C-Bass certificates, and the further to order an examination or accounting of the chain-of-title of and to all these certificates, including an accounting of all monies, properties, or projects lawfully invested in or paid or tendered in equitable consideration of these receipts, together with a particularized list of the Trust's equitable beneficiaries and legal owners and managers.

**96.**     Plaintiffs submit that such an accounting may show no lawful trustee-beneficiary connection at all, or else that the C-BASS Certificates are merely an artificial list of properties never properly transferred as a matter of legal or equitable right, title, or interest into any trust. IN other words, the C-BASS Trust is, in all probability, a fictitious entity never properly created for any purpose different other than that of Mortgage Servicing and Pooling identical to the Mortgage Electronic Registration System which was so roundly criticized by Judge Walt Logan in his August 2005 decisions, whose analysis Plaintiffs Pray this Court should firmly adopt. (Exhibit D).

**97.**     Also the Plaintiffs assert and allege that the suit brought by US BANK, N.A., in Florida was an act of Champtery, within the meaning of the United States (Federal) Court of Appeals Decision in ***Love Funding v Merrill Lynch*** 556 F.3d 100 (2nd Circuit, New York 2009): in that US BANK, N.A., in the case below, is being permitted by Florida Courts to act as assigned agents used as servicers to foreclosure, even though they have no right to such power as nominees or trustees.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

22

22 of 93

**98.**     The United States Court of Appeals for the Second Circuit held earlier this year in the above cited case that a licensed attorney is the only "hired hand" that can actively sell properties and that a nominee cannot simply "buy in" to loans with the idea of foreclosure. Plaintiffs allege that, Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS) is actually representing some unknown and perhaps unascertainable true Holder in Due Course and accordingly that US BANK NA did not even have the right to hire attorneys to file for judicial foreclosure in the Circuit Court of Palm Beach County as US BANK NA is not and never was 1) the holders of the note and 2) not hiring an attorney simply a "trustee".

**99.**     Plaintiffs allege and will show, pursuant to Florida Common and Statutory Law, that CHALLENGE FINANCIAL INVESTORS CORP provided nothing of any value to the Russells, and now U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS cannot show that it promised to transfer or did in fact transfer anything actually belonging to or possessed by U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS to the Plaintiffs;

**100.**     Wherefore, no valid encumbrance was created by the Mortgage or Mortgage Contract between MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER and CHALLENGE FINANCIAL INVESTORS CORP or the Rivernider's and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, despite the existence of a written instrument and any apparent affirmation of contract which may facially appear in that instrument.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                          23

23 of 93

**101.**    In short, the "loan" document does not indicate or even substantially suggest that CHALLENGE FINANCIAL INVESTORS CORP and subsequently Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS never actually took (nor promised to take) any action detrimental to itself.

**102.**    The sole purpose of the written instrument entitled "Mortgage" (attached here as Exhibit C) was to confirm and specify that the Plaintiffs MARSHA G. and ROBERH H. RIVERNIDER had given up things of value, to their own detriment, and would be required to give up more things of value, while CHALLENGE FINANCIAL INVESTORS CORP promised nothing, provided nothing, and promised only to collect the money which the "borrowers" were required to admit they owed, without any factual recitations regarding actual delivery or receipt of funds.

**103.**    Plaintiffs thus allege that CHALLENGE FINANCIAL INVESTORS CORP in fact did nothing (except to collect payments) and U.S. BANK NATIONAL ASSOCIATION, AS    TRUSTEE    FOR    THE    C-BASS    MORTGAGE    LOAN    ASSET-BACKED CERTIFICATES, SERIES 2006-CBS fraudulently holds itself out as a holder or trustee for the holder of certain securities, but in fact has simply filed suit for pure profit (with no real legal title or standing, nor any equitable investment or commitment to the transaction).

**104.**    Plaintiffs allege that this is standard mortgage finance industry practice, but that fact that U.S. BANK's conduct in this case, and the Florida Courts' actions in conformity therewith, is common practice, does not mean that common practice satisfies the Florida common or statutory law of contractual viability because the consideration for a promise must be an act or a return promise, bargained for and given in exchange for the promise.

**105.**    **In fact, as noted above, and in their Application for Temporary Restraining Order and Preliminary Injunction submitted together with this Complaint, Plaintiffs allege that all judges who unquestioningly process these loan-foreclosures knowingly**

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                        24

24 of 93

and intentionally participate in a fraud which results in a state-assisted taking of property without due process of law within the meaning of 42 U.S.C. §§1981-1982, in violation of equal protection in the rights to make, enforce, and enjoy all benefits of contractual relationships in the acquisition and maintenance of ownership of property.

**106.**    A mortgage is originated after a broker or "originating institution" receives a series of promises from a "borrower"; these promises take the form of a mortgage contract and a negotiable instrument known as a "promissory note."

**107.**    The originator typically neither promises nor undertakes any action detrimental to itself, while soliciting and receiving a large number of promises and actions detrimental to the note grantor or borrower.

**108.**    A promissory note is securitized by a transfer of the "borrower's" or grantor's note into a bundle of similar notes, group ranked and rated by FICO scores, date, location, and value of property, into a Mortgage-Backed Equity or Collateral Backed Obligation (MBE or CBO).

**109.**    Once a promissory note is transferred into a securitized bundle, the originator or initial lender is no longer "holder in due course" of said note as a matter of law, and is no longer in privity with the "borrower" or original grantor.

**110.**    U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS has taken the securitized Rivernider mortgage and note and in fact transferred legal and beneficial interest in that note to an unknown party or, even more duplicitous never bothered to get the original note from CHALLENGE FINANCIAL INVESTORS CORP in the first place.

**111.**    Wherefore and accordingly, Plaintiffs pray first that this Court will declare that the contract between MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER was unsupported by any detrimental promises or performance on behalf of either CHALLENGE

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                25

25 of 93

FINANCIAL INVESTORS CORP, or now U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, pursuant to mortgage finance industry and custom, and in additionally or in the alternative that this Court will declare and adjudge that CHALLENGE FINANCIAL INVESTORS CORP, having securitized the mortgage, was no longer the holder in due course of the Rivernider's note and had no right title or interest in the enforcement or collection of that note.

**112.**    Wherefore and accordingly, Plaintiff prays that this Court will declare and adjudge that no valid contract exists or ever existed between MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, and that quiet title should now be awarded accordingly.

**COUNT 5: U.S. BANK, N.A.,**
**KNEW OR SHOULD HAVE KNOWN**

**113.**    Plaintiffs reallege paragraphs ¶¶1-112 of this Complaint and incorporates the same by reference as if the same were fully copied and restated herein below.

**114.**    Plaintiffs allege that, in fact, US BANK, N.A., could not possibly have acted in good faith within the meaning of Florida Statutory or Common Law, because the contractual terms recited even in the Mortgage, are so one-sided and devoid of any obligation to perform any act on the part of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS that real estate professionals knew or should have known that they were in fact participating in and facilitating a fraud.

**115.**    Plaintiffs allege that the Defendants, in so acting with this case and with respect to many other mortgage or trust deed security instruments engage in a pattern and practice of utilizing the non-judicial foreclosure procedures of this State to foreclose on properties

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                    26

26 of 93

when they do not, in fact, have the right to do so, knowing the property owners affected do not have the knowledge and means to contest the right of said Defendants to do so.

**116.** Florida law does not afford any legal immunity or protection to fraudulent devices in mortgage finance, those practices of the Florida Courts which permit abuses such as evident in the case below should be declared evidence of the incompetence of the Florida Courts to protect fundamental and procedural rights of the people to due process protection of law in conformity with the law and constitutions of both the State and the Federal Governments, and that it is a custom, practice, and policy of the Florida Courts to permit suits which constitute both unconstitutional deprivations of property without due process of law and also impairments on the obligations of contract forbidden to the States and the Federal Government under the Constitution of the United States of America.

## COUNT 6: QUIET TITLE TO 9246 DELEMAR COURT WELLINGTON, FLORIDA 33414

**117.** Plaintiff Charles Edward Lincoln, III, realleges paragraphs ¶¶ 1-116 of this Complaint and incorporate the same by reference as if fully copied and restated herein below.

**118.** Plaintiff now sues for quiet title to 9246 Delemar Court, Wellington, Florida 33414 pursuant to the Florida Action to Quiet Title Statute contained in Section 65.061 of the Florida Statutes, which governs quiet title actions.

**119.** As authorized by Florida Statutes §65.061(1)-(2), Plaintiffs assert this claim to establish their title to against the adverse claims of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, its Trustee U.S. BANK, N.A.,, and all Jane and John Does that may or may not have a supposed interest in the title to the Rivernider homestead and marital estate.

