# October 29, 2009
# Ruling of
# Judge David O. Carter

**EXHIBIT "5"**

O/JS-6

UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | |
|---|---|
| Captain Pamela Barnett, et al., | CASE NO. SACV 09-0082 DOC (ANx) |
| Plaintiffs, | |
| v. | **O R D E R** REGARDING DEFENDANTS' MOTION TO DISMISS |
| Barack H. Obama, et al., | |
| Defendants. | |

Before the Court is Defendants President Barack H. Obama ("Obama" or "President"), Michelle Obama, Hillary Clinton ("Clinton"), Joseph Biden ("Biden"), and Robert Gates' ("Gates") (collectively, "Defendants") Motion to Dismiss. After considering the moving, opposing, reply, and sur-reply papers, as well as the parties' oral argument, the Court hereby rules as follows.

## I.      BACKGROUND

### A.      Introduction

On January 20, 2009, the day on which Barack Obama was sworn in as President and

took office, Plaintiffs brought this suit.  The action was filed at 3:26 p.m. Pacific standard time, following President Obama's formal assumption of office.  The suit alleges, in pertinent part, that President Obama does not meet the qualifications required for the Office of the President, as specified by Article II, Section 1, Clause 5 of the United States Constitution, which reads, "No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President."  More specifically, Plaintiffs allege that the President has not shown that he is a "natural born citizen" of the United States and assert that he should have to establish his citizenship by "clear-and-convincing evidence."  Plaintiffs argue that despite the fact that President Obama has produced a birth certificate from the state of Hawaii, there is evidence to show that the President was actually born in Kenya, thus making him ineligible to be President.  Plaintiffs also argue that, even if the President was a natural born citizen, he abandoned his citizenship while living in Indonesia and has not gone through the proper immigration procedures to regain his United States citizenship.

Plaintiffs are third party candidates from the American Independent Party for president and vice president in the 2008 presidential election, inactive and active military personnel, and state representatives.  The third party candidate plaintiffs are Alan Keyes, Gail Lightfoot, and Reverend Wiley Drake.  Keyes and Drake received a total of four-hundredth of one percent of the popular vote for President.

Because Plaintiffs failed to bring their claims in this Court until after President Obama was sworn into office, the Court has been presented with much more than an action against a political candidate asking the Court to interpret the candidate's qualifications to run for office.  Instead, Plaintiffs ask this Court to declare that the current President of the United States is illegitimate and fails to meet the constitutional requirements to hold office.  In their Motion to Dismiss, Defendants challenge the ability of the Court to hear Plaintiffs' claims and redress their alleged injuries through the removal of the sitting President.

## B.    First Amended Complaint

Plaintiffs have since filed a First Amended Complaint ("Complaint"), which adds to the original complaint and which is the subject of this Motion to Dismiss.  Plaintiffs allege that

declaratory judgment is proper pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), and through a civil rights action pursuant to 42 U.S.C. §§ 1983, 1988. First Am. Compl. ("Compl.") ¶ 60, July 14, 2009. Plaintiffs' Complaint sets forth ten questions for which they request declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202. *Id*. ¶¶ 11-21. The questions all relate to the meaning of the Constitution's natural born citizen clause and the appropriate recourse should a sitting president not meet the "natural born citizen" requirement. Plaintiffs frame these questions as seeking "an answer to the simple question of constitutional qualifications . . . [and seeking] a declaratory judgment confirming their fundamental civil or constitutional right to ask and know the constitutional qualifications of any person elected or appointed to public office in the United States of America." *Id*. 3:8-12. Beyond this "simple question," however, Plaintiffs make a significantly more expansive request. Plaintiffs seek "injunctive relief against all four office-holding defendants [the President, Secretary of State, Secretary of Defense, and Vice President] to limit their powers to order new deployments or assignments of any armed forces of the United States outside of the territorial limits of the United States without express Congressional approval, and further to limit the execution of certain orders of the President of the United States relating to the conduct of foreign policy by and through the use of currently deployed and assigned military force, as well as the appointment of judges or justices and the ratification or modification of treaties during the pendency of this lawsuit until and unless Defendant Barack Hussein Obama's constitutional qualifications are established in this court by clear-and-convincing evidence." *Id*. 3:13-22. In other words, Plaintiffs do not propose succession by Vice President Biden but instead seek a complete shutdown of the government by enjoining it from acting while holding a new presidential election.

Plaintiffs also request that the Court order the production of documents pursuant to FOIA. *Id*. ¶¶ 60-109. Plaintiffs further allege a violation of civil rights pursuant to 42 U.S.C. §§ 1983, 1988(a). *Id*. ¶¶ 110-122. Finally, Plaintiffs make a request for a writ *quo warranto*, in which Plaintiffs state, "This Court has the power to order Barack Hussein Obama to appear and to show cause all the relief sought by this complaint should not be upheld (or entered) against

1   him." *Id.* ¶ 121; *see also id.* 4:3-19.   The prayer for relief states the resolution sought in the

2   action as:

3             This Court should issue an order to Barack Hussein Obama to show

4             cause why the full measure of relief requested by the Plaintiffs in this

5             case should not be granted, and should in particular order that the

6             contours of the final judgment under 42 U.S.C. § 1988(a), including

7             the extension or modification of common and statutory law to protect

8             the civil rights of the people of the United States to demand clear-

9             and-convincing evidence of the constitutional qualifications,

10            elegibility [sic], and competence of their elected (as well as their

11            non-elected [sic]) officials, representatives, and executive agents.

12   *Id.* ¶ 126.

13      **II.    LEGAL STANDARD**

14       Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if the

15   Court lacks subject matter jurisdiction to adjudicate the claims.   Once subject matter jurisdiction

16   is challenged, the burden of proof is placed on the party asserting that jurisdiction exists.   *Scott v.*

17   *Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (holding that "the party seeking to invoke the

18   court's jurisdiction bears the burden of establishing that jurisdiction exists.").   Accordingly, the

19   Court will presume lack of subject matter jurisdiction until the plaintiff proves otherwise in

20   response to the motion to dismiss.   *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

21   377, 114 S. Ct. 1673 (1994).

22       Defendants assert that the Court lacks subject matter jurisdiction in this action on five

23   bases: (1) Plaintiffs have failed to demonstrate Article III standing; (2) the issues in this action

24   present non-justiciable political questions; (3) this Court is not the appropriate forum for

25   Plaintiffs' *quo warranto* claims; (4) this Court does not have subject matter jurisdiction pursuant

26   to 42 U.S.C. §§ 1983, 1988; and (5) Plaintiffs have failed to state a claim with respect to their

27   Freedom of Information Act claims and all claims against Defendants Clinton, Gates, Michelle

28   Obama, and Biden.

## III.   DISCUSSION

The Court must establish that it has jurisdiction before it may reach the question of interpreting the natural born citizen clause of the Constitution.  "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."  *Ashwander v. Tenn. Valley Authority*, 297 U.S. 288, 347, 56 S. Ct. 466 (1936) (Brandeis, J. concurring) (citing *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 191, 29 S. Ct. 451 (1909); *Light v. United States*, 220 U.S. 523, 538, 31 S. Ct. 485 (1911)).