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

27

27 of 93

**120.**    Plaintiffs define Jane and John Does as anyone who may have any supposed interest in Title. Plaintiffs believe that, given the current state of this economy (which is rife with fraud) that there could be other fraudulent parties, outside of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS that may assert ownership. Plaintiffs, though wary of fraud, welcome the appearance of the true Original Note Holder and also assign the title of John and Jane Does to any TRUE holder of the note, whether that holder turns out to be HSBC, UBS, or some anonymous numbered account holder of a nameless Swiss bank in Zurich.

**121.**    Jurisdiction and Venue are proper pursuant to the Florida Quiet Title Statutes because 9246 Delemar Court, Wellington, the principal property in question for which quiet title is sought, is located within the County of Palm Beach within the territorial jurisdiction of the United States District Court for the Southern District of Florida.

**122.**    Plaintiffs have filed a *lis pendens* as required by law with the County Clerk of Palm Beach, Florida. Pursuant to the Florida Statutes Plaintiffs identify the principal property as 9246 Delemar Court, Wellington, Florida 33414, as being legally described as:

> **Lot 1363, Block E, of Olympia-Plat II, according to the Plat thereof, as recorded in Plat Book 92, Page 1, of the Public Records of Palm Beach County, Florida, A.P.N.: 73424417020013630.**

**123.**    Plaintiffs ask and pray for relief that this Court to grant quiet title to the Plaintiffs, because U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS's encumbrance on the subject property entirely depends on a contract with MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER, which was either void *ab initio* or voidable by Plaintiffs as assignees and transferees (successors in interest) to MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER for the simple reasons that (a) CHALLENGE FINANCIAL INVESTORS CORP undertook not to assume and accept no

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    28

28 of 93

detriment to itself nor any entity under its control, and there was accordingly no mutuality of consideration, (b) even if CHALLENGE FINANCIAL INVESTORS CORP were a bona fide contracting party on origination, after securitization of the Riverniders' note, CHALLENGE FINANCIAL INVESTORS CORP surrendered its status as holder in due course of the Riverniders' note, and ceased to have any privity of contract with MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER., or their successors in interest whatsoever.

124.    And the same can certainly be said of the current mortgagor of interest and Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS.

125.    To this end, Plaintiffs ask this Court to devise a means of publishing or effectively noticing the purchasers of their securitized mortgage note to appear and answer this complaint or be forever barred from doing so, even if the John Does or Jane Does or Corporations who are the actual holder in due course of MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER's note reside or are incorporated or do business abroad.

126.    Plaintiffs reserve the right to amend this Complaint for Quiet Title further to conform with Florida or Federal law before any final determination of the legal sufficiency of this Complaint.

127.    Pursuant to Florida Statute 65.061, Plaintiffs pray that the Court will hold a hearing to examine into and determine Plaintiffs' Claims against all of the Defendants, and that upon Final Trial-by-Jury, demand for which is hereby made and tendered, that the Court will award Plaintiffs quiet title to their property, the subject of this lawsuit, ordering that all encumbrances and liens, including the Mortgage filed by or on behalf of Defendants U.S. BANK, N.A., CHALLENGE FINANCIAL INVESTORS CORPORATION, or any other party be ordered stricken and removed from the public property records of Florida, or else

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                                    29

29 of 93

expunged and marked as VOID if otherwise required to remain in the public property records of each relevant county.

**128.** WHEREFORE, Plaintiffs move and request that this Court declare and adjudge that U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS, NA does not have, and never had, any legal right, title, nor any equitable or beneficial interest in the enforcement of the Rivernider's note, and should be both temporarily and permanently enjoined from proceeding against 9246 Delemar Court, Wellington, Florida 33414.

### COUNT 7: QUIET TITLE

**129.** Plaintiffs MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER reallege ¶¶1-128 of this Complaint and incorporate the material allegations and legal contentions set forth within the same by reference as if fully copied and restated herein.

**130.** Plaintiffs MARSHA G. RIVERNIDER and ROBERT H. RIVERNIDER pray for Quiet Title to 9246 Delemar Court, Wellington, Florida 33414, pursuant to Florida law as against U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS and all persons or entities, including but not limited to TRUSTEE SERVICES, INC., who purports to act on behalf of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2006-CBS.

### TRIAL-BY-JURY

**131.** **Plaintiffs demand a trial-by-jury of all issues of fact so triable, and all mixed questions of law and fact which may be triable as a matter of controlling case law, and Plaintiffs demand an advisory jury on all other matters to the extent permitted by law, with appropriate instructions distinguishing the advisory from the deciding issues presented to the jury for resolution.**

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                    30

30 of 93

## PRAYER FOR RELIEF

Plaintiffs MARSHA G. RIVERNIDER, ROBERT H. RIVERNIDER, and

CHARLES EDWARD LINCOLN, III, together pray for judgment against all defendants

for the relief requested above, including but not limited to declaratory judgment regarding

the rights and status of each party in relation to the property at 9246 Delemar Court,

Wellington, Florida 33414, and the interests assigned to Plaintiff in such property and the

notes, transactions, and occurrences relating to the same.

Respectfully submitted,

Friday, August 28, 2009

By:_____

Robert H. Rivernider, Plaintiff, *in propia persona*
9246 Delemar Court, Wellington FL 33414
Telephone: (561) 315-2487

And By:_____
MARSHA G. RIVERNIDER, Plaintiff, *pro se*
9246 Delemar Court, Wellington, FL 33414

And By:_____
Charles Edward Lincoln, III
c/o Peyton Yates Freiman
Tierra Limpia/Deo Vindice
603 Elmwood Place, Suite #6
Austin, Texas 78705

Telephone: (512) 968-2500; (512) 923-1889
E-Mail: charles.lincoln@rocketmail.com

Facsimile: *eFax: 419.844.9142*

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*                31

31 of 93

## CERTIFICATE OF SERVICE

In addition to seeking issuance of summons from the U.S. District Clerk on Defendant US BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE C-BASS MORTGAGE LOAN ASSET_BACK CERTIFICATES, SERIES 2006-CBS, Plaintiffs served a true and correct copy of this above-and-foregoing Original Complaint by Facsimile Transmission to the attorney or record in the State Action herein complained of, to wit Case No. CA-08-036061-AW, in the Circuit Court in and for Palm Beach County, Florida, to wit:

Lauren Ann Cascino, Esquire,
Butler & Hosch, P.A.,
3185 South Conway Road, Suite E,
Orlando Florida, 32812,
Telephone 407--381-5200;
Facsimile: 407-381-5577

On this Friday 28th day of August 2009.

Charles Edward Lincoln, III
603 Elmwood Place, Suite 6
Austin, Texas 78705

(512) 923-1889

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

32

32 of 93

# EXHIBIT A:
## *PROMISSORY NOTE*
## *"ADJUDSTABLE RATE BALLOON NOTE"*
## *Dated April 24, 2006*
## *With Endorsements "Without Recourse"*
## *From*
## *CHALLENGE FINANCIAL INVESTORS CORP.*
## *To*
## *NEW CENTURY MORTGAGE CORP.*
## *And*
## *By*
## *New Century Mortgage Corp*
## *Without recourse, apparently payable to*
## *Nobody?  Everybody?*
## *The Court Should Determine*
## *How Many Times this Note was paid &*
## *Satisfied IN FULL or IN PART*

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*
*Final Typescript Prepared, Reviewed & Edited by CEAL IV*

33

33 of 93

Loan Number: 1007470658

# ADJUSTABLE RATE BALLOON NOTE

## (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

APRIL 24, 2006          ST. PETERSBURG                 FLORIDA
[Date]                       [City]                                    [State]

9246 DELEMAR COURT, WELLINGTON, FLORIDA 33414
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 729,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is CHALLENGE FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      8.925   %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.    PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the   1st   day of each month beginning on JUNE 1       ,
2006     . My monthly payments will be based on an assumed   40    -year amortization period (the "Amortization Period"). I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 1, 2036
I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

NCMC - ADJUSTABLE RATE BALLOON NOTE (FL)
RE-519  01/18/06                              Page 1 of 5                    DocMagic *eForms* 800-649-1362
                                                                                          *www.docmagic.com*

34 of 93

I will make my monthly payments at 360 CENTRAL AVENUE, SUITE 600, ST. PETERSBURG, FLORIDA 33701