### A.   Jurisdiction Under Article III

Rule 12(b)(1) mandates that the Court dismiss claims for which it lacks subject matter jurisdiction.  Standing is an element of subject matter jurisdiction.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003).  To establish standing under Article III of the Constitution, a plaintiff must demonstrate: "(1) an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized," meaning that the injury must "affect the plaintiff in a personal and individual way," and (b) "'actual or imminent,' not 'conjectural' or 'hypothetical;'" (2) "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court;'" (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992) (internal citations omitted).  Each element of standing is "an indispensable part of the plaintiff's case," and accordingly "must be supported in the same way as any other matter on which the plaintiff bears the burden, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.

The caption of the Complaint in this matter lists forty-four (44) plaintiffs.  The Complaint does not individually identify the bases for standing for each of these plaintiffs, but alleges generally, "The Plaintiffs are all American citizens, the majority with military service backgrounds (retired or inactive but subject to recall), a number of former and possible or

1  prospective political candidates, including a number of state legislators and third-party

2  candidates for President and Vice-President."  Compl. 3:5-8.

3         Plaintiffs are comprised of six groups which claim standing: (a) active military personnel;

4  (b) former military personnel; (c) state representatives; (d) federal taxpayers; (e) relatives of

5  President Obama; and (f) political candidates.  The Complaint identifies eleven plaintiffs who

6  fall within these groups.  Thirty-two of the named plaintiffs are not identified in the Complaint

7  with any particularity.  The Court must assume that the remainder of the plaintiffs fall into one

8  of the aforementioned six categories.

9         The majority of Plaintiffs are addressed through the first prong of Article III standing,

10 which requires that Plaintiffs demonstrate the "invasion of a legally protected interest" which is

11 both "concrete and particularized" and "actual or imminent."  *Lujan*, 504 U.S. at 560-61.

12                    **a.    Active Military Personnel**

13        The Complaint alleges that Plaintiff Lieutenant Jason Freese ("Lieutenant Freese") has

14 standing because he is on active military duty in Alaska.  Compl. ¶ 6.  The Complaint states that,

15 because Lieutenant Freese is on active military duty, he has standing "to challenge and demand

16 clear-and-convincing proof of the constitutional qualifications of the Commander-in-Chief and

17 the legality of the current chain of command."  *Id.*  Plaintiffs argue that Lieutenant Freese's

18 standing stems from the oath that military officers are required to take in which they swear to

19 support and defend the Constitution.  Pl. P.B.'s Opp'n 9:12-13:19.  The oath that all military

20 personnel take when enlisting in the military states as follows:

21              I, _____, do solemnly swear (or affirm) that I will support and

22              defend the Constitution of the United States against all enemies,

23              foreign and domestic; that I will bear true faith and allegiance to the

24              same; and that I will obey the orders of the United States and the

25              orders of the officers appointed over me, according to regulations

26              and the Uniform Code of Military Justice.  So help me God.

27 10 U.S.C. § 502.

28        Plaintiffs rely primarily on *Board of Education v. Allen* for their argument that Plaintiff

has standing as an oath taker.  392 U.S. 236, 88 S. Ct. 1923 (1968).  In *Allen*, Plaintiffs who were serving on the Board of Education took an oath in which they pledged to uphold the Constitution.  *Id.* at 241 n.5.  Plaintiffs alleged that if pursuant to that oath they refused to follow a law requiring them to lend books to parochial schools on the basis that the law violated the Establishment Clause of the First Amendment to the Constitution, then they would face the injury of likely being expelled from office and having state funds to their school district reduced. *Id.*  While the issue of standing was not before the Court, the Court observed in a footnote that it had no doubt that the plaintiffs had a personal stake in the outcome of the litigation.  *Id.* Plaintiffs argue that this action is similar to *Allen* because Lieutenant Freese has taken an oath to support and defend the Constitution, and if pursuant to that oath he refused to follow the orders of President Obama on the basis that all orders from the President are unconstitutional because he does not satisfy the natural born citizen clause, then Freese would face the injury of likely disciplinary action within the military.

The footnote regarding standing in *Allen* is not binding Supreme Court precedent.  In addition, the Supreme Court has significantly tightened standing requirements subsequent to the *Allen* ruling.  *City of South Lake Tahoe v. Calif. Tahoe Reg. Planning Agency*, 625 F.2d 231, 236 (9th Cir. 1980).  The Ninth Circuit has rejected the reasoning of the footnote in *Allen* on the basis that the real source of an oath taker's complaint is not sufficiently concrete to establish standing.  The Ninth Circuit, discussing the standing of oath takers to bring an action for injunctive and declaratory relief regarding the constitutionality of an action, reasoned that oath takers hold merely an abstract objection to an unconstitutional act because they generally face only an abstract injury should they choose to object to the act.  *Id.* at 237.  The Court found that the oath takers' objection was insufficient to invoke standing because "the difficulty with abstract constitutional grievances is that they lack the specificity and adversarial coloration that transmute vague notions of constitutional principle into a form historically viewed as capable of judicial resolution."  *Id.* at 237-38 (internal quotations and citations omitted).  Pursuant to the reasoning under *South Lake Tahoe*, Plaintiff Lieutenant Freese fails to establish standing based on his military oath because his injuries are not sufficiently concrete to establish Article III

1     standing.

2         The Complaint also requests that this Court enjoin the President's "powers to order new

3     deployments or assignments of any armed forces of the United States outside of the territorial

4     limits of the United States without express Congressional approval, and further to limit the

5     execution of certain orders of the President of the United States relating to the conduct of foreign

6     policy by and through the use of currently deployed and assigned military force." Compl. 3:14-

7     19. This "cut and run" call to lay down arms and leave this country defenseless is an effort by

8     Plaintiffs to emasculate the military**.**

9         Plaintiffs have inappropriately requested that this Court interfere with internal military

10     affairs. *See Orloff v. Willoughby*, 345 U.S. 83, 93-94, 73 S. Ct. 534 (1953) ("[J]udges are not

11     given the task of running the Army."). Plaintiffs only seek to enjoin acts that the President takes

12     as Commander-in-Chief internationally, not domestically. This peculiarity leads the Court to

13     suspect that the constitutional objection is being used as a veil to avoid deployment to countries

14     where the United States military is currently active, such as Iraq or Afghanistan. *See Rhodes v.*

15     *Thomas D. MacDonald et al.*, No. 4:09-CV-106 (CDL), 2007 WL 2997605 (M.D. Ga. Sept. 16,

16     2009) (Plaintiff objecting to President Obama's natural born citizen status "had no concerns

17     about fulfilling her military obligation until she received orders notifying her that she would be

18     deployed to Iraq in September 2009"). Furthermore, Lieutenant Freese's claims are based upon