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 5,581.17 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the 1st   day of MAY, 2008 , and on that day every 6th   month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 300/1000 percentage point(s) ( 6.300 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.425 % or less than 8.925 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 15.925 %. My interest rate will never be less than 8.925 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

NCMC - ADJUSTABLE RATE BALLOON NOTE (FL)
RE-519 01/18/06                                     Page 2 of 5                    DocMagic *eForms* 800-649-1362
                                                                                   www.docmagic.com

35 of 93

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me.  The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15      calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 5.000 % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

NCMC - ADJUSTABLE RATE BALLOON NOTE (FL)
RE-519  01/18/06                                          Page 3 of 5                    DocMagic *eForms* 800-649-1362
                                                                                         www.docmagic.com

36 of 93

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

NCMC - ADJUSTABLE RATE BALLOON NOTE (FL)
RE-519 01/18/06

Page 4 of 5

*DocMagic eForms* 800-649-1362
www.docmagic.com

37 of 93

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


*Marsha G. Rivernider*   (Seal)
_____   (Seal)
MARSHA G. RIVERNIDER      -Borrower                              -Borrower


_____   (Seal)          _____   (Seal)
                          -Borrower                              -Borrower


_____   (Seal)          _____   (Seal)
                          -Borrower                              -Borrower


NEW CENTURY MORTGAGE CORPORATION

PAY TO THE ORDER OF:
WITHOUT RECOURSE

CHALLENGE FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION

BY: _____

ITS: VP


Pay to the order of, without recourse
New Century Mortgage Corporation
By: _____
Steve Nagy
V.P. Records Management


                                                    *[Sign Original Only]*

Loan Number:  1007470658

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this  24th  day of  APRIL 2006                    and is
incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure repayment of Borrower's Note to CHALLENGE
FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION   (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note
and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such
inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and
Lender further covenant and agree as follows:

**5.    BORROWERS RIGHT TO PREPAY**
       I have the right to make prepayments of principal any time before they are due.  A payment of
principal only is known as a "prepayment".  When I make a prepayment, I will tell the Note Holder
in writing I am doing so.  The Note Holder will use all of my prepayments to reduce the amount of
principal that I owe under this Note.  If I make a partial prepayment, there will be no changes in the
due dates of my monthly payments unless:  the Note Holder agrees in writing to those changes.  My
partial prepayment may reduce the amount of my monthly payments after the first Change Date
following my partial prepayment.
       If within  2    year(s) from the date of execution of the Security Instrument, I make a full
prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-
month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will
pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the
amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY
PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.

*Marsha G. Rivernider* _____

MARSHA G. RIVERNIDER

_____          _____

_____          _____

NCMC GENERIC PREPAYMENT RIDER                    *DocMagic eForms* 800-649-1362
RE 103  REVISED (020800)                          www.docmagic.com

# EXHIBIT B:
# Warranty Deed to
# Charles Edward Lincoln, III

*Marsha G. Rivernider et. al. v. U.S. Bank, N.A., August 27, 2009*

CFN 20090292988
OR BK 23409 PG 1611
RECORDED 08/25/2009 15:55:37
Palm Beach County, Florida
AMT 10.00
Doc Stamp 0.70
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1611 - 1612; (2pgs)

**RECORDING REQUESTED BY**
**WHEN RECORDED MAIL TAX STATEMENTS TO:**
CHARLES LINCOLN
C/O PEYTON FREIMAN
603 ELMWOOD, # 6
AUSTIN, TEXAS, 78705

## WARRANTY DEED

Property address: 9246 Delmar Ct., Wellington, FL 33414

On this the 25th day of August, 2009, MARSHA G. RIVERNIDER whose mailing address is, 469246 Delmar Ct., Wellington, FL 33414 did execute this deed, for the sum of TEN AND 00/100's ($10.00) Dollars hereby conveying, delivering, granting and transferring all the legal right title, and equitable interest, without division or reservation, to Charles Edward Lincoln, a resident of the state of Texas, with mailing address (c/o Peyton Freiman) 603 Elmwood #6, Austin, TX, 78705, in the following described land, situated, lying, and being located in Palm Beach County, Florida to wit:

> **Lot 1363, Block E, of OLYMPIA – PLAT II, according to the Plat**
> **thereof, as recorded in Plat Book 98, Page 1, of the Public Records**
> **of Palm Beach County, Florida.**

Grantor fully guarantees, promises, and warrants to the grantee that there are no undisclosed claims, deeds, liens, encumbrances, or other liabilities associated with, relating, or attaching to, or affecting the property, subject of this transaction in any way.  All claims or encumbrances, including all those which might be disputed or contingent, have been enumerated, itemized, and fully disclosed to the grantee after the grantor's diligent search of all relevant and accessible public and private records, stipulation to the conduct of which diligent search is hereby made.

**TO HAVE AND TO HOLD**, the same in fee simple forever.

Signed and executed in Palm Beach County, Florida on this the 25th day of August, 2009 for ten dollars in hand and other valuable consideration.

In witness whereof, Grantor has hereunto set Grantor's hand and seal on this 25th ay of August, 2009. Signed, sealed, and delivered in our presence:

GRANTOR , MARSHA G. RIVERNADER

*Warranty Deed to Charles Edward Lincoln*                     1

## WITNESSES & NOTARY

*Theresa Rivernider*
_____
1st Witness Signature

*THERESA RIVERNIDER*
_____
1st Witness Name

*8525 VIA BRILLIANTE*
_____
1st Witness Address

*WELLINGTON FL 33411*
_____
1st Witness City, State and Zip

*Pauline Hydro*
_____
2nd Witness Signature

*P Hydro*
_____
2nd Witness Name

*2625 STATE Rd 7*
_____
2nd Witness Address

*Wellington, FL 33414*
_____
2nd Witness City, State and Zip

### NOTARY'S JURAT

Before me, on this the 26 day of August, 2009, MARSHA G. RIVERNIDER
appeared before me to execute and acknowledge this document, and having
been duly sworn on his oaths did acknowledge this Warranty Deed from
MARSHA G. RIVERNIDER to Charles Edward Lincoln III

*Pauline Hydro*
_____
Notary Public, State of Florida

*Pauline Hydro*
_____
Printed Name of Notary

PAULINE HYDRO
Notary Public, State of Florida
Commission# DD676250
My comm. expires May 20, 2011

_____
Commission Expires

**Warranty Deed to Charles Edward Lincoln**                    2

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office.
THIS 26 DAY OF AUG, 20 09
SHARON R. BOCK
CLERK & COMPTROLLER
By _____
DEPUTY CLERK

FILE NUM: 20090281031 OR BOOK/PAGE 23407/0621 DATE: 08/24/2009 15:11:03 Pgs 0621 - 0623, (3pgs)
Sharon R. Bock, CLERK & COMPTROLLER

## ASSIGNMENT & ASSOCIATED RIGHTS IN NOTES & OBLIGATIONS

On this the 21st day of August, 2009, MARSHA G. RIVERNIDER, whose address is: 9246 Delemar Ct., Wellington, FL 33414, executed this Assignment of Rights to grantee Charles Edward Lincoln, III, for the purpose of executing a supplemental warranty deed.

Wherefore, by all to whom this document may come, let it be known that said grantor, assignor, transferor, MARSHA G. RIVERNIDER ---for and in consideration of the sum of $10.00 (ten and no/100 dollars) and other good and valuable considerations from said assignee and transferee Lincoln, the receipt and sufficiency of which is hereby acknowledged---has granted (and did on August 21st, 2009, actually deed, grant, sell, and transfer) unto Charles Edward Lincoln, and does hereby now confirm the sale and transfer of all of her contractual rights, equitable interests, and statutory claims to Lincoln as Grantee. The Grantor has also specifically assigned and transferred all other legal claims of whatever origin or description, arising from, concerning, or touching upon those certain lots or parcels situated in the Village of Wellington, County of Palm Beach County, Florida more commonly known as 9246 Delemar Ct, Wellington, FL 33414 but formally and fully described as a single family house as set forth in bold print below.