19     the notion that his duty to serve is based upon who is in office. The duty to defend is not

20     dependent upon a political or personal view regarding the individual who serves as President and

21     Commander-in-Chief. It is an unequivocal duty to defend our country.

22         This Court will not interfere in internal military affairs nor be used as a tool by military

23     officers to avoid deployment. The Court has a word for such a refusal to follow the orders of the

24     President of the United States, but it will leave the issue to the military to resolve.

25         Plaintiff Freese fails to meet the Article III standing requirements.

26            **b.**      **Former Military Personnel**

27         The Complaint states that all inactive or retired military personnel "have standing to

28     challenge and demand clear-and-convincing proof . . . [because] they are subject to recall and

service at any time under and subject to the *de facto* chain of command." Compl. ¶ 7. In order for Article III standing to be met, the Supreme Court requires that the injury be "actual or imminent, not 'conjectural' or 'hypothetical,'" and that the injury must be likely, not merely speculative. *Lujan*, 504 U.S. at 560-61 (citations omitted). Currently, Plaintiffs are inactive in the military and therefore are not subject to any orders from the Commander-in-Chief, President Obama. Therefore, Plaintiffs base their standing on the possibility that they could be called back to service at any time and would at that point have to follow the Commander-in-Chief's orders. Plaintiffs argue that following such orders would be injurious because they would have to follow the commands of someone who does not meet the requirements to hold the position of Commander-in-Chief. However, the chance that Plaintiffs would be called back to active duty fails to meet the requirement that the injury not be merely hypothetical or speculative. Whether or not Plaintiffs will be called back to active duty depends on future unknown events, and is thereby both hypothetical and speculative. *See Bates v. Rumsfeld*, 271 F. Supp. 2d 54, 62 (D. D.C. 2002) (where plaintiff challenging the military's policy of forcing personnel to receive anthrax vaccine was no longer on active duty and the vaccine was only being administered to select units, plaintiff did not meet requirement that injury be concrete and actual or imminent).

As such, inactive or former military personnel fail to meet the Article III standing requirements.

### c. State Representatives

The Complaint additionally identifies a group of "Plaintiff State Representatives" as having "unique standing." Compl. ¶ 8. While the Complaint does not specifically identify these representatives serving in the state government, from the caption of the Complaint it appears they are Tennessee Representative Glen Casada; New Hampshire Representative Timothy Comerford; Missouri Representative Cynthia Davis; Missouri Representative Timothy Jones; Tennessee Representative Frank Niceley; and Tennessee Representative Eric Swafford (collectively, the "State Representatives").

The Complaint alleges that the State Representatives have "a special non-delegable constitutional right and responsibility to verify the qualifications of the Chief Executive Officer

of the United States of America who is responsible for allocating large sums of funds, since receipt of funds from any officer without legal authority would be complicity in theft or conversion." *Id*. Defendants argue that this allegation is "wholly insufficient to constitute injury-in-fact" because it is "neither actual or imminent" and is "highly speculative." Mot. 8:13-14. Morever, Defendants assert that the allegation fails to "withstand any logical scrutiny" because the causes of action of theft and conversion require intent. *Id.* Since Plaintiffs state that they do not know with certainty that President Obama was not born in the United States, they do not have the requisite intent to be held liable for theft or conversion. *Id.* 8:8-21.

In effect, Plaintiffs allege that the State Representatives have standing because they could be held liable for theft or conversion should they accept federal funds pursuant to an unconstitutionally elected president. The threat of liability for theft or conversion against these representatives is highly speculative. *See City of South Lake Tahoe*, 625 F.2d at 238 (exposure of plaintiffs to civil liability was wholly speculative where no lawsuit was currently threatened); *see also O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S. Ct. 669 (1974) ("attempting to anticipate" whether respondent will be charged with a crime which will possibly lead to them suffering a constitutional violation takes the Court into "the area of speculation and conjecture"). The State Representatives' liability for theft or conversion is speculative because it takes multiple logical leaps to assume that the representatives would be prosecuted criminally for theft and conversion for taking funds from the President who has been elected and sworn into office. Because the alleged harm faced by the State Representatives is highly speculative and conjectural, this group also fails to satisfy the standing requirements.

Moreover, to the extent that Plaintiffs allege State Representatives have standing based on an oath to uphold the Constitution, the allegation is insufficient to establish standing under the reasoning of *City of South Lake Tahoe*, as discussed above.

### d. Federal Taxpayers

Plaintiffs argue that they have standing to challenge President Obama's unconstitutional presidency as federal taxpayers. However, Plaintiffs concede that current Supreme Court precedent would not allow for standing in this situation and that the Court could only find

1    taxpayer standing should it expand the Supreme Court's holdings.  Pl. P.B.'s Opp'n 19:22-20:11.

2        As a basis for this standing, Plaintiffs encourage the Court to expand the Supreme Court

3    holding in *Flast v. Cohen*, 392 U.S. 83, 88 S. Ct. 1942 (1968).  In *Flast*, federal taxpayers sought

4    to enjoin the expenditure of federal funds by Congress on the purchase of textbooks and other

5    materials for use in parochial schools on grounds that it violated the Establishment Clause of the

6    First Amendment.  *Id.* at 85.  The Supreme Court rejected the Government's position that

7    standing could never be established on the basis of taxpayer status and held that taxpayer

8    standing could be established if the taxpayer demonstrates "that the challenged enactment

9    exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing

10   and spending power and not simply that the enactment is generally beyond the powers delegated

11   to Congress" by Article 1, Section 8.  *Id.* at 103.  The Court stated that it lacked confidence that

12   the issues would be framed with the necessary specificity to establish standing in cases "where a

13   taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances

14   about the conduct of government or the allocation of power in the Federal System."  *Id.* at 106.

15       *Flast* involved the challenge of congressional spending, whereas Plaintiffs in this case

16   appear to be challenging the President's role in making any executive decisions, presumably

17   including spending, even though Congress, not the President, is granted the taxing and spending

18   power in Article I, Section 8 of the Constitution.  Plaintiffs' taxpayer standing argument ties into

19   their universal argument that if the President has been elected without meeting the Constitution's

20   requirements, then every presidential order is unconstitutional.  Plaintiffs' dispute against the

21   President is a generalized grievance, not tied to a specific spending measure in violation of the

22   Constitution.  Tellingly, Plaintiffs make no argument pertaining to a particular spending

23   provision, and their argument does not even relate to the limits of the *congressional* taxing and

24   spending power as discussed in *Flast.*

25       Plaintiffs encourage the Court to expand standing grounds, arguing that the reasoning of

26   *Flast* regarding the Establishment Clause is analogous to the natural born citizen clause because

27   it is "an absolute limitation on the unconstitutional exercise of power by government whose

28   effect (i.e. injury) will always be by definition diffuse rather than particularized."  Pl. P.B.'s

Opp'n 20:5-11.  Even ignoring the fact that *Flast*'s holding was limited to Establishment Clause claims which are not present here, *Flast* clearly required that in order for taxpayer status to create standing, the taxpayer must demonstrate a nexus between the challenged spending and the constitutional right.   *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 605, 127 S. Ct. 2553 (2007) (requiring a "link" between congressional action and constitutional violation). Here, Plaintiffs do not show a nexus between any challenged spending provision passed by Congress and the constitutional requirement that the President be a natural born citizen.  *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 228, 94 S. Ct. 2925 (1974) (taxpayers did not have standing because they failed to establish a nexus between the challenged act and the constitutional violation where the challenged action was one of the executive branch).