Furthermore, without any express or implied limitation whatsoever, grantor MARSHA G. RIVERNIDER has specifically assigned, granted, and transferred all of her statutory, legal, equitable, and contractual interests in the notes, claims conveying, delivering, granting, and transferring all her legal rights, title, and equitable interests in the herein-described land or real estate, situated, lying and being located in Village of Wellington, Palm Beach County, Florida and as well as the obligations to which he granted or contractually agreed to undertake with any party arising from and associated with the following described land or real estate, situated in Palm Beach County, Florida:

**Lot 1363, Block E, of OLYMPIA – PLAT II, according to the Plat thereof, as recorded in Plat Book 98, Page 1, of the Public Records of Palm Beach County, Florida.**

## WARRANTY DEED CONFIRMED

And said grantor, assignor, transferor MARSHA G. RIVERNIDER, does hereby confirm and reaffirm that she, by separate document, has fully and irrevocably deeded, granted, transferred, and warranted unto Charles Edward Lincoln, III, all of her legal and equitable rights, title, and interest in the land and real estate, situated in Palm Beach County, Florida in the Village of Wellington, as well as her claims to and arising from

any and all notes, contracts, and obligations which he granted or contractually agreed to with respect to any party to Charles Edward Lincoln, III, to have and to hold, from this day forward, without limitation or qualification whatsoever.

In witness whereof, the grantor, assignor and transferor set unto grantor's hand and seal the day of the above-and-foregoing quit claim deed, to wit 21st day of August, 2009.

Signed, sealed and delivered in my presence:

_Marsha G. Rivernider_

GRANTOR, MARSHA G. RIVERNIDER
9246 Delemar Ct.
Wellington, FL 33414

## WITNESSES & NOTARY

_Robt Rivernider_
1st Witness Signature

_RoBeRT RiveRNideR_
1st Witness Name

_9246 DeLoMARct_
1st Witness Address

_Wellington, FL 33414_
1st Witness City, State and Zip

_Theresa R. Rivernider_
2nd Witness Signature

_THeRESA R. RiveRNideR_
2nd Witness Name

_____

*Assignment and Transfer of Claims, Interests, and Rights to Charles Edward Lincoln*     2

2nd Witness Address

8525 Via Brilliante

2nd Witness City, State and Zip

Wellington FI 33411

## *NOTARY'S JURAT*

The above-and-foregoing Assignment of Associated Rights in Notes and Obligations from Grantor MARSHA G. RIVERNIDER to Grantee Charles Edward Lincoln, III, was executed and acknowledged personally before me on this _____ the 21 day of August, 2009

NOTARY'S OFFICIAL SEAL HERE BELOW:

_____
Notary Public, State of Florida

PAULINE HYDRO
Notary Public, State of Florida
Commission# DD676250
My comm. expires May 20, 2011

_____
Pauline Hydro
Printed Name

_____
My Commission Expires

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office.
THIS 24 DAY OF AUG , 20 09
SHARON R. BOCK
CLERK & COMPTROLLER
By_____
DEPUTY CLERK

*Assignment and Transfer of Claims, Interests, and Rights to Charles Edward Lincoln*    3

# EXHIBIT C:
## "MORTGAGE" dated April 24, 2006
## regarding
## 9246 Delemar Court
## Wellington, Florida 33414

*15977291*
*NEW319*

This Instrument Prepared By: **06-6858**

CFN 20060265896
OR BK 20296 PG 1660
RECORDED 05/05/2006 10:08:00
Palm Beach County, Florida
AMT 729,000.00
Deed Doc 2,551.50
Intang 1,458.00
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1660 - 1682; (23pgs)

After Recording Return To: **WlC #66**
CHALLENGE FINANCIAL INVESTORS, CORP.
360 CENTRAL AVENUE, SUITE 600
ST. PETERSBURG, FLORIDA 33701
Loan Number: 1007470658

**TROPICAL LAND TITLE**
**INSURANCE AGENCY, INC.**
1005 W. Indiantown Road #201
Jupiter, Florida 33458

——— [Space Above This Line For Recording Data] ———

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   APRIL 24, 2006   , together with all Riders to this document.
**(B)** "Borrower" is   MARSHA G. RIVERNIDER, A MARRIED WOMAN, AND ROBERT H. RIVERNIDER, HER HUSBAND,

Borrower is the mortgagor under this Security Instrument.
**(C)** "Lender" is   CHALLENGE FINANCIAL INVESTORS, CORP.

Lender is a   FLORIDA CORPORATION                                          organized
and existing under the laws of   FLORIDA
Lender's address is   360 CENTRAL AVENUE, SUITE 600, ST. PETERSBURG, FLORIDA 33701
Lender is the mortgagee under this Security Instrument.
**(D)** "Note" means the promissory note signed by Borrower and dated   APRIL 24, 2006   .
The Note states that Borrower owes Lender   SEVEN HUNDRED TWENTY-NINE THOUSAND AND 00/100                                          Dollars (U.S. $ 729,000.00                )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   MAY 1, 2036   .
**(E)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(F)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

264861

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                          Page 1 of 15

DocMagic *CForms* 800-649-1362
www.docmagic.com

(G)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider          ☒ Planned Unit Development Rider
☐ Balloon Rider                  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider               ☐ Second Home Rider
☐ Condominium Rider              ☒ Other(s) [specify]
                                   ADDENDUM TO ADJUSTABLE RIDER,
                                   PREPAYMENT RIDER

(H)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K)  "Escrow Items" means those items that are described in Section 3.

(L)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                    Page 2 of 15          DocMagic *eFerms* 800-649-1362
                                                                        www.docmagic.com

48 of 93

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

|                  COUNTY | of  |       PALM BEACH | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

LOT 1363, BLOCK E, OF OLYMPIA-PLAT II, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 98, PAGE 1, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.
A.P.N.: 73424417020013630

which currently has the address of    9246 DELEMAR COURT

                                                                                    [Street]

WELLINGTON                        , Florida            33414                ("Property Address"):
        [City]                                                   [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    **UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
    1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

---

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                     Page 3 of 15                                     DocMagic *eForms* 800-649-1362
                                                                                                                    www.docmagic.com

49 of 93

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section

9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender

requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Page 6 of 15

DocMagic *eFarms* 800-649-1362
www.docmagic.com

52 of 93

are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **6.  Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **7.  Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **8.  Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    **9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument; including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

    Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

---

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any

---

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Page 9 of 15

DocMagic *eForms* 800-649-1362
www.docmagic.com

55 of 93

Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                    Page 10 of 15                         DocMagic *eForms* 800-649-1362
                                                                                        www.docmagic.com

56 of 93

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might

result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.**  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.**  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_MarSha G. Rivernider_ (Seal)
MARSHA G. RIVERNIDER        -Borrower
9246 DELEMAR COURT,
WELLINGTON, FLORIDA 33414

_Robt H. R_ (Seal)
ROBERT H. RIVERNIDER        -Borrower
9246 DELEMAR COURT,
WELLINGTON, FLORIDA 33414

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Signed, sealed and delivered in the presence of:

_____
Witness: GEE66 V. DAPATO

_____
witness:
                    **Wendy K. Foster**

---

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                          Page 14 of 15          DocMagic *eForms* 800-649-1362
                                                               www.docmagic.com

———————————————— [Space Below This Line For Acknowledgment] ————————————————

STATE OF FLORIDA
COUNTY OF   PALM BEACH

The foregoing instrument was acknowledged before me this         day of    **APR 2 4 2006**
by   MARSHA G. RIVERNIDER, AND ROBERT H. RIVERNIDER

who is personally known to me or who has produced
as identification.

(Type of Identification)

_Wendy K. Foster_
Signature _____

_____
Name of Notary

(Seal)

_____
Title

_____
Serial Number, if any

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                              Page 15 of 15                        DocMagic *eForms* 800-649-1362
                                                                                 www.docmagic.com

61 of 93

Loan Number: 1007470658

# ADJUSTABLE RATE RIDER

## (LIBOR Six-Month Index (As Published In *The Wall Street Journal* - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 24th day of APRIL, 2006 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to CHALLENGE FINANCIAL INVESTORS,
CORP., A FLORIDA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

9246 DELEMAR COURT, WELLINGTON, FLORIDA 33414
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of       8.925 %.  The unpaid principal of the
Note is being amortized over an assumed   40    -year period (the "Amortization Period").  The unpaid
principal of the Note is fully due and payable on the maturity date of the Note.  The Note provides for
changes in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the   1st  day of MAY, 2008 ,
and on that day every  6th   month thereafter.  Each date on which my interest rate could change is called
a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the
average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal.*  The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

---

NCMC - SIX MONTH LIBOR MULTISTATE BALLOON ADJUSTABLE RATE RIDER
RE-560  01/18/06                                                Page 1 of 3                          *DocMagic* €Ferms 800-649-1362
                                                                                                    *www.docmagic.com*

62 of 93

Loan Number: 1007470658

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal* - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 24th day of APRIL, 2006 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to CHALLENGE FINANCIAL INVESTORS,
CORP., A FLORIDA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

9246 DELEMAR COURT, WELLINGTON, FLORIDA 33414
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of      8.925 %.  The unpaid principal of the
Note is being amortized over an assumed   40    -year period (the "Amortization Period").  The unpaid
principal of the Note is fully due and payable on the maturity date of the Note.  The Note provides for
changes in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the   1st day of MAY, 2008            ,
and on that day every  6th  month thereafter.  Each date on which my interest rate could change is called
a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the
average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

---

NCMC - SIX MONTH LIBOR MULTISTATE BALLOON ADJUSTABLE RATE RIDER
RE-560  01/18/06                             Page 1 of 3          *DocMagic* **eForms** 800-649-1362
www.docmagic.com

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 300/1000 percentage points (   6.300  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  10.425  % or less than     8.925  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage points (   1.500  %) from the rate of interest I have been paying for the preceding    6     months. My interest rate will never be greater than  15.925 %. My interest rate will never be less than 8.925%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.