Under *Flast,* Plaintiffs do not have standing as taxpayers to challenge the President's qualifications.  Furthermore, expanding the Supreme Court's holding in *Flast* to the current situation would be contrary to later Supreme Court jurisprudence reaffirming the narrow circumstances in which taxpayer status establishes standing.  *See, e.g., Hein*, 551 U.S. at 615 (rejecting broad reading of *Flast* and affirming its application only to Congressional action, stating, "in the four decades since *Flast* was decided, we have never extended its narrow exception to a purely discretionary Executive Branch expenditure."); *Bowen v. Kendrick*, 487 U.S. 589, 618, 108 S. Ct. 2562 (1988) (reaffirming *Flast* and acknowledging that *Flast* creates only a "narrow exception" to the "general rule against taxpayer standing").  The taxpayer plaintiffs have failed to allege injury-in-fact.

### e.   Relatives

The Complaint further alleges that Plaintiff Kurt Fuqua ("Fuqua") has "traced his genealogy to be common with Mr. Obama's" and that he thereby has standing because of "family relationship" and "concerns of the family medical history." Compl. ¶¶ 49, 52. The Court finds that Plaintiff Fuqua also fails to satisfy standing requirements based on his alleged familial ties to President Obama. The Complaint alleges that this family relationship, as well as purported concerns Plaintiff has regarding his family medical history, establish standing. *Id.* ¶ 52. The Court takes this to mean that Fuqua has a greater interest in finding out where President Obama was born than the average citizen. Plaintiff Fuqua's injury from an allegedly unqualified president is not any greater than the common citizen's injury simply because he is allegedly related to President Obama.

The "general right" of "every citizen, to require that the government be administered according to law" is insufficient to establish standing. *Fairchild v. Hughes*, 258 U.S. 126, 129, 42 S. Ct. 274 (1922). Plaintiff's stake in this controversy as a citizen is no greater than the millions of other United States citizens, and the harm he alleges is too vague. As such, Fuqua has not alleged an injury-in-fact because the grievance of a citizen in the alleged violation of the natural born citizen clause is too generalized. *See Hollander v. McCain*, 566 F. Supp. 2d 63 (D. N.H. 2008); *Berg v. Obama*, 574 F. Supp. 2d 509 (E.D. Pa. 2008).

### f.   Political Candidates

The Complaint alleges that Plaintiffs Wiley S. Drake ("Drake"), Alan Keyes ("Keyes"), Gail Lightfoot ("Lightfoot"), and Markham Robinson ("Robinson") have "unique political standing" because they appeared on the California ballot as candidates for president or vice president in the 2008 national election. Compl. ¶ 5. Keyes was the presidential nominee for the American Independent Party (also called America's Independent Party on some ballots) in the 2008 Presidential election, and Plaintiff Drake was the vice presidential nominee for the American Independent Party in the 2008 Presidential election on the California ballot. Pl. W.D.'s Opp'n 1:6-13. Lightfoot was also a vice presidential nominee for the American Independent Party. Plaintiff Robinson was "a pledged Presidential elector for the American

13

1   Independent Party in the 2008 Presidential election for the California ballot." *Id.*

2        In order to establish injury-in-fact, the injury must "affect the plaintiff in a personal and

3   individual way." *Lujan*, 504 U.S. at 560-61 n.1.  Defendants argue that the political candidate

4   plaintiffs have failed to establish injury-in-fact because they were not serious enough contenders

5   for the presidency that another candidate's alleged lack of qualifications for the position could

6   cause them any harm.  Notably, President Obama's primary opponent for the Democratic Party

7   nomination, Secretary Hillary Clinton, and President Obama's Republican Party opponent,

8   Senator John McCain, did not initiate any suits against President Obama regarding his birth

9   status.  These candidates, who were poised to benefit the most from the removal of Obama as a

10  candidate, chose to refrain from bringing suit under the natural born citizen clause.

11       Defendants argue that because the third party political candidates would have lost the

12  election in any event, they have not been harmed by competing against a candidate who did not

13  qualify.  Defendants state that the Plaintiffs cannot meet the injury-in-fact requirement because

14  they "cannot counter the argument that, from a simple mathematical analysis, . . . they were not

15  on the ballot in enough states in the 2008 Presidential election to even hope that they could gain

16  the requisite 270 electoral votes to win the Presidency or Vice Presidency of the United States."

17  Defs.' Reply 3:6-11.  If there should in fact be a dividing line for that is dependent on the

18  likelihood of success in the election, then this is not a case which would hover on that line as

19  Plaintiffs received only four-hundredth of one percent of the vote.  The Court may have already

20  met this entire group of voters at the hearings on this matter.

21       In this case, it does seem highly unlikely that the replacement of President Obama with

22  another Democratic nominee such as Hillary Clinton would have resulted in a victory for

23  Plaintiffs Keyes, Drake, or Lightfoot of the American Independent Party.  However, creating a

24  dividing line for standing according to chance of success in political elections is, by the nature of

25  our political system, an especially difficult determination because political elections lack

26  predictability and can be greatly affected by a single speech or action of a candidate.  At the

27  same time, perhaps it is precisely this unpredictability of political elections that makes the claim

28  of a third party candidate, who received less than one percent of the popular vote in the 2008

national election that did take place, too speculative to establish standing.

In addition, Defendants' arguments raise obvious slippery slope objections. Would a candidate such as Ross Perot, who received nearly twenty percent of the popular vote but no electoral college votes in the 1992 election, have a sufficiently strong chance of winning the election to establish standing to challenge a major party candidate's qualifications? At the same time, if every candidate has standing to challenge an opposing candidate, would that include write-in candidates who receive minimal votes? Where to draw the line between which political candidates have standing and which candidates do not have standing to challenge their opposing candidates' qualifications is an amorphous determination that would need to take into account, at the very least, the number of states in which the candidate was on the ballot.

The Court is troubled by the idea that a third party candidate would not have standing to challenge a major party candidate's qualifications, while the opposing major party candidate may be able to establish standing because he or she has a better chance of winning the election. Defendants' argument encourages the marginalization of the voice of a third party in what is a dominantly two-party political system and would require the Court to pass judgment that Plaintiffs are such unlikely candidates that who they are running against would not make a difference. This argument also ignores the tremendous effect that a third-party candidate can have on the presidential election. In 2000, many political commentators opined that should Green Party candidate Ralph Nader not have run for presidential office and received less than three percent of the popular vote, Al Gore would have won the election instead of President George W. Bush. Even when third-party candidates themselves may not have a chance of winning, which candidates they compete against can certainly have an effect on the election results.