_Marsha G. Rivernider_ (Seal)
MARSHA G. RIVERNIDER   -Borrower

_Robert H. Rivernider_ ___ (Seal)
ROBERT H. RIVERNIDER   -Borrower


_____ (Seal)
-Borrower

_____ (Seal)
-Borrower


_____ (Seal)
-Borrower

_____ (Seal)
-Borrower


NCMC - SIX MONTH LIBOR MULTISTATE BALLOON ADJUSTABLE RATE RIDER
RE-560  01/18/06                         Page 3 of 3          *DocMagic eForms* 800-649-1362
                                                              www.docmagic.com

Loan Number: 1007470658

# ADJUSTABLE RATE RIDER ADDENDUM
## (LIBOR INDEX - RATE CAPS)

This Adjustable Rate Rider Addendum is made this 24th day of APRIL, 2006
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the
"Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note
to CHALLENGE FINANCIAL INVESTORS, CORP., A FLORIDA
CORPORATION                                                                                  (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:

9246 DELEMAR COURT, WELLINGTON, FLORIDA 33414
(Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the provisions
of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall prevail over and
supersede any such inconsistent provisions of the Note and/or Security Instrument and/or Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and
Lender further covenant and agree as follows:

**4.   (D) LIMITS ON INTEREST RATE CHANGES**
      The interest rate I am required to pay at the first Change Date will not be greater than
      10.425 % or less than        8.925 %. Thereafter, my interest rate will never be
increased or decreased on any single Change Date by more than ONE AND 500/1000
                              percentage point(s) (      1.500  %) from the rate of interest
I have been paying for the preceding   6      months. My interest rate will never be greater than
      15.925 % or less than       8.925 %.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable
Rate Rider Addendum.

_Marsha G. Rivernider_ (Seal)          _Robert H. Rivernider_ (Seal)
MARSHA G. RIVERNIDER   -Borrower      ROBERT H. RIVERNIDER   -Borrower

_____ (Seal)       _____ (Seal)
                      -Borrower                              -Borrower

_____ (Seal)       _____ (Seal)
                      -Borrower                              -Borrower

NCMC ADJUSTABLE RATE RIDER ADDENDUM                    DocMagic *eForms* 800-649-1362
RE-102  08/22/96                                              www.docmagic.com

Loan Number:   1007470658

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this   24th   day of   APRIL 2006                                    and is
incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure repayment of Borrower's Note to CHALLENGE
FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION      (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note
and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such
inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and
Lender further covenant and agree as follows:

## 5.     BORROWERS RIGHT TO PREPAY

I have the right to make prepayments of principal any time before they are due.  A payment of
principal only is known as a "prepayment".  When I make a prepayment, I will tell the Note Holder
in writing I am doing so.  The Note Holder will use all of my prepayments to reduce the amount of
principal that I owe under this Note.  If I make a partial prepayment, there will be no changes in the
due dates of my monthly payments unless:  the Note Holder agrees in writing to those changes.  My
partial prepayment may reduce the amount of my monthly payments after the first Change Date
following my partial prepayment.

If within   2      year(s) from the date of execution of the Security Instrument, I make a full
prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-
month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will
pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the
amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY
PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.

_Marsha G. Rivernider_
MARSHA G. RIVERNIDER

_Robt H. R_
ROBERT H. RIVERNIDER

NCMC GENERIC PREPAYMENT RIDER
RE 103  REVISED (020800)

DocMagic *eFerms*  800-649-1362
www.docmagic.com

Loan Number: 1007470658

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this     24th     day of
APRIL, 2006                      , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to   CHALLENGE
FINANCIAL INVESTORS, CORP., A FLORIDA CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

9246 DELEMAR COURT, WELLINGTON, FLORIDA 33414
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

OLYMPIA

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and
which provides insurance coverage in the amounts (including deductible levels), for the periods, and against
loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but
not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the
provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property
insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance
coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the
Owners Association policy.

---

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                          Page 1 of 3

*DocMagic eForms* *800-649-1362*
*www.docmagic.com*

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:  (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.**  If Borrower does not pay PUD dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                          Page 2 of 3

*DocMagic eForms* 800-649-1362
*www.docmagic.com*

69 of 93

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
MARSHA G. RIVERNIDER   -Borrower

_____ (Seal)
ROBERT H. RIVERNIDER   -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                    Page 3 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and exact copy of the foregoing was furnished by U.S.
Mail this _____ day of July 2009 to:

Marsha G. Rivernider
9246 Delemar Court
Wellington, FL 33414

Robert H. Rivernider
9246 Delemar Court
Wellington, FL 33414

Robert C. Martin, Esquire
Martin & Bennis, P.A.
319 SE 14th Street
Ft. Lauderdale, FL 33316-1929
Attorney for Defendant Olympia Master Association, Inc.

Lauren Ann Cascino, Esquire
BUTLER & HOSCH, P.A.
3185 South Conway Road, Suite E
Orlando, Florida 32812
Telephone: (407) 381-5200
Fax: (407) 381-5577
Florida Bar No: 0058339

# Exhibit D:
# Judge Walt Logan's August 2005
# Decision in MERS v. Azize---
# The Model for All Mortgage Foreclosure
# Analysis

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA

IN RE:

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. (MERS)

(See attached list of Defendants/Case #)
_____/

## ORDER REGARDING STANDING OF MERS
## TO FORECLOSE ON BEHALF OF OTHERS

Numerous cases have come before the undersigned Judge filed by Mortgage Electronic Registration Systems, Inc. (hereinafter referred to as MERS).    MERS is listed as either the Plaintiff or a Co-Plaintiff seeking to collect on a Note via mortgage foreclosure.   In all cases MERS is seeking to represent the interest of another corporate entity in the collection of a Note via foreclosure of a mortgage.   MERS describes its role as a "nominee" seeking to further the interest of another corporation.    The Court began raising a question as to the process wherein one corporation would represent another corporation's interest before the Bench.    The Court's raising the question on a case by case basis did not provide resolution.    Numerous attorneys represent the interest of MERS in the various cases and a single definite answer or legal argument was not forthcoming.

The Court issued an Order To Show Cause in approximately fifteen cases via a standard Order.    The initial Order was dated June 7, 2005 establishing a show cause hearing time as July 26, 2005 at 3:00 P.M. before the Bench.    The Order provided that additional cases that came to the

Court's attention would be added to the show cause docket. The Court observed a reasonable cut-off time period and by the time the docket was complete there were twenty-eight cases noticed under the standard Order To Show Cause.

The Trial Bench has a basic duty and authority to establish that the proper parties are before the Court. See <u>Morales v. All Right Miami, Inc.,</u> 755 So.2d 198 (Fla. 3rd DCA 2000) and <u>Dollar Systems, Inc. v. Detto</u>, 688 So.2d 470 (Fla. 3rd DCA 1977). The MERS files typically came to the Court's attention when a Motion for Summary Judgment was submitted. The Court would then have occasion to review the file and compare the allegations in the Petition for Foreclosure to the contents of the file. Without fail the review resulted in finding that the allegations in the Petition were not supported by what the Court viewed in the Court file. The standard allegation in the Complaint alleged that "...Plaintiff now owns and holds a mortgage note and mortgage..." The Court never found that allegation which is contained in all of the MERS Complaints to be supported by a review of the documents within the Court file.

The Court noted that in the Order To Show Cause that "...The Court is unclear as to how a corporation can sue as "Nominee" for another corporation. Corporations are generally not allowed to pursue matters without counsel and to the undersigned's knowledge, the law has not allowed one corporation to act as Nominee for another corporation in

2

bringing a lawsuit. No authority has been shown to the Court to support a corporation suing as "Nominee" of another corporation..."