Plaintiffs Drake and Robinson argue that it is irrelevant that those candidates which had the most to gain by removing Obama as a candidate, Secretary Clinton and Senator McCain, are not the candidates challenging President Obama. Plaintiffs encourage the Court to reject Defendants' success-based concept of standing. They make a qualitatively different argument regarding why they have suffered injury as political candidates, an argument that does not

require the Court to consider their likelihood of winning the election. Plaintiffs argue that the injury they suffered was the deprivation of the right to run for office on a fair playing field against only candidates who meet the constitutional requirements to serve as President. Under this theory, the injury is not that of being deprived the chance to win, but being deprived the chance to compete only against "legitimate" candidates. If the Court accepts this concept of injury, then all candidates would have standing to sue the President on the basis that they were all injured by having to compete against him in the national election.

Because the political candidate plaintiffs are the only category of plaintiffs who *potentially* satisfy the injury-in-fact requirement, the Court will turn to whether the political candidates can satisfy the redressability requirement of the standing analysis and whether the political candidates can further clear the political question and separation of powers hurdles of justiciability.

### B. Redressability, Political Question, and Separation of Powers

The third prong of Article III standing requires that the alleged injury be likely to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citations omitted). The redressability prong requires the court to "examine whether 'the court has the power to right or to prevent the claimed injury.'" *Railway Labor Executives Ass'n v. Dole*, 760 F.2d 1021, 1023 (9th Cir. 1985) (quoting *Gonzales v. Gorusch*, 688 F.2d 1263, 1267 (9th Cir. 1985)). While standing generally focuses upon the potential plaintiff and his or her relationship to the alleged harm, the redressability prong of standing turns the focus upon the type of redress that the court is able to offer to the plaintiff. Courts will refrain from finding standing in cases where, regardless of a showing of injury-in-fact, the court would be unable to offer redress that would cure plaintiff's harm. *See Railway Labor Executives Ass'n*, 760 F.2d at 1023-24 (plaintiffs failed to satisfy redressability prong where court did not have the power to "fashion[] an enforcement manual for an executive branch agency that was presumably commissioned by Congress to devise its own enforcement strategy").

Ultimately, Plaintiffs' alleged injury is having to respect the authority of a president who does not meet the constitutional requirements to hold office. Therefore, Plaintiffs' injury would

1    only be redressed by the removal of President Obama from office.  Plaintiffs thereby ask this

2    Court to intervene and overthrow a president who was elected by "We the People"–over *sixty-*

3    *nine million* of the people.  President Obama was popularly elected.  He received the requisite

4    votes from the Electoral College, which were received and counted by Congress with no

5    objections.  President Obama took office at noon on January 20, 2009 pursuant to the Twentieth

6    Amendment.  He was sworn in on January 20, 2009, and re-sworn in on January 21, 2009,

7    pledging the oath set forth in Article II, Section 1, cl. 8 of the Constitution: "I do solemnly swear

8    (or affirm) that I will faithfully execute the Office of President of the United States, and will to

9    the best of my Ability, preserve, protect and defend the Constitution of the United States."  In

10   order for Plaintiffs' alleged injury to be fully addressed, Plaintiffs would have the Court

11   intervene, upheave the results of a national election, declare the President illegitimate, shut down

12   the functioning of the government of the United States, and leave this country defenseless.

13          Furthermore, if the Court accepts Plaintiffs Drake and Robinson's conceptualization of

14   their injury as the harm of being unable to compete in an election with only "legitimate"

15   candidates, redressing the injury of competing in an unfair election would require that the Court

16   order a new national presidential election.  Instead of impeachment, which would allow

17   succession by the Vice President and continuation of the order of a functioning government,

18   Plaintiffs seek to shut down the government through an injunction and install a replacement

19   government through a new election.  In other words, if the political candidates' harm is based on

20   their inability to compete against constitutionally qualified candidates, in order to redress that

21   harm the Court would not only have to remove the President, it would have to order a new

22   national election.

23          The analysis of redressability and political question is significantly different in the

24   context of a sitting president than it would be for a presidential candidate.  Therefore, it is a

25   crucial distinction that Plaintiffs' counsel waited to bring this action until after President

26

27

28

Obama's formal assumption into office.[1] *See Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005) (quoting *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005)) ("'As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint . . .'").

Because Plaintiffs did not file this action until the day President Obama took office and was sworn in, any action that this Court takes in this matter is not merely against Senator Obama as a political candidate but against President Obama, this country's sitting president.  In this case, the redressability prong of standing is intimately intertwined with and influenced by another justiciability concept–political question and the separation of powers.  Any action taken by the Court would necessarily infringe upon, at the very least, the Executive branch because it would involve a declaration regarding the qualifications of the President.  Because the redressability analysis must consider what actions the Court may take against a sitting President, separation of powers concerns regarding the appropriate role of the judiciary sit at the forefront of the redressability analysis.

Plaintiffs have requested both an injunction and a declaratory judgment in the Complaint.  Compl. ¶¶ 11-22.  Plaintiffs would have the Court reverse the election of President Obama by the American people through a declaratory judgment or injunction that would result in the removal of the President from office.  The power of this Court generally to issue an injunction or

---

[1]    Plaintiffs' counsel Taitz admitted that the failure to bring a suit before this Court previous to the President's assumption of office was the fault of counsel due to in-fighting between plaintiffs and between her and counsel Kreep.  As stated in the October 5 hearing on this matter:

> THE COURT: Just a moment.  You didn't answer my question. Why didn't you file this case?
> MS. TAITZ: Because the plaintiffs wanted to wait for Mr. Kreep.
> THE COURT: So that's a conscious choice on the plaintiffs' team, then, that you acceded to at that time to put this case in the posture and position of a duly sworn President.
> MS. TAITZ: Well, again, Your Honor, not duly sworn President. If one is sworn based on fraudulent information, then the word "duly" wouldn't. . .

Tr. of Oral Argument 52-53, Oct. 5, 2009.

18

declaratory judgment against the President is limited at best.  The Supreme Court has stated that enjoining a President is an "extraordinary" action that should "raise[ ] judicial eyebrows." *Franklin v. Massachusetts*, 505 U.S. 788, 802, 112 S. Ct. 2767 (1992) (plurality opinion).  It has also stated that "in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* at 802-03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)).

In addition, Plaintiffs have requested that other officials, including Secretary of Defense Robert Gates, be enjoined.  In their original complaint, Plaintiffs also included FBI Director Robert Mueller.  While Plaintiffs removed Mueller in their First Amended Complaint following the Court's suggestion that they narrow and focus their claims, they insisted upon the continued inclusion of the First Lady, Secretary of State, Secretary of Defense, and Vice President as Defendants.[2]  Plaintiffs' cause of action is against the President and goes to the heart of the President's ability to hold office.  A remedy directed toward any subordinate officials would not redress Plaintiffs' injury.  Therefore, Plaintiffs' injury could not be redressed through the injunction of other subordinate executive officials which may be more properly within the power of this Court.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S. Ct. 863 (1952).