The hearing on the Order To Show Cause was held before the Bench on July 26, 2005 commencing at 3:00 P.M. The matter has been reported with a transcript of ninety-eight pages.[1] The transcript will be referred to as (T_____) where appropriate in this Order. The Court has received memorandums on behalf of MERS and on behalf of some of the Defendants. The question has been well presented and argued to the Court by both sides of the issue.

The Court's inquiry as to whether the proper party was before the Court in the several MERS files was based upon review of numerous files. In <u>MERS v. Montalvo</u>, Case No. 04-001919CI-11, the Affidavit in Support of Summary Judgment filed by one Tracy Johnson on December 13, 2004 advised the Court that the Plaintiff (MERS) "...is the holder and owner of the note..." The same information was repeated in a form Affidavit from Angie Fleckenstein dated February 10, 2005. The information in the Affidavit was inconsistent with the exhibit to the Complaint which the Court reviewed and noted that First Union Mortgage Corporation was the lender. The inconsistency did not stop; a Lost Note Affidavit in the file alleging that the Defendants had executed and delivered a Promissory Note and "...that said note was assigned and delivered to Washington Mutual Bank, F.A. in its

---

[1] The Court will file the transcript in <u>MERS v. Azize</u>, Case No. 05-001295CI-11, where it will be available for review purposes as necessary.

3

office in Jacksonville, Florida...and that Washington Mutual Bank, F.A. is still owner and holder in due course of sole (sic) lost note..." The Lost Note Affidavit was signed by a Vice-President of Washington Mutual Bank, F.A. on March 2, 2004. The Summary Judgment sought in that case was denied based upon a failure to provide unrefuted proof in support of the Motion for Summary Judgment as to what entity or person owned the Note.

In <u>Mers v. Young</u>, Circuit Civil No. 05-000650CI-11, MERS sued as nominee for Countrywide Home Loans, Inc. The question as to proper party arose in Paragraph 2 of the Complaint where MERS identified itself as nominee for Amnet Mortgage, Inc. d/b/a American Mortgage Network of Florida. There are no allegations that would explain to the Court the relationship, if any, or bridge between Countrywide Home Loans, Inc., the lender, listed as Plaintiff via the "nominee" (MERS) and Amnet Mortgage, Inc. nor any allegations that would satisfy the Court that MERS as a corporation was representing the interest of another corporation before the Bench. Plaintiff filed a Motion for Summary Judgment which was set for hearing April 7, 2005. Upon review of the file the Court dismissed the Complaint allowing twenty days for the filing of an Amended Complaint by Order dated April 7, 2005. MERS filed a Voluntary Dismissal May 3, 2005.

In <u>Mers v. White</u>, Circuit Civil No. 05-001085CI-11, the Plaintiff sought Summary Judgment which led to the Court reviewing the file. The Complaint in Count I sought re-establishment of the Promissory Note. Later

4

in the file MERS filed the original Note with the Court which indicated the lender as First Family Mortgage and gave no indication of any interest in MERS. The standard allegation that MERS was the owner and holder of the subject Note and Mortgage was refuted by the documents submitted. During a telephone hearing the Court brought that inconsistency to the attention of counsel and was advised there was an Assignment to MERS on counsel's desk about to be sent to the Clerk for recording. The Court concluded its Order of April 27, 2005:

> "...The representation to the Court that this file was appropriate for Summary Judgment was not true. When the Court raised a question as to MERS' status in the file attorney Green advised that an assignment to MERS was on her desk about to be sent to the Clerk of Court for recording. This Court will not function as auditor or quality control for lenders seeking foreclosure on notes/mortgages. With regard to representations to the Court regarding Summary Judgment proceedings see <u>The Florida Bar v. Corbin</u>, 701 So.2d 334 (Fla. 1997).

> For reasons set forth above the Motion for Summary Judgment is DENIED.

> **IT IS SO ORDERED** in Chambers at St. Petersburg, Pinellas County, Florida this 27 day of April, 2005..."

The above cases are but a sampling of the manner in which the question came to the Court's attention. The Court has entered approximately a dozen Orders denying Summary Judgment until the Court is satisfied that one corporation can represent another corporation's interest as a "nominee" before the Bench. When the Court did not receive an adequate response to

5

those Orders, the Court accumulated the then pending files and proceeded under the Order To Show Cause method.

## The MERS Involvement

MERS' interest was argued by Robert Mark Brochin, Esquire at the return hearing on the Order To Show Cause. Counsel candidly acknowledged that MERS is not on any of the Promissory Notes. The Court made inquiry as to who owns the Note:

> "...THE COURT:   Who owns the note?
>
> MR. BROCHIN:   Well, the note starts with the original lender, and then as a negotiable instrument, under Article III of the Uniform Commercial Code, is transferred and passes hands and is endorsed over several times. So by the time it comes to foreclosure, it's not certain who has the beneficial interest in the note, But, for example, in the case –
>
> THE COURT:   What do you mean, it's not certain as to who has the beneficial interest in the note?
>
> MR. BROCHIN:   Well, the note can be transferred and sold through the secondary mortgage market, to the Jennie Maes (sic) and Freddie Macs of the world.
>
> THE COURT:   But at the time you come before the bench for foreclosure, doesn't it have to be certain who has the beneficial interest in the note?
>
> MR. BROCHIN:   Not who has the beneficial interest in the note. It has to be certain who has the right to enforce the note, and that's specifically what the memorandum points out..." (T 10-11)

MERS' response to the Court's inquiry as to the standing of MERS to proceed as a Plaintiff or as a "nominee" of a Plaintiff rests largely on possession of

6

the Note.  Counsel advised the Court that a requirement to show a chain of

title to the Note would not be reasonable.

> "...THE COURT:    So   you're   telling   me   that   possession   is
> sufficient.   It does not have to be signed over to MERS?
>
> MR. BROCHIN:    Yes...
>
> THE COURT:       Do you feel as though it would be reasonable
> for the Court to be presented with a chain of title as to where
> the note started and how it got to MERS?
>
> MR. BROCHIN:    No.  I do not.
>
> THE COURT:    You don't think that's reasonable?
>
> MR. BROCHIN:    I don't.   And, in fact, not only do I think it's
> not reasonable, often that's going to be impossible..." (T 22)

The Court inquired as to the flow of cash from the Clerk's office forward.

MERS indicated their corporation's interest in the Note did not include a

monetary interest, only a representative interest:

> THE COURT:      Say a note goes to foreclosure.    There's a
> sale, and for purposes of model, say there's $50,000 proceeds
> from the sale.   Where does that $50,000 ultimately end up?
>
> MR. BROCHIN:    Well, it doesn't end up in MERS, if that's the
> question.   MERS doesn't have the beneficial interest in the note.
> It travels back through the members of MERS, who will disburse
> it to the entities who are entitled to the proceeds.    And those
> would be what I would refer to as the beneficial interests, or the
> beneficial owners in the notes, whoever the entities are that own
> the interest to the proceeds of that note.
>
> So it would travel back through the servicer and back to
> the appropriate persons, because they've been authorized by the
> lenders or the investors to act on their behalf and to administer
> and enforce the notes.   They take their fee and they disburse
> the proceeds.

7

THE COURT:   So MERS is a collecting entity in that event.

MR. BROCHIN:   Well, MERS doesn't actually collect the money, no.   MERS is actually –

THE COURT:   Well, wait a minute.   The clerk gets the money.   Who does the clerk write the check to?

MR. BROCHIN:   Well, if they write the check to MERS, which would be fine, MERS would just remit it over.

THE COURT:   Well, who else would they write it to?

MR. BROCHIN:   Well, often they would write it to the servicer. I mean, are you talking about on a redemption right or a payoff, or are you talking about a —-

THE COURT:   Either one.   The clerk's sitting down there and they've got some money, either from a sale or redemption –

MR. BROCHIN:   They could write it to MERS, and MERS –

THE COURT:   Well, who do they write it to?

MR. BROCHIN:   I'm just saying.   MERS –

THE COURT:   Who would you expect the clerk to write it to, other than MERS, if they're the plaintiff?

MR. BROCHIN:   The clerk, I would expect to write it to MERS, because the clerk has no dealings at all with any but the named plaintiff.

THE COURT:   Then what happens to the money?

MR. BROCHIN:   Then MERS would, I think, just endorse it over and send it out to its member.

THE COURT:   MERS would never cash it?   They'd never cash the check from the clerk?

MR. BROCHIN:   I don't know if they would cash it or they would simply endorse it over to the proper member.