The case of *Newdow v. Bush* is instructive regarding the power of the Court to issue an injunction or declaratory judgment against the President.  In *Newdow*, the court considered whether plaintiff had standing to seek a preliminary injunction against President Bush restraining him from inviting clergy to give a religious prayer at his inauguration.  355 F. Supp. 2d 265, 268 (D. D.C. 2005).  The court observed that issuing an injunction against the President "raises serious separation of powers concerns" and further asserted that "[t]here is longstanding legal authority that the judiciary lacks the power to issue an injunction or declaratory judgment against the co-equal branches of the government–the President and the Congress."  *Id.* at 280.  The court rejected the argument that there should be an exception read into the President's immunity

---

[2]      The inclusion of the First Lady in this lawsuit, considering she holds no constitutional office, is baffling.

"where he is claimed to have violated the Constitution." *Id.* at 282. Further, the court found that the same considerations foreclosing the possibility of issuing an injunction against the President foreclosed the possibility of issuing a request for declaratory judgment. *Id.* at 281.

In this case, Plaintiffs ask the Court to declare that President Obama is not a constitutionally elected president. Plaintiffs do not ask the Court to enjoin the President from issuing a particular order; they request that President Obama be enjoined from issuing *any* orders whatsoever and be enjoined from holding the office of President. Plaintiffs make it clear from their briefing that they believe that any order issued by a president who does not satisfy the natural-born citizen clause is unconstitutional. Therefore, in order to cure Plaintiffs' perceived injury, the Court would need to wade deep into the waters of the President's official duties–in fact, it would have to declare that the President could no longer perform *any* official duties. The separation of powers concerns implicated by this request are grave.

Beyond the general power of this Court to issue an injunction or declaratory judgment against the President, the Court must consider its power to take any action removing the President from office. Defendants have argued that the Court cannot suitably redress any injury to Plaintiffs because the Court does not have the power to upseat the President. They further argue that because the Court lacks this power, any declaratory judgment issued by the Court finding that the President was not qualified to hold his office would be a nullity.

Removing the President would not only affect the Executive branch, it may also infringe upon the power of the Legislative branch granted by the Constitution in matters of Presidential impeachment and succession. Defendants argue that the Constitution grants Congress the sole power to remove a president through Article I, Sections 2 and 3, which address impeachment, and the Twenty-Fifth Amendment, which addresses the removal of the president should he or she be unfit to serve.

The non-justiciability of an action on political question grounds is "primarily a function of the separation of powers" and pertains to "the relationship between the judiciary and the coordinate branches of the Federal Government." *Baker v. Carr*, 369 U.S. 186, 210, 82 S. Ct. 691 (1962). The key inquiry is whether the matter has "in any measure been committed by the

Constitution to another branch of government." *Id.* at 211. The Supreme Court has set forth factors indicating the existence of a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.

Thus, the Court turns to the first factor set forth in *Baker v. Carr*–whether the Court finds a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* The natural born citizen clause is couched in absolute terms of qualifications and does not designate which branch should evaluate whether the qualifications are fulfilled. Therefore, the Court necessarily turns to a structural analysis of the Constitution regarding the role of the respective branches of government in deciding the qualifications of a sitting president to hold office.

Three provisions of the Constitution speak to which branch of government has the power to evaluate the qualifications of a president: the Twelfth Amendment, the Twenty-Fifth Amendment, and the Twentieth Amendment to the Constitution. The Twelfth Amendment provides a role for Congress to make the ultimate determination of who shall be president and vice president through the counting of the electoral votes. The Twenty-Fifth Amendment, which addresses the succession to presidency and vice presidency in the case the president is disabled,

1  including by death or resignation, directs that in the case where there is disagreement as to

2  whether the President is able to discharge the powers and duties of his or her office, "Congress

3  shall decide the issue."

4      The Twentieth Amendment, known as the "Lame Duck Amendment," addresses the task

5  of ensuring that someone holds the office of president in the case of the death of a president or

6  the failure of a president to be chosen or qualify by the beginning of his or her term.  The

7  Twentieth Amendment provides: "If, at the time fixed for the beginning of the term of the

8  President, the President elect shall have died, the Vice President elect shall become President.  If

9  a President shall not have been chosen before the time fixed for the beginning of his term, or if

10  the President elect shall have failed to qualify, then the Vice President elect shall act as President

11  until a President shall have qualified; and the Congress may by law provide for the case wherein

12  neither a President elect nor a Vice President elect shall have qualified, declaring who shall then

13  act as President, or the manner in which one who is to act shall be selected, and such person

14  shall act accordingly until a President or Vice President shall have qualified."

15      Even though these provisions of the Constitution tend to suggest that, at least in some

16  circumstances, it is within the province of Congress to decide whether the President meets the

17  qualifications to serve,[3] the Court cannot reach the issue of whether in all cases the interpretation

18  of the natural born citizen clause would present a political question.  Instead, because redress of

19  Plaintiffs' alleged harm would require removal of President Obama, the key analysis is whether

20  the power to remove a sitting president from office is textually committed to another branch.

21      The Constitution grants to Congress the sole power of impeachment of the President.  The

22  Constitution reads, "The Senate shall have the sole Power to try all Impeachments. When sitting

23  for that Purpose, they shall be on Oath or Affirmation. When the President of the United States

24

25      [3]    Plaintiffs presume that the words of Emmerich de Vattel, John Jay, and John Armor Bingham alone empower this Court to define the natural born citizen clause.  The

26  Complaint conveniently chooses to ignore Congress' long history of defining citizenship, whether naturalized or by birth.  *See* Charles Gordon, "*Who Can be President of the United*

27  *States: The Unresolved Enigma*," 28 Md. L. Rev. 1, 7-22 (1968) (contrasting 150 years of active Congressional legislation against judicial restraint).

28

1    is tried, the Chief Justice shall preside: And no Person shall be convicted without the

2    Concurrence of two thirds of the Members present."  U.S. Const. Art. I, § 3, cl. 6.  In *Nixon v.*

3    *United States*, when considering the issue of whether the Court could review the manner in

4    which the Senate conducted impeachment proceedings, the Supreme Court focused on the grant

5    of "sole" power to try impeachments to the Senate, noting that the definition of sole is

6    "'functioning . . . independently and without assistance or interference.'"  506 U.S. 224, 231,

7    113 S. Ct. 732 (1993).  The Court ruled that the text of the impeachment clause indicated a

8    purposeful decision by the Framers to commit impeachment to the Legislative branch.  *Id.* at

9    235-36.  Furthermore, the Twenty-Fifth Amendment sets forth the line of succession "in case of

10   the removal of the president from office" or in case of his or her death, resignation, or inability

11   to serve.  The Amendment specifies a role for Congress in this process, but no role for the

12   judiciary.  The combination of Article I and the Twenty-Fifth Amendment leads the Court to

13   conclude that there is a textually demonstrable constitutional commitment of the issue of the

14   removal of a sitting president to a coordinate political department–the Legislative branch.