8

THE COURT:      Well, cashing and endorsing over are two very
different things.  Which one would it be?

MR. BROCHIN:   I don't know.

Do you know?      (counsel was inquiring of his client)

They would endorse it.

THE COURT:      I'm trying to get an understanding for what
goes on here.

MR. BROCHIN:   They would endorse it.

THE COURT:      Endorse it over to whom?

MR. BROCHIN:   To the MERS member who we brought the
action on behalf of.

THE COURT:      Who some people might call the real party in
interest.

MR. BROCHIN:   Or a servicer –

THE COURT:      Or a servicer?..."
(T 25 -28)

Counsel for MERS acknowledged that "...MERS doesn't have a beneficial

interest in the note..."   That raises the question to the Court as to whether

the corporation known as MERS is properly in Court representing a

corporation that does own the beneficial interest in the Note.   Counsel

further acknowledged that in a given case MERS might not know the identity

of the beneficial owner of the Note:

"THE COURT:      Don't you know who the beneficial owner is?

MR. BROCHIN:   Well, we may again not know the beneficial
owner, because we may get the note from –

9

THE COURT:    I thought you just told me when you get a check from the clerk's office you endorse it over to the beneficial owner?

MR. BROCHIN:    No, I think I said you endorse it over to the servicer who, in turn, would disburse it to the appropriate lenders or beneficial owners.

* * *

THE COURT:    So now, we're two entities removed from the real party in interest, the one who's going to get the money.

MR. BROCHIN:    No. No. Because the servicers are real parties in interest, and --..."    (T 30)

## Ancillary Concerns

Although the standing of MERS to represent the interest of the beneficial owner of the Note was the primary thrust of the return hearing, other matters did arise.   Mortgage foreclosure Complaints on occasion draw Counterclaims.    Inquiry was made as to how a nominee in the mix would affect a Counterclaim:

"THE COURT:    What happens if a defendant has a counterclaim?

MR. BROCHIN:    They certainly can initiate a counterclaim.

THE COURT:    Against MERS?

MR. BROCHIN:    If they've got a claim, certainly.

THE COURT:    How would they have a claim against MERS? They never did business with you?

MR. BROCHIN:    Well, it depends what the counter – I don't know what the counterclaim is.   And, also, it depends on the note..."    (T 28)

10

The Court is not well satisfied with that response.   Reading <u>Taylor, Bean &</u>
<u>Whitaker Mortgage Corporation v. Brown</u>, 583 S.E. 2nd 844 (GA 2003) it
appears that as a defendant MERS raised indispensable party as a defense.

The Complaints contain boilerplate Counts for establishment of a lost
note.   The Court noted in the Order To Show Cause that the allegations do
no more than repeat the statutory language with no case specific allegations
whatsoever.   Again, on many occasions the original Notes are submitted
with the explanation given at the return hearing that at the time of pleading
the person doing the Complaint to foreclose does not know whether the Note
can be found or not!

The position of MERS that a blank endorsement is enough for them to
proceed to Court as a real party in interest would seem to provide a
substantial block to the re-establishment of what is basically a bearer
instrument:

> "THE COURT:    If you have a blank endorsement, you have
> basically bearer instrument, right?
>
> MR. BROCHIN:   Yes.
>
> THE COURT:    Kind of like a $20 bill in your pocket.
>
> MR. BROCHIN:   Or a blank check, right.
>
>                             * * *
>
> THE COURT:    How would you go about establishing a lost
> bearer instrument?
>
> MR. BROCHIN:   Who, MERS?

THE COURT:   MERS.   Anybody.   If it's just a bearer instrument, and whoever has it, has it, how in the world would you go about proving that the court should foreclose upon a bearer instrument that you don't have?

MR. BROCHIN:   Well, the rule – I mean, the statute is specific on what needs to be proven for a lost note.

THE COURT:   Well, your allegations in that regard, by the way, are very close to the statute. . . In fact, one might surmise or observe that it is the statute, and it's really not enough.

If you really want to state a cause of action, you need some facts.   Don't just give me the statute, because that's not going to cook.   And that's what your complaints do.

MR. BROCHIN:   I'm not going to disagree with you on the pleadings.

THE COURT:   And also, don't come back later and say, well, we've got the note' we just did it in case we didn't have the note.   We expect better practice than that.   We expect you to have a file, and your lawyers to have a file in front of them, and to present us with the true facts in the file, and not the what ifs.   That causes us to waste a lot of time.   You know, with 1200 or so files, we just don't have the time to spend on it to go through and say, well, which one is this?

Now please, don't consider going back and giving me a paragraph in place of this thing that says plaintiff is the owner and holder of the subject note and mortgage.   Don't give me a either/or type of paragraph that says, or maybe it's something else, or maybe it's something else.

I expect pleadings to be case specific, and not boilerplate. Boilerplate is a big red flag, and it doesn't do anybody any good..."   (T 36 – 38)

The very practical matter of who to contact was discussed.   The Court

noted several calls to Chambers by Defendants frustrated over not being

able to contact someone with whom they could do business:

"THE COURT:     Well, who has the right to deal with the landowner when they want to deal with somebody on the note?
                                          * * *
MR. BROCHIN:    Well, inevitably, on all of these loans there is a servicer who has been authorized to service the note...
                                          * * *
THE COURT:      How do they find out who that is?

MR. BROCHIN:    One of the advantages about MERS is it tracks the servicer of all of the mortgages...". (T 24 – 25)

The Court readdressed the contact issue at the conclusion of the hearing:

"THE COURT:     Well, they need to talk to a person who has authority to deal with them.

MR. BROCHIN:    Well, they will tell you who the servicer is, and then they would just get in contact with that servicer, and they would have the authority.

THE COURT:      It's really not a very welcome thing for us judges to be getting calls --

MR. BROCHIN:    I understand.

THE COURT:      -- saying we're under foreclosure, we want to talk to somebody, nobody will return our call.     And the only people who take more displeasure in it than the judges would be our judicial assistants, as you might well understand and appreciate.

MR. BROCHIN:    I do. I do.

THE COURT:      So for their benefit, I'd sure like to have that number.

MR. BROCHIN:    Well, here's the 800 number of MERS that can be called to determine who is servicing any MERS mortgage, and it's 8-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.

THE COURT:      Wait a minute.  Do we have enough numbers?

13

MR. BROCHIN:  Let me repeat it, because I may have misstated it.  1-888-680-6377.  I'll repeat it one more time. 1-888-680-6377..."  (T 97 – 98)

## The Legal Argument

The Court's inquiry began with a question as to whether the proper Plaintiff was before the Court.  The hearing has been instructive to the Court as to what these multiple files present.  MERS' counsel stated candidly that "...MERS doesn't have the beneficial interest in the note..." (T 25, Line 23)  The Court has further been advised that MERS never takes possession of any funds.  MERS is not the servicing agent or nominee as in the case cited by Mr. Trawick at Section 4-2 of his 2005 work in Footnote 8 in Overseas Development, Inc. v. R.A. Krause, 323 So.2d 679 (Fla. 3rd DCA 1975).  The factual situation in Overseas is substantially different than in the case at bar in that "...the Plaintiff, so styled, was the named payee on the indebtedness that was the subject of the foreclosure..."  Thus, in Overseas, Krause was the payee on the indebtedness/the Note and was not merely in attendance to enforce the Note and foreclose on the Mortgage.  Florida law is clear that assignment of a Mortgage without the Note is a nullity.  The participation of MERS before the Bench is solely to collect on behalf of another corporation.  None of the files presented to this Court support the status of MERS.  There is no chain of ownership and in fact counsel has represented to the Court that presenting the Court with a chain of ownership of beneficial interest in the Notes is not possible.

14

Based upon information gained at the return hearing, it appears that the real party in interest in many of these cases is not known at the time Complaint for mortgage foreclosure is filed. The concept is foreign to this Court. Careful review of the argument presented by attorney Brochin does not convince the Court that MERS is a real party in interest in any sense.[2]

Were the Court to accept MERS as a real party in interest in the context of collecting a Note in which they have no beneficial interest, then the next step might well be a personal injury suit filed by a nominee who might have a contractual relationship with the injured party.   Some may seek to represent another using a Power of Attorney.   Such attempts have historically not been allowed, however, if a nominee with as little relationship to the subject matter as MERS is allowed, it may open a new area of practice.