15       In *Nixon*, the Court also discussed prudential considerations that counseled against

16   judicial review of Senate impeachment proceedings.  506 U.S. at 252 n.4.  While *Nixon* involved

17   the impeachment of a judge, the Court commented on the dangers of judicial review of

18   impeachment of the President:

19           This lack of finality would manifest itself most dramatically if

20               the President were impeached.  The legitimacy of any successor, and

21               hence its effectiveness, would be impaired severely, not merely

22               while the judicial process was running its course, but during any

23               retrial that a differently constituted Senate might conduct if its first

24               judgment of conviction were invalidated.

25   506 U.S. at 236.  The potential upheaval to this country that would result from a branch other

26   than Congress ruling on the removal of the President weighs heavily in this case as well.  The

27   founders of the Constitution created impeachment to allow an orderly process of transition and

28   succession during which the country can continue to function.  Plaintiffs' request, asking this

1   Court to sweep away the votes of over sixty-nine million Americans with the stroke of a pen and

2   order a new election during which the country would be in a state of turmoil, ignores the

3   Constitution's processes and separation of powers that were developed by the founders.

4         Evaluation of the other *Baker v. Carr* factors confirms that refraining from taking

5   jurisdiction over this matter is appropriate.  Specifically, the factors of (1) "the impossibility of a

6   court's undertaking independent resolution without expressing lack of the respect due coordinate

7   branches of government;" (2) "an unusual need for unquestioning adherence to a political

8   decision already made;" and (3) "the potentiality of embarrassment from multifarious

9   pronouncements by various departments on one question" all support the impropriety of

10  assuming jurisdiction.  369 U.S. at 217.

11        At oral argument, Plaintiffs Drake and Robinson encouraged the Court to find that the

12  redressability prong has been satisfied on the basis that President Obama's removal from office

13  would not require impeachment, which they agree is reserved by the Constitution for Congress.

14  Because President Obama never met the constitutional requirements to run for President, they

15  argue, he was never a valid candidate and could not be validly elected.  Because he does not

16  validly hold the office of President, he would not be subject to the Constitution's requirements

17  regarding the removal of a president from office through impeachment.  Finally, they reasoned

18  that, because whatever alternative process would be required to remove the President is not set

19  forth in the Constitution, it is not clearly reserved for another branch and is therefore within the

20  province of this Court.

21        There may very well be a legitimate role for the judiciary to interpret whether the natural

22  born citizen requirement has been satisfied in the case of a presidential candidate who has not

23  already won the election and taken office.  However, on the day that President Obama took the

24  presidential oath and was sworn in, he became President of the United States.  Any removal of

25  him from the presidency must be accomplished through the Constitution's mechanisms for the

26  removal of a President, either through impeachment or the succession process set forth in the

27  Twenty-Fifth Amendment.  Plaintiffs attempt to subvert this grant of power to Congress by

28  convincing the Court that it should disregard the constitutional procedures in place for the

1  removal of a sitting president.  The process for removal of a sitting president–removal for any

2  reason–is  within the province of Congress, not the courts.

3       This case highlights the complicated relationship between the redressability prong of

4  standing and the political question doctrine in cases where the plaintiff's injuries can only be

5  addressed through a court taking action against another branch of the government.  Because the

6  Court finds that it does not have the power nor the right to redress the political candidates' injury

7  by removing a sitting President from office, the Court does not have jurisdiction as to the

8  political candidates' claims on the basis that they fail to satisfy the redressability requirement of

9  Article III standing.

10      Therefore, the Court finds that it lacks jurisdiction because Plaintiffs have failed to

11  establish standing on injury-in-fact and redressability grounds.  Plaintiffs' declaratory relief,

12  injunction, and Section 1983 claims are DISMISSED.

13      **C.    *Quo Warranto* Claims**

14      Plaintiffs encourage the Court to issue a *quo warranto* writ against President Obama

15  challenging the President's right to hold his office.  The Complaint recognizes that the District of

16  Columbia would be the appropriate district in which to bring this writ, but alleges that bringing

17  this request to the United States District Court for the District of Columbia would be futile

18  because the United States Attorney is biased and Judge Robertson within that district had already

19  rejected a similar case in which President Obama's qualifications were challenged.  Compl. ¶¶

20  32 - 35.

21      The writ of *quo warranto* must be brought within the District of Columbia because

22  President Obama holds office within that district.  The *quo warranto* provision codified in the

23  District of Columbia Code provides, "A quo warranto may be issued from the United States

24  District Court for the District of Columbia in the name of the United States against a person who

25  within the District of Columbia usurps, intrudes into, or unlawfully holds or exercises, a

26  franchise conferred by the United States or a public office of the United States, civil or military."

27  D.C. Code §§ 16-3501 - 16-3503.  Should a person other than the Attorney General of the

28  United States or the United States Attorney wish to bring a *quo warranto* claim, that person must

25

1  receive leave of court to do so.  *Id.* at § 16-3502.  This leave of court must be granted, according

2  to the text of the statute, by the District Court for the District of Columbia.

3       At oral argument, Plaintiffs encouraged the Court to apply the District of Columbia's *quo*

4  *warranto* statute pursuant to California choice-of-law provisions because the District of

5  Columbia is the residence of Defendants.  Plaintiffs' contention is wholly misplaced because,

6  while this Court can apply the law of other jurisdictions where appropriate, it is precluded from

7  robbing the D.C. court of jurisdiction as to any *quo warranto* writ against President Obama

8  because the D.C. Code grants exclusive jurisdiction to the District Court for the District of

9  Columbia.  Plaintiffs' *quo warranto* demand is hereby DISMISSED for improper venue.

10       **D.**    **Discovery and Freedom of Information Act Claims**

11       Plaintiffs argue that they have been ignored by several government agencies in their quest

12  to receive Obama's long-form Hawaiian birth certificate and other information such as his

13  passport records.  *See* Compl. ¶¶ 86 - 109.  Plaintiffs have indicated that they plan to seek

14  extensive discovery in this case, including the deposition and appearance in court of President

15  Obama and the request through a letter rogatory to the government of Kenya for the birth

16  certificate that they allege proves he was born in Kenya.  *See* Mot. for Issuance of Letters

17  Rogatory for Authentication of Kenyan Birth Certificate (Aug. 1, 2009); Special Mot. For Leave

18  to Conduct Pre-R. 26(f) Discovery (Aug. 1, 2009) ("Plaintiffs . . . intend on taking the following

19  depositions: a. Barack Hussein Obama; b. Cheryl Fukino; c. Speaker of the House of

20  Representatives, Congresswoman Nancy Pelosi; d. Commissioner of Social Security; e. All other

21  Defendants . . .").  Plaintiffs appear to assume that should the Court receive a document from

22  Kenya, the Court would give credence to this document over the American birth records of the

23  President and the case would be resolved.  Even should the Court permit the issuance of a letter

24  rogatory to Kenya, the Court would still engage in a comparative exercise in which the records

25  of America, which has historically maintained some of the most credible recordkeeping practices

26  in the world, would be contrasted with the credibility of the records obtained from Kenya**.**  Such

27  an analysis would seemingly favor the records of the United States.