Counsel for MERS has cited the provisions of the Uniform Commercial Code with agility. Review of those provisions and review of the cases cited by counsel indicate that MERS seems to take the position that there are numerous beneficial interests in regard to a Promissory Note.   MERS

---

[2]   Co-Counsel, April Carrie Charney, Esquire has raised several points in the representation of Defendant Dixon in Circuit Civil Case No. 04-008325CI-11.   In addition to arguing against MERS having standing to foreclose, counsel questions whether Promissory Notes are negotiable instruments, whether MERS is engaged in consumer collection agency activity without a proper license, whether MERS is participating as a mortgage lender without a proper license in Florida and finally whether MERS is involved in the unauthorized practice of law.   The Court having found the standing issue under Rule 1.210 to be dispositive, the remaining issues have not been considered or ruled upon.

15

concludes that the most dominant beneficial interest of collecting the money due can be less important than other beneficial interests that MERS argues exists in the Note.   The Court does not read the provisions of the Uniform Commercial Code or the cases cited to support the position that the "beneficial interest" to sue absent any other beneficial interest is a sufficient beneficial interest that can stand alone.    The provisions of the Uniform Commercial Code do not support the mention of MERS in the Mortgage and labeling MERS as a "mortgagee" as giving rise to a right to collect on a Note on which MERS is not mentioned and in which MERS acknowledges it has no beneficial interest.

The MERS situation seems to have resulted from the establishment of the corporation and agreements with lenders without the participation of the Florida Legislature or the Supreme Court in its rule making role.   The fact that the market might find it easier to operate with the real party in interest somewhere in the background of a foreclosure lawsuit is not a compelling reason to modify the traditional requirements of a party to establish status to bring litigation.   The argument that "...if servicers were not permitted to foreclosure in their own name, every multiple investor would have to appear and litigate separately.   Practically speaking this is just not possible, and, as a matter of economics it would force consumer credit costs to significantly increase..." (Plaintiff's memorandum)  Again, the solution may be with the Legislature and not with a private agreement outside of the legislative law-

16

making ability or the Supreme Court's rule-making authority.   (Again, MERS is not the servicing agent but rather the "foreclosure agent", at best, regarding these Notes and Mortgages.)[3]

The reading of Florida Rule of Civil Procedure 1.210 by MERS is generous to its position.   Review of the memorandum and research by this Court provides no Florida case that interprets the Rule to allow a corporation with no beneficial interest in the Note to sue on the Note for collection.

Accordingly, the Court finds that MERS is not a proper party to file a lawsuit to collect on the Notes where the corporation has no beneficial interest.   MERS as a corporation does not have the standing to sue on behalf of another corporation which other corporation remains to the file unknown.

Each of these cases will be dismissed for failure to bring the action in the name of the real party in interest.[4]   The Court is satisfied, based upon the presentation and the completeness of information available, that MERS is not capable under Florida law of satisfying the Court that MERS is a real

---

[3] The law on standing has evolved.   Partnership law is a prime example where prior to the mid 1970's a partnership had no standing in Court separate and apart from the individual partners.   In Pinellas County v. Lake Padgett Pines, 333 So.2d 472 (Fla. 2nd DCA 1976), cert. dismissed 352 So.2d 172, the Court held to a limited extent that the appellee partnership could prosecute their lawsuit to protect the partnership's interest in the real property which interest was statutorily allowed to be held in the partnership name.   The Legislature codified that result in 1995 in Chapters 620.8201 and 620.8307(1)(2), Florida Statutes Annotated, providing that partnerships are separate legal entities from the partners and that partnerships could sue and be sued in the partnership name. See Trawick 2005 edition, Section 4-2. The policy considerations that led to the Court of Appeals ruling and then the legislative action are perhaps better considered at the Appellate Court or legislature level where a broader perspective is provided than on the case by case approach of the Trial Court.
[4]   In the files where a Motion to Substitute Plaintiffs has been filed the Court will rule on those Motions by separate Order.

17

party in interest capable of pursuing the interest of other corporations before the Court.

The various cases will be dismissed with prejudice as to MERS as a party in interest by separate Order with this Order being incorporated therein by reference.

### Amendment

Counsel for Plaintiff in a few of the cases has requested leave to amend the Complaint to change the Plaintiff from MERS to the real party in interest. The Court is not aware of a procedure that would allow for the amendment of the Complaint to completely change the name of the Plaintiff from one to another. The Court is well aware of cases where an individual Plaintiff passes away and a substitution is made under the Rules, however, the Court is not aware of a situation where an attorney is allowed to file a Complaint on behalf of Alpha Corporation and later upon realizing that Alpha Corporation is the wrong entity to amend and file what essentially is a separate and correct claim on behalf of Beta Corporation.

Another complicating factor is that counsel in these cases do not represent the real party in interest and have not filed a Notice of Appearance for the real party in interest. Be that as it may, the Court will entertain Motions for Reconsideration and to replead with a different Plaintiff on a one-time basis should proper Notices of Appearance and Motions be timely filed in each case. The Motion should attach and include a copy of the proposed

amended pleading with necessary supporting documents to establish standing for the Court's consideration, without hearing, and otherwise comply with applicable Rules of Procedure. The original Motion must be filed with the Clerk with a courtesy copy mailed directly to the Court for consideration.

### Conclusion

Based upon the above analysis, the Court finds it appropriate to dismiss with prejudice as to MERS the Complaints as not having been filed by the proper party and therefore the Complaints do not state a cause of action and are dismissed. Morales and Dollar Systems, Inc., supra. The dismissal will be by separate Order in each case.[5]

**MERS' lead counsel, Robert Mark Brochin, Esquire, is ordered to provide copies of this Order to appropriate counsel and parties in each file immediately upon receipt.**

**IT IS SO ORDERED** in Chambers at St. Petersburg, Pinellas County, Florida this __18__ day of August, 2005.

WALT LOGAN, CIRCUIT JUDGE

ORIGINAL SIGNED

AUG 1 8 2005

WALT LOGAN
CIRCUIT JUDGE

cc:   Robert Mark Brochin, Esquire

---

[5] Twenty-eight cases were set for the July 26th return date. Based upon this ruling, twenty cases are being dismissed by the Court, five cases were voluntarily dismissed, one Suggestion of Bankruptcy was filed and two cases are in late stages and remain under consideration.

19

## Cases Dismissed by Court Order August 18, 2005

| | |
|---|---|
| MERS v. Azize | 05-001295CI-11 |
| MERS v. Banks | 04-006874CI-11 |
| MERS v. Boudreault | 05-000602CI-11 |
| MERS v. Chance | 05-001675CI-11 |
| MERS v. Denson | 05-001625CI-11 |
| MERS v. Dixon | 04-008325CI-11 |
| MERS v. Eckhardt | 05-002665CI-11 |
| MERS v. Fix | 05-003571CI-11 |
| MERS v. Gallagher | 04-007544CI-11 |
| MERS v. Jones | 05-000217CI-11 |
| MERS v. Josephs | 05-000309CI-11 |
| MERS v. Langworthy | 03-007842CI-11 |
| MERS v. Mattos | 04-007696CI-11 |
| MERS v. Maxwell | 04-008963CI-11 |
| MERS v. Mellor | 05-002792CI-11 |
| MERS v. Montalvo | 04-001919CI-11 |
| MERS v. Renaud | 05-001172CI-11 |
| MERS v. Rogers | 02-003111CI-11 |
| MERS v. Sinclair | 04-006780CI-11 |
| MERS v. White | 05-001085CI-11 |

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed C

**August 28, 2009**

FILED by __ D.C.
ELECTRONIC
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## I. (a) PLAINTIFFS

Marsha G. Rivernider, Robert H. Rivernider, and Charles Edward Lincoln, III

## DEFENDANTS

U.S. BANK, National Association, as Trustee for RASC/CBS
Mortgage Loan Asset-Backed Certificates, Series 2006-CBS

**(b)** County of Residence of First Listed Plaintiff  Palm Beach, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Hennepin County, MN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Charles Edward Lincoln, III, in propia persona, pro se
603 Elmwood Place, Suite 6
Austin, Texas 78705  (512) 923-1889; (512) 968-2500

Attorneys (If Known)

Lauren Ann Cascino, Equire, Butler & Hosch, P.A.
3185 South Conway Road, Suite E

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

09CV81255 DIMITROULEAS
/ SNOW

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☒ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS —Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ☐ YES ☐ NO

JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

42 U.S.C. Sections 1981, 1982, 1983, 1988(a); 28 U.S.C. Sections 1331, 1332

LENGTH OF TRIAL via  four  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 1,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD  pro se

DATE  August 28, 2009

FOR OFFICE USE ONLY
AMOUNT 350.00   RECEIPT # 726252   IFP