28       As support for their right to these documents, Plaintiffs purport to state a claim under the

Freedom of Information Act.  The Complaint states, "The Plaintiffs as a group may not have adhered closely or precisely to the letter of FOIA in all of their approaches to the current administration for information, but this court has assured them that the present case will be decided on its legal merits and factual substance, and not on procedural irregularities."  Compl. ¶ 59.  In Plaintiffs' briefing, they state, "Plaintiffs can and do allege exhaustion of FOIA requirements as a practical and substantive matter."  Pl. P.B.'s Opp'n 8:27-28.

However, even ignoring the fact that Plaintiffs appear to admit that they have not complied with FOIA requirements in their requests for information, Plaintiffs' claim fails because FOIA does not apply to Defendants.  FOIA only applies to entities qualifying as an "agency."  5 U.S.C. § 552(a)(2).  The statute defines "agency" as, "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."  *Id.* at § 551(1).  The Executive Office of the President is an agency within the Executive branch and is a body separate from the President himself.  All of the Defendants–President Obama, Michelle Obama, Secretary Clinton, Vice President Biden, and Secretary Gates–are individuals, not agencies.  Therefore, Plaintiffs fail to state a claim against these individuals under FOIA and the claim is hereby DISMISSED.

### E.    Claims Against the Remaining Defendants

Plaintiffs have also named Michelle Obama, Hillary Clinton, Joseph Biden, and Robert Gates as defendants.  Plaintiffs made overtures at pleading a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim under 18 U.S.C. §§ 1961 et seq. against all Defendants.  However, the pleading only states that while Plaintiffs had "accumulated several dossiers of evidence" suggesting a civil RICO conspiracy, they were unable to actually set forth a RICO pleading "[b]ecause of the complexity of RICO."  Compl. ¶¶ 123-25.  Plaintiffs originally filed this action on January 20, 2009, and the First Amended Complaint at issue was filed on July 15, 2009.  Nearly six months was more than sufficient time for Plaintiffs to at least attempt to set forth civil RICO allegations.  The failure to do so is inexcusable, and as Plaintiffs have failed to state any claim whatsoever against Defendants Michelle Obama, Clinton, Biden,

1  and Gates, all claims against them are DISMISSED.

2      **F.    Conduct of Plaintiffs' Counsel**

3      The hearings have been interesting to say the least.  Plaintiffs' arguments through Taitz

4  have generally failed to aid the Court.  Instead, Plaintiffs' counsel has favored rhetoric seeking

5  to arouse the emotions and prejudices of her followers rather than the language of a lawyer

6  seeking to present arguments through cogent legal reasoning.  While the Court has no desire to

7  chill Plaintiffs' enthusiastic presentation, Taitz's argument often hampered the efforts of her co-

8  counsel Gary Kreep ("Kreep"), counsel for Plaintiffs Drake and Robinson, to bring serious

9  issues before the Court.  The Court has attempted to give Plaintiffs a voice and a chance to be

10  heard by respecting their choice of counsel and by making every effort to discern the legal

11  arguments of Plaintiffs' counsel amongst the rhetoric.

12      This Court exercised extreme patience when Taitz endangered this case being heard at all

13  by failing to properly file and serve the complaint upon Defendants and held multiple hearings to

14  ensure that the case would not be dismissed on the technicality of failure to effect service.  While

15  the original complaint in this matter was filed on January 20, 2009, Defendants were not

16  properly served until August 25, 2009.  Taitz successfully served Defendants only after the

17  Court intervened on several occasions and requested that defense counsel make significant

18  accommodations for her to effect service.  Taitz also continually refused to comply with court

19  rules and procedure.  Taitz even asked this Court to recuse Magistrate Judge Arthur Nakazato on

20  the basis that he required her to comply with the Local Rules.  *See* Order Denying Pls.' Mot. For

21  Modification of Mag. J. Nakazato's Aug. 6, 2009, Order; Denying Pls.' Mot. to Recuse Mag. J.

22  Nakazato; and Granting *Ex Parte* App. for Order Vacating Voluntary Dismissal (Sep. 8, 2009).

23  Taitz also attempted to dismiss two of her clients against their wishes because she did not want

24  to work with their new counsel.  *See id.*

25      Taitz encouraged her supporters to contact this Court, both via letters and phone calls.  It

26  was improper and unethical for her as an attorney to encourage her supporters to attempt to

27  influence this Court's decision.  Despite these attempts to manipulate this Court, the Court has

28  not considered any outside pleas to influence the Court's decision.

Additionally, the Court has received several sworn affidavits that Taitz asked potential witnesses that she planned to call before this Court to perjure themselves.  This Court is deeply concerned that Taitz may have suborned perjury through witnesses she intended to bring before this Court.

While the Court seeks to ensure that all interested parties have had the opportunity to be heard, the Court cannot condone the conduct of Plaintiffs' counsel in her efforts to influence this Court.

## IV.    DISPOSITION

Plaintiffs have expressed frustration with the notion that this case could be dismissed on separation of powers, political question, or standing grounds, asserting that these are mere "technicalities" obstructing Plaintiffs from being able to resolve the case on the merits of President Obama's birth and constitutional qualifications.  As the Supreme Court has stated, "It is indeed a singular misconception of the nature and character of our constitutional system of government to suggest that the settled distinction . . . between judicial authority over justiciable controversies and legislative power as to purely political questions tends to destroy the duty of the judiciary in proper cases to enforce the Constitution." *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 149-150, 32 S. Ct. 224 (1912).  Interpreting the Constitution is a serious and crucial task with which the federal courts of this nation have been entrusted under Article III.  However, that very same Constitution puts limits on the reach of the federal courts.  One of those limits is that the Constitution defines processes through which the President can be removed from office.  The Constitution does not include a role for the Court in that process.

Plaintiffs have encouraged the Court to ignore these mandates of the Constitution; to disregard the limits on its power put in place by the Constitution; and to effectively overthrow a sitting president who was popularly elected by "We the People"–over *sixty-nine million* of the people.  Plaintiffs have attacked the judiciary, including every prior court that has dismissed their claim, as unpatriotic and even treasonous for refusing to grant their requests and for adhering to the terms of the Constitution which set forth its jurisdiction.  Respecting the constitutional role and jurisdiction of this Court is not unpatriotic.  Quite the contrary, this Court

considers commitment to that constitutional role to be the ultimate reflection of patriotism.

Therefore, for the reasons stated above, Defendants' Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

DATED: October 29, 2009

_David O. Carter_

DAVID O. CARTER
United States District Judge