# October 13, 2009 Ruling of Judge Clay D. Land

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CONNIE RHODES,                          *

     Plaintiff,                        *

vs.                                     *

                                          CASE NO. 4:09-CV-106 (CDL)

THOMAS D. MACDONALD, Colonel,           *
Garrison Commander, Fort
Benning; *et al.*,                      *

     Defendants.                       *

_____

O R D E R

INTRODUCTION

Commenting on the special privilege granted to lawyers and the corresponding duty imposed upon them, Justice Cardozo once observed:

> Membership in the bar is a privilege burdened with conditions. [A lawyer is] received into that ancient fellowship for something more than private gain. He [becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.

*People ex rel. Karlin v. Culkin,* 162 N.E. 487, 489 (N.Y. 1928) (Cardozo, J., writing as Chief Judge of the New York Court of Appeals before his appointment to the United States Supreme Court) (internal quotation marks omitted). Competent and ethical lawyers "are essential to the primary governmental function of administering justice." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). For justice to be administered efficiently and justly, lawyers must understand the conditions that govern their privilege to practice law. Lawyers who do not understand those conditions are at best woefully unprepared to practice the profession and at worst a menace to it.

When a lawyer files complaints and motions without a reasonable basis for believing that they are supported by existing law or a modification or extension of existing law, that lawyer abuses her privilege to practice law.  When a lawyer uses the courts as a platform for a political agenda disconnected from any legitimate legal cause of action, that lawyer abuses her privilege to practice law. When a lawyer personally attacks opposing parties and disrespects the integrity of the judiciary, that lawyer abuses her privilege to practice law.  When a lawyer recklessly accuses a judge of violating the Judicial Code of Conduct with no supporting evidence beyond her dissatisfaction with the judge's rulings, that lawyer abuses her privilege to practice law.  When a lawyer abuses her privilege to practice law, that lawyer ceases to advance her cause or the ends of justice.

It is irrefutable that a lawyer owes her client zealous advocacy, but her zeal must be constrained within the bounds placed upon her as an officer of the Court and under the Court's rules.  *See e.g., Polk County v. Dodson*, 454 U.S. 312, 323 (1981) (though a lawyer "has a duty to advance all colorable claims and defenses . . . [i]t is the obligation of any lawyer . . . not to clog the courts with frivolous motions or appeals").  Specifically, Rule 11 of the Federal Rules of Civil Procedure expressly sets forth the outer boundaries of acceptable attorney conduct.  That rule prohibits a lawyer from asserting claims or legal positions that are not well-founded under existing law or through the modification, extension, or expansion of

2

existing law.   Rule 11 also prohibits an attorney from using the courts for a purpose unrelated to the resolution of a legitimate legal cause of action.  *Cf., e.g., Donaldson v. Clark*, 819 F.2d 1551, 1558-59 (11th Cir. 1987) (en banc) (noting that members of the bar have a "special administrative responsibility in the judicial process" and that monetary sanctions may be imposed for "an unjustified failure to carry out" this special responsibility (internal quotation marks omitted)).

Regrettably, the conduct of counsel Orly Taitz has crossed these lines, and Ms. Taitz must be sanctioned for her misconduct.  After a full review of the sanctionable conduct, counsel's conduct leading up to that conduct, and counsel's response to the Court's show cause order, the Court finds that a monetary penalty of $20,000.00 shall be imposed upon counsel Orly Taitz as punishment for her misconduct, as a deterrent to prevent future misconduct, and to protect the integrity of the Court.  Payment shall be made to the United States, through the Middle District of Georgia Clerk's Office, within thirty days of today's Order.  If counsel fails to pay the sanction due, the U.S. Attorney will be authorized to commence collection proceedings.[1]

---

[1] The Court does not take this action lightly, and in fact, cannot recall having previously imposed monetary sanctions upon an attorney *sua sponte.*

BACKGROUND

**I.   Major Stefan Frederick Cook's Action**

The Court first encountered Plaintiff's counsel, Orly Taitz, on July 9, 2009, when she filed an action in this Court on behalf of Army reservist Major Stefan Frederick Cook.  In that action, counsel sought a temporary restraining order to prevent Major Cook's deployment to Afghanistan.  Counsel alleged that Major Cook's deployment orders were void and unenforceable because President Barack Obama was not eligible to hold the office of President and thus was not the legitimate Commander in Chief.  These allegations were based on counsel's conclusory allegations that the President was not born in the United States.  As a national leader in the so-called "birther movement," Plaintiff's counsel has attempted to use litigation to provide the "legal foundation" for her political agenda.  She seeks to use the Court's power to compel discovery in her efforts to force the President to produce a "birth certificate" that is satisfactory to herself and her followers.

Plaintiff's counsel requested an emergency hearing on her motion for a temporary restraining order based upon Major Cook's alleged imminent deployment.  The Court accommodated counsel's request and scheduled a hearing for July 16, 2009.  The U.S. Army had to activate its legal team, which required a Major from the Army's Litigation Division in Washington, D.C. to travel to Columbus for the emergency hearing.  Prior to the hearing, Major Cook's future commander in Afghanistan decided that he did not wish for Major Cook to assume the

4

duties set out in his deployment orders, expressing the opinion that he had a military mission to conduct in Afghanistan and did not need any distractions associated with a reservist who did not wish to serve.  Therefore, the Army revoked Major Cook's deployment orders. As a result, Major Cook received the ultimate relief that he purportedly sought in the legal action: a revocation of the deployment order.  However, the revocation pulled the proverbial rug out from under Ms. Taitz, who at that point had no legitimate legal basis for pursuing the litigation in her attempt to further her agenda of obtaining a "satisfactory birth certificate" from the President.

Notwithstanding the revocation of the deployment order, counsel insisted upon pursuing the claim.  Her actions confirmed that counsel's focus was not to obtain legal relief on behalf of Major Cook; rather, the objective was to maintain a legal action in federal court in hopes of having a federal judge permit discovery that would require the President of the United States to produce a "birth certificate" that was satisfactory to counsel and her followers.

The Court dismissed the *Cook* action, finding that Major Cook did not have standing to pursue his claim.  *Cook v. Good,* No. 4:09-CV-82 (CDL), 2009 WL 2163535 (M.D. Ga. Jul. 16, 2009).  Although Ms. Taitz's antics at that time caused the Court concern, the Court exercised restraint, optimistically expecting that Plaintiff's counsel would not return for a repeat performance.  The Court's hopes were quickly dashed when it learned of Ms. Taitz's subsequent press conference, in which she reportedly stated that the Court's ruling made "absolutely

5

no sense," was "totally illogical" and "defie[d] any sense of decency," notwithstanding the fact that her client had obtained the relief he sought and thus had no legal standing to maintain the action. Lily Gordon, *Federal Judge Dismisses Lawsuit Questioning Obama's Natural Born Citizen Status*, Columbus Ledger-Enquirer, July 17, 2009, *available at* http://www.ledger-enquirer.com/news/story/779860.html. These comments foreshadowed that we would see Ms. Taitz again.

## II.  Captain Connie Rhodes's Texas Action

Ms. Taitz continued to pursue similar litigation across the Country,[2] but the next action relevant here was filed in the U.S. District Court for the Western District of Texas on August 28, 2009. In that action, Ms. Taitz, representing Connie Rhodes, the same Captain Rhodes that was the Plaintiff in the present action, sought to have the Texas Court prevent the U.S. Army from deploying Captain Rhodes to Iraq based upon the President's alleged ineligibility to hold office—the same exact claim she asserted here.  Judge Xavier Rodriguez promptly denied Plaintiff's motion for a temporary restraining order, finding that "Plaintiff has no substantial likelihood of success on the merits." *Rhodes v. Gates*, 5:09-CV-00703-

---

[2]Immediately on the heels of his loss in this Court, Major Cook filed another action in the Middle District of Florida. *Cook v. Simtech, Inc.*, No. 8:09-CV-01382-RAL-EAJ (M.D. Fla. 2009). That case was promptly dismissed.  Upon receiving an adverse ruling in that case, Ms. Taitz, consistent with her *modus operandi*, filed a motion to recuse the district judge there as she has done here.  That judge found her motion to be frivolous.

XR, Order Den. Mot. for TRO 3 (W.D. Tex. Aug. 28, 2009).   Judge
Rodriguez explained that "Plaintiff presents nothing but conjecture
and subjective belief to substantiate the basis for her claims[.]"
Captain Rhodes was thus on her way to Iraq, but she had to stop at Ft.
Benning, Georgia first.   With yet another legal defeat and still no
court order requiring the President to "turn over his birth
certificate," Ms. Taitz apparently concluded that this Court would be
more receptive to Captain Rhodes's claim than Judge Rodriguez was.

## III. Captain Rhodes's Action in this Court

A mere seven days after losing in Texas, Ms. Taitz filed the same
action in this Court.   She again sought an emergency hearing on the
motion.   Reluctant to summarily deny a litigant her day in court, the
Court scheduled a hearing on September 14, 2009, prior to Captain
Rhodes's scheduled deployment.   In the midst of a jury trial of
another case, the Court nevertheless rearranged its schedule, along
with the schedules of jurors and other attorneys, so that Captain
Rhodes's matter could be heard during an extended lunch break.
Because of the alleged urgent nature of the request, the Court waived
its local rule that requires counsel admitted *pro hac vice* to
associate local counsel.   *See* M.D. Ga. R. 83.1.2(c)(1).[3]   It became
apparent during the hearing on the motion that the Court's waiver of
this local rule was a mistake as counsel abused her *pro hac vice*

_____

[3]Ms. Taitz, a member of the California Bar, is not admitted to
practice in this Court.   Under this Court's rules, an attorney may be
admitted *pro hac vice,* as long as she associates another attorney who is
admitted to practice in the Middle District of Georgia.

privileges.  Instead of arguing  pertinent legal authority supporting
her position, counsel reverted to "press conference mode," repeating
political "talking points" that did not answer the Court's questions
or address the Court's concerns.  Specifically, counsel was unable to
explain why this Court should not abstain from deciding this case
based upon well-established precedent, and she was unable to
articulate clearly how the alleged "cloud" on the President's place
of birth amounted to a violation of her client's individual
constitutional rights.  Rather than address these two important
questions, counsel retreated to her political rhetoric.  When the
Court admonished her for not addressing the legal issues presented by
her Complaint, counsel accused the Court of unfairly badgering her and
implored the Court to ask Defendants' counsel questions instead of
her.  Ms. Taitz's performance confirmed to the Court that her focus
was not to pursue a legitimate legal cause of action to obtain relief
for her client but was to use the Court to force the President to
produce a "birth certificate" satisfactory to her and her followers.
Her other purpose appeared to be to use litigation as a means of
drawing attention to her political agenda.  During the hearing,
Plaintiff's counsel threatened that if she did not get the opportunity
to obtain the relief she sought (discovery of a birth certificate),
then a wave of subsequent similar actions would be filed in this Court
until she obtained what she wanted.

Two days after the hearing, the Court issued an admittedly strong
order dismissing the action on abstention grounds.  *Rhodes v.*

8

*MacDonald*, No. 4:09-CV-106 (CDL), 2009 WL 2997605 (M.D. Ga. Sept. 16, 2009).  The Court found that Plaintiff had failed to satisfy any of the elements necessary for a federal court to interfere with a deployment order issued by the U.S. Army.  The Court further found the action to be legally frivolous, meaning that no reasonable attorney could have expected that her legal claim would prevail under existing law or under a reasonable extension or modification of existing law.  The claims were based solely on conjecture and speculation that the President may not have been born in the United States.  Moreover, counsel failed to allege and explain how any such factual allegations resulted in a denial of Plaintiff's individual constitutional rights such that Plaintiff would be authorized to ignore a valid deployment order from her chain of command.  Counsel likewise could not reconcile her claim that the deployment order was suspect with the fact that Plaintiff apparently had followed other orders (without questioning them) that had been issued since the President had taken office.  Plaintiff's sensitivity to the President's eligibility only existed when she faced deployment to Iraq, where she may be in harm's way.  Given the obvious frivolous nature of the legal claim and the clear evidence that Ms. Taitz was using the Court for an improper purpose, the Court placed Ms. Taitz on notice that the filing of any future similar frivolous filings would subject her to Rule 11 sanctions.  *Id.* at *1.

## IV.   Counsel's Motion for Reconsideration

Undeterred by the Court's warning, counsel filed a motion for reconsideration the next day.  (Pl.'s Emergency Req. for Stay of Deployment, Sept. 17, 2009.)  That motion is the specific conduct that the Court relies upon in determining that sanctions are appropriate. In her motion for reconsideration, counsel did not address the substance of the Court's order dismissing her case.  Rather, counsel used the motion for reconsideration as a platform to repeat her political diatribe against the President, to accuse the undersigned of treason, and to maintain that "the United States District Courts in the 11th Circuit are subject to political pressure, external control, and . . . subservience to the same illegitimate chain of command which Plaintiff has previously protested."  (*Id.* at 2 (emphasis omitted).)

The Court denied the motion, finding it to be frivolous and the filing of it to be sanctionable.  The Court provided counsel with the opportunity to show cause why she should not be sanctioned with a financial penalty of $10,000.00.  (Order Den. Mot. for Recons. 7, Sept. 18, 2009.)

## V.   Counsel's Response to Show Cause Order

The Court, consistent with Rule 11 and the requirements of due process, provided counsel with the opportunity to respond to the Court's intention to impose sanctions.  *See, e.g., Donaldson*, 819 F.2d at 1560-61 (finding that due process requires notice and an opportunity to respond prior to imposition of Rule 11 sanctions but

10

that a hearing is not necessary and may be a "waste of judicial resources" where the attorney fails to present support for her claims despite opportunities to do so). Instead of responding to the Court's specific concerns or addressing the contemplated amount of the monetary sanction, Ms. Taitz continued her attacks on the Court, as well as her political grandstanding. She now moves to recuse the undersigned, alleging that the undersigned had *ex parte* communication with the Attorney General of the United States; that the undersigned's ownership of certain stock caused him to have a financial interest in the litigation; that the tone of the Court's previous rulings, and the rapidity with which they were made, demonstrate bias on the part of the Court; and that sanctions cannot be imposed in this case by the undersigned without violating her due process rights. Counsel therefore seeks to burden the federal judiciary further by having another judge subjected to her unprofessional conduct and by prolonging the inevitable with an unjustified extension of time to respond to the show cause order.

DISCUSSION

The Court will first address counsel's Motion to Recuse (Doc. 24) and Motion for Enlargement of Time to Respond to the show cause order (Doc. 25). The Court next addresses the sanctionability of counsel's misconduct. Finally, the Court concludes by determining the appropriate sanction necessary to deter counsel from repeating her misconduct and to protect the integrity of the Court.

11

## I.   Motion to Recuse and Motion for Enlargement of Time

Counsel seeks recusal of the undersigned for the following reasons: (1) baseless speculation that the undersigned may have engaged in *ex parte* communication with the Attorney General; (2) fictitious allegations that the undersigned has a financial interest in the outcome of the case based on ownership of stock in Microsoft and Comcast; (3) frivolous argument that the Court cannot issue monetary sanctions as a penalty to deter future misconduct under Rule 11; and (4) frivolous contention that the Court is biased based upon the tone of its previous rulings and the expedited nature and substance of the Court's rulings.  The Court addresses each of these issues in turn.

Preliminarily, the Court addresses the issue of whether it must proceed no further with these proceedings based solely upon counsel's conclusory allegations that the Court has a personal bias against her. 28 U.S.C. § 144 states in relevant part:

> Whenever a party to any proceeding in a district court makes and files a *timely* and *sufficient* affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.

28 U.S.C. § 144 (emphasis added) ("§ 144").

12

The Court finds that counsel's purported affidavit—the "certificate of good faith"—is neither sufficient nor timely. First, § 144 applies to "parties" to the proceeding. The party in this case was Captain Connie Rhodes. Captain Rhodes makes no claim that the undersigned has a personal bias against her. In fact, she has discharged Ms. Taitz and stated she has no interest in pursuing the matter further. (*See* Letter from Rhodes to Ct., Sept. 18, 2009, Doc. 18.) In response to Captain Rhodes's termination of her services, counsel sought to withdraw from representation of Captain Rhodes, which the Court permitted. (*See* Mot. to Withdraw, Sept. 28, 2009, Doc. 20 & Order Granting Mot. to Withdraw, Sept. 28, 2009, Doc. 21.) Thus, no affidavit has been executed and filed by the party in this action alleging personal bias against the party to the action. Accordingly, the undersigned is not required to step aside from deciding the remaining issue regarding sanctions against counsel.

Insofar as counsel contends that § 144 requires the Court to step aside because of alleged personal bias against counsel, the Court notes that counsel has not filed a § 144 affidavit on her own behalf. She filed a "certificate of good faith," purportedly pursuant to § 144, that the undersigned was personally biased against Captain Rhodes. But counsel has filed no affidavit, on her own behalf, pursuant to § 144. Thus, having failed to comply with § 144, no legal justification exists for the undersigned to discontinue further involvement in these proceedings.

13

Even if counsel's "certificate of good faith" were deemed to be a sufficient "affidavit" under § 144 and even if counsel, as opposed to the party to the action, has the right to seek immediate disqualification pursuant to § 144, counsel's certificate was not timely. It was not filed ten days prior to the beginning of the term during which the case was to be heard, as required by § 144, and counsel offers no good cause why the certificate was not filed sooner. Counsel's certificate was filed *after* the Court heard the underlying case and *after* that case was terminated against counsel's client. Moreover, as to the sanctions aspect of the case, the motion to disqualify was filed *after* the Court entered its order indicating its intention to impose sanctions and requiring counsel to show cause why the amount of those sanctions should not be $10,000.00. Counsel had ample opportunity to seek removal of the undersigned prior to the undersigned's devotion of substantial time to this matter. The Court observes that after the Court ruled against counsel's claims in the *Cook* case and before she filed the present action, counsel filed no affidavit pursuant to § 144 that the Court possessed a personal bias warranting disqualification. After the Court held a hearing in the *Rhodes* case but before a ruling was made, no § 144 affidavit was submitted. Even when counsel filed her motion for reconsideration, in which she accused the Court of treason, she did not file a § 144 affidavit. Only after the Court devoted substantial time to this case and ultimately found counsel's conduct sanctionable, ordering her to show cause why she should not be subjected to a financial sanction,

14

did she file her § 144 affidavit.   Counsel's claim of personal bias is thus untimely under § 144.

Moreover, as explained below, the grounds for seeking disqualification are frivolous on their face.  They are not sufficient for purposes of 28 U.S.C. § 144.  Section 144 contemplates some initial screening of the affidavit in order to prevent manipulation of the judicial system by disgruntled litigants.  *See Davis v. Bd. of Sch. Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (5th Cir. 1975) ("Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit[.]").[4]  As explained below, counsel provided no factual allegations other than her dissatisfaction with the Court's rulings to substantiate her claim that the Court has any personal bias against her.  Under these circumstances, the Court finds that § 144 does not provide counsel with the authority to prevent the undersigned from completing its disposition of this matter.  *See, e.g., Liteky v. United States*, 510 U.S. 540, 555-56 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

It is clear that the Court is not *automatically* recused pursuant to 28 U.S.C. § 144 simply based upon counsel's conclusory allegations of bias.  However, the Court is obligated to evaluate counsel's reasons offered in support of her demand for disqualification and

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

determine whether they require the undersigned to disqualify himself pursuant to 28 U.S.C. § 455.[5]

A.   The Attorney General

Ms. Taitz alleges that the undersigned may have discussed this case with the Attorney General of the United States.  In support of this accusation, counsel submits the affidavit of Robert D. Douglas. Mr. Douglas states that on the day of the hearing in the *Cook* case, he saw in the "coffee shop" across the street from the federal courthouse someone whom he recognized as Eric Holder, the Attorney General.  Mr. Douglas's identification is based upon what he describes as the Attorney General's "distinguishing features: his trim upper lip mustache, not large of stature and general olive complexion." (Douglas Aff., Sept. 26, 2009.)  The affidavit further states that Mr. Douglas "new [sic] instantly that it was none other than Eric Holder, the current Attorney General of the United States."  (*Id.*)   Mr. Douglas has apparently never seen the Attorney General in person, but Mr. Douglas states that he recognized the Attorney General because he had seen Mr. Holder on television.

The undersigned has never talked to or met with the Attorney General.  As to whether the Attorney General took time out of his busy schedule to visit an "obscure" "coffee shop" in Columbus, Georgia on

---

[5] 28 U.S.C. § 455(a) requires a judge to disqualify himself if his impartiality "might reasonably be questioned."   A judge shall also disqualify himself if he has a personal bias or prejudice against a party or if he has a financial interest in the subject matter in controversy. 28 U.S.C. §§ 455(b)(1) & (b)(4).

July 16, 2009, the Court cannot definitively say because the Court was not there.  What the Court can say is that no reasonable attorney would rely upon this affidavit in support of a legal argument in a court of law.  *See, e.g., Fox v. Prudential Fin.*, 178 F. App'x 915, 919 (11th Cir. 2006) (per curiam) (finding that reasonable person would not find partiality based on bare allegations and unsupported conclusory statements that "secret discussions" took place between defendant and court).  To use this "evidence" in support of a false and misleading accusation that a judge had an *ex parte* conversation with someone whom the judge has never spoken to or even met is additional proof of a pattern of frivolous and outrageous conduct on the part of Ms. Taitz.[6]

B.   Stock Ownership

Counsel's contention that the undersigned has a financial interest in this case is perhaps more preposterous than the phantom visit with the Attorney General.  In the main action by Captain Rhodes, Plaintiff sought an injunction enjoining her from being deployed to Iraq.  The outcome of that action had no financial ramifications other than perhaps to Captain Rhodes and the U.S. Army.

---

[6]Minimal research reveals that the Attorney General was in Los Angeles on July 15 and July 16, the same time Ms. Taitz claims he was in Columbus, Georgia, 2,000 miles away.  *E.g.,* Press Release, U.S. Department of Justice, Attorney General Eric Holder to Visit Los Angeles to Address Southwest Border Strategy, Violence Against Women and Gang Prevention (July 14, 2009), *available at* http://www.reuters.com/article/pressRelease/idUS175936+14-Jul-2009+PRN20090714; Press Release, U.S. Department of Justice, Attorney General Announces $500,000 Recovery Act Grant for California Transitional Housing Program (July 16, 2009), *available at* http://www.usdoj.gov/opa/pr/2009/July/09-ag-689.html.

17

The action certainly did not implicate Microsoft or Comcast, the two investments specifically referred to in counsel's motion. (*See* Mot. to Recuse 2.)  Moreover, that action has terminated in Defendants' favor, with Captain Rhodes having discharged Ms. Taitz and indicating she no longer wished to pursue it.  Thus, the legal matter from which counsel seeks recusal of the undersigned is the sanctions proceeding against her.  While that proceeding will certainly affect Ms. Taitz's financial condition, it is fantasy to suggest that these proceedings will in any way affect the fortunes of Microsoft and Comcast. Furthermore, counsel's suggestion—that if she were to succeed on her frivolous claim, and as a result the President were removed from office, that these two companies would suffer as a result–is so speculative and ridiculous that it is not worthy of additional comment.  The Court must nevertheless remind counsel that she has been fired by her former client, who has made it clear that she no longer wishes to pursue the matter.  Therefore, counsel cannot possibly succeed on her main claim that she maintains would topple Microsoft and Comcast because she has no means to appeal the Court's dismissal of that claim.

C.    *Sua Sponte* Imposition of Monetary Sanctions

Ms. Taitz argues that the undersigned should be recused because a judge cannot *sua sponte* act as "prosecutor, judge, and jury" in imposing monetary sanctions that are designed as a penalty to punish and deter lawyer misconduct.  (Mot. to Recuse 17.)  Once again, counsel ignores the law.  Rule 11 specifically authorizes the *sua*

*sponte* imposition of monetary sanctions for these purposes. Fed. R. Civ. P. 11(c)(3); *cf. Donaldson*, 819 F.2d at 1558 (finding that due process does not require courts to follow criminal contempt procedures when imposing monetary sanctions under Rule 11). Furthermore, it is likewise well settled that the Court has the inherent authority to impose such sanctions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-43 (1991). The Court recognizes that such action is serious and that the lawyer must be given due process before the sanction is imposed. This requires that the Court notify counsel of the conduct and allow counsel an opportunity to respond. To suggest that the Court has not done so in this case is simply wrong. The Court outlined in its previous order the sanctionable conduct. Counsel was given ample opportunity to respond. In fact, she filed a twenty-two page response. Counsel's contention that this Court, which is most familiar with counsel's conduct, must recuse so that another judge may be burdened with counsel's frivolous arguments is meritless.

    D.   Judicial Bias

    Ms. Taitz maintains that the undersigned should recuse because of bias. In support of her bias claim, she relies upon three things: 1) the tone of the Court's previous rulings; 2) the expedited nature in which those rulings were made; and 3) the substance of those rulings, which she extrapolates into a personal attack on the Court, suggesting that the rulings indicate that the Court would have denied access to civil rights claims had the undersigned been on the bench during the civil rights movement.

19

The Court makes no apology for the tone of its previous orders. They were direct and strong but apparently not strong enough. They certainly do not demonstrate personal bias. They do demonstrate a lack of tolerance for frivolous legal claims asserted by lawyers who should know better. A Court's insistence that lawyers comply with their duty to follow the rules and their obligations as officers of the Court is not a legitimate basis for recusal.

Counsel's contention that the expedited nature of the Court's rulings demonstrates that the Court had prejudged the case is laughable. First, as the Court has noted previously, counsel sought expedited consideration. She sought an injunction enjoining the U.S. Army from deploying her client, which was to occur within days of the filing of her Complaint. Yes, the Court ruled quickly. Had the Court not done so, counsel undoubtedly would have accused the Court of some conspiracy to delay ruling until after the deployment had occurred. Furthermore, although the Court is not personally familiar with the pace of legal decision making in counsel's home state of California, the Court notes that Georgia courts have long recognized that the expedited nature of a decision does not detract from its quality. As observed by the Georgia Supreme Court long ago:

> Both observation and experience teach, that the human mind acts with increased power according to the pressure put upon it. Give it time and it acts slowly. Force it to decide promptly, as the General is required to do on the battle-field, and the statesman in the midst of revolutions, and the same mind will do the work of a month in a moment; and what is more, will do it better. True, the effect upon the individual himself, is most exhausting, but the public does not suffer.

*Thornton v. Lane,* 11 Ga. 459, 491 (1852).

Finally, counsel insists that her substantive claims are so meritorious that only a biased judge would find them frivolous. Comparing herself to former Supreme Court Justice and civil rights icon Thurgood Marshall, counsel likens her plight to Justice Marshall's epic legal battle to desegregate American schools and public places. Quite frankly, the Court is reluctant to even dignify this argument by responding to it, but it captures the essence of counsel's misunderstanding of the purpose of the courts and her misunderstanding of her own claims. Yes, Justice Marshall had to extend then-existing law to prevail in *Brown v. Board of Education*, 347 U.S. 483 (1954). But he did so by persuading the Court that the *de jure* discrimination against black schoolchildren violated their rights under the existing Fourteenth Amendment to the Constitution—a fundamental truth that had been recognized years earlier by Justice Harlan in his eloquent and prescient dissent in *Plessy v. Ferguson,* 163 U.S. 537, 555-56 (1896) (Harlan, J., dissenting). Justice Marshall's arguments were a logical extension and certainly a necessary modification of then-existing law. Counsel in this case cannot articulate how the President's ineligibility to hold office, even if proven, violates an Army officer's individual constitutional rights such that it would authorize that officer to disobey a deployment order. Counsel has likewise never cited any legal authority or made any reasonable argument as to why the traditional abstention doctrine should not have been applied here. Finally,

Justice Marshall had real evidence that black children were being sent to inferior segregated schools based solely on the color of their skin.  He had credible evidence as to the impact of inferior segregated schools upon the schoolchildren forced to attend them by their government.  Justice Marshall was also able to articulate how this conduct on the part of the government violated the Fourteenth Amendment, an amendment clearly designed to assure that the government finally recognized the promise of the Declaration of Independence: that all men are created equal.

Counsel here has an affidavit from someone who allegedly paid off a government official to rummage through the files at a Kenyan hospital to obtain what counsel contends is the President's "authentic" birth certificate.  Counsel here makes no coherent argument connecting the Constitution's presidential citizenship requirement to a violation of her client's individual constitutional rights.  Counsel here points to no legal authority—in the Constitution or elsewhere—that could be extended or expanded to create an exception to the well-established doctrine of abstention, which disfavors judicial interference in the internal affairs of the military.

To suggest that an Army officer, who has received a medical education at the expense of the government and then seeks to avoid deployment based upon speculation that the President is not a natural born citizen, is equivalent to a young child, who is forced to attend an inferior segregated school based solely on the color of her skin, demonstrates an appalling lack of knowledge of the history of this

Country and the importance of the civil rights movement. Counsel's attempt to align herself with Justice Marshall appears to be an act of desperation rather than one of admiration. For if counsel truly admired Justice Marshall's achievements, she would not seek to cheapen them with such inapt comparisons.

In summary, counsel, dissatisfied with the Court's rulings and "seeing the writing on the wall," now seeks to escape accountability for her misconduct during this litigation. She shall not be allowed to do so. Her motion to recuse and motion for enlargement of time have no merit and are accordingly denied as frivolous.

## II. Reaffirmation of the Appropriateness of Sanctions

The major goal of Federal Rule of Civil Procedure 11 is to "reduce frivolous claims, defenses or motions and to deter costly meritless maneuvers." *Donaldson*, 819 F.2d at 1556 (internal quotation marks omitted).

> Rule 11 sanctions are properly assessed (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose.

*Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (per curiam) (internal quotation marks omitted). The preliminary legal issue for resolution by the Court is whether an attorney, as an officer of the Court, should be sanctioned under Rule 11 for (1) filing a motion for reconsideration of an order that found the assertion of Plaintiff's claim to be legally frivolous, when no reasonable attorney could have

23

concluded that there was a reasonable basis for arguing that legitimate legal grounds existed for vacating the previous order either under existing law or a reasonable extension or modification of existing law; and/or (2) using a legal action for which no reasonable expectation of obtaining relief existed in order to pursue a political and/or personal agenda.  The Court finds that Rule 11 clearly authorizes the imposition of sanctions under these circumstances.  *See, e.g., Massengale*, 267 F.3d at 1303 (affirming finding that party violated Rule 11 by filing amended complaint with no factual or legal basis); *see also Saltany v. Reagan,* 886 F.2d 438, 440 (D.C. Cir. 1989) (per curiam) ("We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."). For the following reasons, the Court reaffirms that sanctions are necessary and appropriate.

First, notwithstanding counsel's narrow focus, the issue is not simply whether the President is eligible to hold that office.  Federal courts are limited to deciding actual cases and controversies.  U.S. Const. art. III, § 2, cl. 1.  They are not advisory councils to be called upon whenever a lawyer believes a Constitutional question needs answering, no matter how important that question may be.  *See, e.g., Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (noting that "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them" (internal quotation marks omitted)); *R.T. Vanderbilt Co.*

24

*Occupational Safety & Health Review Comm'n*, 708 F.2d 570, 574 (11th Cir. 1983) (explaining that under Article III, "federal courts are constitutionally empowered only to render judgments which are not advisory opinions or political in nature" (citations omitted)).  As consistently held by the Supreme Court,

> [A] plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573-74 (1992) (plurality opinion).  Counsel's grievance in this case is that the President has failed to produce satisfactory proof of his place of birth.  That general grievance is beyond the reach of the federal judiciary.

Counsel, at least superficially, appears to understand that she must structure her claim to overcome the standing hurdle.  She attempted to clear that hurdle on her way to the prize (verification of the President's place of birth) by having her client challenge her deployment orders.  This leap from a concern about a President's Constitutional eligibility to hold the office to a private legal cause of action by an Army Captain to avoid deployment pursuant to an otherwise valid order is where counsel entered the thicket of legal frivolity.  Counsel and her followers certainly have the right, as citizens, to seek from their President proof of where he was born.  Counsel does not have the right, however, to file an action in federal court on behalf of an Army officer to avoid deployment when the only

25

basis for seeking the Court's aid to prevent deployment is speculation and conjecture that the President is not eligible to serve. Plaintiff's counsel ignored the well-established precedent that disfavors judicial interference in the internal affairs of the armed forces. She pointed to no legal authority supporting her contention that an alleged "cloud" on the President's eligibility to hold office violated one of her client's individual constitutional rights. And she provided no legal authority to support the proposition that even if the President were found not to be eligible for the office, that this would mean all soldiers in the military would be authorized to disregard their duty as American soldiers and disobey orders from their chain of command.

Adoption of counsel's legal theory would make the judiciary the arbiter of any dispute regarding the President's constitutional qualifications. Our founders provided opportunities for a President's qualifications to be tested, but they do not include direct involvement by the judiciary. In addition to the obvious opportunity that exists during a presidential campaign to scrutinize a candidate's qualifications, the framers of the Constitution provided a mechanism for removing a President who "slips through the cracks," which is how counsel describes President Obama. Upon conviction by the Senate of treason, bribery, or other high crimes and misdemeanors, the President can be removed through impeachment. U.S. Const. art. II, § 4; *see also id.* art. I, §§ 2 & 3. Thus, if the President were elected to the office by knowingly and fraudulently concealing evidence of his

26

constitutional disqualification, then a mechanism exists for removing him from office. Except for the Chief Justice's role in presiding over the trial in the Senate, that mechanism does not involve the judiciary. *Id.* art. I, § 3, cl. 6.

One can readily see the wisdom of entrusting the elected representatives of the people with the ultimate decision as to whether a President should be removed from office rather than litigating the issue in our courts. Although counsel's present concern is the location of the President's birth, it does not take much imagination to extend the theory to his birthday. Perhaps, he looks "too young" to be President, and he says he stopped counting birthdays when he reached age thirty. If he refused to admit publicly that he is older than the constitutional minimum age of thirty-five, should Ms. Taitz be allowed to file a lawsuit and have a court order him to produce his birth certificate? *See* U.S. Const. art. II, § 1, cl. 4. Or perhaps an eccentric citizen has become convinced that the President is an alien from Mars, and the courts should order DNA testing to enforce the Constitution.[7] Or, more to the point, perhaps the Court should issue a nationwide injunction that prevents the U.S. Army from sending any soldier to Iraq or Afghanistan or anywhere else until Ms. Taitz is permitted to depose the President in the Oval Office. The federal

---

[7]The Court does not make this observation simply as a rhetorical device for emphasis; the Court has actually received correspondence assailing its previous order in which the sender, who, incidentally, challenged the undersigned to a "round of fisticuffs on the Courthouse Square," asserted that the President is not human.

27

courts were not established to resolve such purely political disputes or to assist in the pursuit of a political fishing expedition, particularly when that intrusion would interfere with the ability of the U.S. Army to do its job.

Contrary to counsel's suggestion, the courts do not refrain from entering political debates because of bias or personal disinterest. They do so because the Constitution, within which counsel attempts to wrap herself, prevents their encroachment into the political sphere. That does not mean that judicial decisions do not often have political consequences, nor does it mean that the judiciary cannot rule upon issues that may overturn actions by the political branches when they are contrary to the Constitution. But it is clear that the Constitution does not contemplate that the judiciary will participate in the selection or removal of the President, unless an individual can clearly demonstrate that his individual constitutional rights are somehow violated by the process. A generalized claim that the President is unqualified does not fall within this narrow exception and is best addressed to the First branch of government, not the Third.

The absolute absence of any legitimate legal argument, combined with the political diatribe in her motions, demonstrates that Ms. Taitz's purpose is to advance a political agenda and not to pursue a legitimate legal cause of action. Rather than citing to binding legal precedent, she calls the President names, accuses the undersigned of treason, and gratuitously slanders the President's father. As the

28

Court noted in an earlier order, counsel's wild accusations may be protected by the First Amendment when she makes them on her blog or in her press conferences, but the federal courts are reserved for hearing genuine legal disputes, not as a platform for political rhetoric and personal insults. Simply put, no reasonable basis existed for counsel to believe that her legal cause of action was legitimate under existing law or under a reasonable extension or modification of existing law. Thus, counsel's Complaint on behalf of Captain Rhodes was frivolous.

Although the Court found the Complaint frivolous, the Court did not impose sanctions upon that finding alone. The Court did notify counsel of its conclusion, as it had a duty to do, in order to prevent future similar filings. Defying that admonition, counsel immediately sought reconsideration of the Court's order. In doing so, she did not challenge with contrary legal authority the legal basis for the Court's decision—abstention—nor did she attempt to distinguish the authority cited by the Court. She didn't even mention it.

Local Rule 7.6 authorizes a motion for reconsideration when "absolutely necessary." M.D. Ga. R. 7.6. Reconsideration is "absolutely necessary" only where the movant demonstrates that (1) there was an intervening development or change in controlling law, (2) new evidence has been discovered, or (3) the court made a clear error of law or fact. *McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1222-23 (M.D. Ga. 1997). Counsel simply had no basis for concluding that reconsideration was appropriate here, much less absolutely necessary.

29

Instead, she continued her political diatribe against the President and baseless accusations against the Court.  Her argument that she should have been given more time to respond before the Court issued its ruling, when she had requested the expedited consideration, is so shockingly devoid of reality that it is difficult to know how to respond.    It  is  beyond  dispute  that  filing  a  motion  for reconsideration of an order when no reasonable basis exists under existing law or under an extension or modification of existing law to modify that order is sanctionable under Rule 11.

In addition, an attorney, as an officer of the Court, has an obligation to use legal proceedings for the legitimate purpose of pursuing a lawful cause of action.  It is not appropriate to use briefs or motions to make personal attacks on opposing parties or the Court.  As the Supreme Court observed, "if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal." *Sacher v. United States,* 343 U.S. 1, 9 (1952).  Calling the President a usurper and mocking his father as treacherous and disloyal to the British Crown added nothing to the advancement of Plaintiff's legal cause of action.  It provides good rhetoric to fuel the "birther agenda," but it is unbecoming of a member of the bar and an officer of the Court. Likewise, accusing a judge of treason and suggesting that the federal courts are under the thumb of the Executive Branch for no reason other than the judge ruled against you may be protected by the First Amendment when made outside of court proceedings, but it has no place

in a legal motion for reconsideration. *See e.g. In re Mann,* 229 F.3d 657, 659 (7th Cir. 2000) ("Litigants are understandably disappointed when they do not prevail in court, but that does not give them the license to attack the integrity of the judiciary."). Counsel's conduct certainly could not be viewed as advancing Plaintiff's cause of action. It expanded the legal proceedings beyond their proper scope, burdening the Court with the necessity of responding to the frivolous contentions. It is further evidence of counsel's attempt to use the federal courts for the improper purpose of advancing her anti-Obama "birther agenda." This is not the forum for that. The proper forum for that agenda, as previously explained, is to convince Congress to initiate impeachment proceedings or at the ballot box.

For all of these reasons, the Court reaffirms its findings in its previous order that counsel's motion for reconsideration was frivolous and that her conduct demonstrates that she has attempted to use the legal process for an improper purpose. Thus, sanctions are warranted.

**III. The Nature and Amount of the Sanction**

A.   Factors To Be Considered

Rule 11 expressly limits a sanction to "what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The imposition of a monetary sanction is a particularly reasonable use of the court's discretion under Rule 11." *Donaldson*, 819 F.2d at 1557. The following considerations are appropriate in deciding the amount of the sanction:

[1] [w]hether the improper conduct was willful, or negligent;

[2] whether it was part of a pattern of activity, or an isolated event;

[3] whether it infected the entire pleading, or only one particular count or defense;

[4] whether the person has engaged in similar conduct in other litigation;

[5] whether it was intended to injure;

[6] what effect it had on the litigation process in time or expense;

[7] whether the responsible person is trained in the law;

[8] what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; [and]

[9] what amount is needed to deter similar activity by other litigants[.]

Fed. R. Civ. P. 11 advisory committee's note (1993).

The Court finds that counsel's conduct was willful and not merely negligent.  It demonstrates bad faith on her part.  As an attorney, she is deemed to have known better.  She owed a duty to follow the rules and to respect the Court.  Counsel's pattern of conduct conclusively establishes that she did not mistakenly violate a provision of law.  She knowingly violated Rule 11.  Her response to the Court's show cause order is breathtaking in its arrogance and borders on delusional.  She expresses no contrition or regret regarding her misconduct.  To the contrary, she continues her baseless attacks on the Court.  Defiantly defending the "position of the patriots," she scoffs at the notion that a federal court would

32

consider sanctioning her when she is on the side of such freedom fighters as the late Justice Thurgood Marshall, a comparison that, if accepted, would disgrace Justice Marshall's singular achievements. Counsel's bad faith warrants a substantial sanction.

Counsel's misconduct was not an isolated event; it was part of a pattern that advanced frivolous arguments and disrespectful personal attacks on the parties and the Court. This pattern infected the entire proceeding, not just an isolated pleading. Her initial Complaint was legally frivolous. Upon being so informed, counsel followed it with a frivolous motion for reconsideration. In response to the Court's show cause order, she filed a frivolous motion to recuse. In all of counsel's frivolous filings, she hurled personal insults at the parties and the Court. Rather than assert legitimate legal arguments, counsel chose to accuse the Court of treason and of being controlled by the "Obama Machine." She had no facts to support her claims—but her diatribe would play well to her choir. This pattern of conduct reveals that it will be difficult to get counsel's attention. A significant sanction is necessary to deter such conduct.

Whether Ms. Taitz had the subjective purpose to cause injury through her conduct cannot be easily ascertained. It is clear to the Court, however, that objectively her actions demonstrate an attempt by her to smear the Court and the judiciary because she did not prevail. She accused the Court of treason based upon its dismissal of her case. She maintained that the district courts in the Eleventh Circuit must be controlled by the vast "Obama conspiracy" because

33

otherwise she would have prevailed on her claim.  She suggested that the Court violated the Code of Judicial Conduct by engaging in *ex parte* communications when she had no evidence to support the suggestion and when the credible evidence undisputably refuted the suggestion.  She frivolously asserted that the Court had a financial interest in the litigation, posting the web site for the undersigned's financial disclosure reports in her briefing, for no reason other than to advance a false assertion.  Counsel's smear attempts were not limited to the Court; she appears to relish calling the President names that added nothing to her legal arguments.  The Court concludes from this conduct that counsel did have an intent to injure anyone associated with the litigation who did not agree with her.

Although the Court has not thoroughly researched counsel's record to find similar instances of misconduct in other cases, the Court is aware of at least two other cases related to this one where counsel engaged in similar conduct.  First, counsel filed the very same case on behalf of Captain Rhodes in the Western District of Texas and then refiled it here upon the Texas court's finding that she had no reasonable possibility of success on the merits.  Counsel filed another similar action here on behalf of Major Cook in which she insisted on pursuing the case even though the Army had revoked the deployment order.  Then, counsel filed another action on behalf of Major Cook in the Middle District of Florida.  That action was summarily dismissed, and upon losing there, counsel filed a motion to recuse that judge; that motion to recuse was found to be frivolous.

34

Counsel's similar conduct in other actions demonstrates that substantial sanctions are necessary to deter future misconduct.

Counsel's frivolous and sanctionable conduct wasted the Defendants' time and valuable judicial resources that could have been devoted to legitimate cases pending with the Court. When she filed the *Rhodes* case, counsel indicated that it was urgent that the matter be heard because her client was facing imminent deployment. The Court rearranged its schedule, took time to read the legal papers, and conducted preliminary research in preparation for the hearing. The Army had to activate its legal team on short notice, sending a Major from the Army Litigation Division in Washington, D.C. and a Captain from the CONUS Replacement Center at Ft. Benning. In addition, the Assistant U.S. Attorney had to accompany them. Like the Court, the government attorneys had to prepare in an expedited manner for the hearing. During the week preceding Captain Rhodes's deployment, the Court was in the midst of a jury trial. Therefore, the Court had to alter the trial schedule to conduct the hearing during an extended lunch break, thus affecting other counsel and jurors. The Clerk's Office was burdened by Ms. Taitz's inability to follow the Court's rules regarding *pro hac vice* admission and the Court's rules for electronic filing. On five separate occasions in a short period, the Clerk's Office personnel error-noticed counsel for her failure to follow simple rules. At the hearing, counsel failed to make coherent legal arguments but instead wasted the Court's time with press conference sound bites and speeches. Due to the alleged urgency of

35

the situation, the Court issued a ruling within two days of the hearing so that the Army would have guidance as to whether Captain Rhodes would be deployed.  This expedited ruling, during an ongoing jury trial, obviously placed a burden on the Court and Court staff. Then counsel filed her motion for reconsideration two days before Captain Rhodes was scheduled to deploy, and the Court again was forced to address the motion in an unusually expedited fashion.  The Court now has to draft the present order, which is longer than it should be because the Court must address the additional frivolous arguments made by counsel in her motion to recuse and also must make sure the Court of Appeals has the complete picture of counsel's misconduct.  Although the Court has not attempted to place a price tag on the time and expense caused by counsel's misconduct, any objective observer can ascertain that it is substantial.

The Court also finds that counsel's response to the Court's show cause order demonstrates that the originally contemplated monetary sanction of $10,000.00 is not sufficient to deter counsel's misconduct.  In response to this threatened sanction, counsel scoffed and resumed similar sanctionable conduct.  Rather than provide legitimate arguments as to why this amount was unnecessary or why a lesser amount would be appropriate, she filed a motion to recuse, relying upon false allegations and baseless assertions.  Counsel had an opportunity to present financial information to demonstrate that the intended penalty was excessive, yet she never addressed the amount even as an alternative position.  If she wished for the Court to

36

consider whether the $10,000.00 was excessive and unnecessary to deter future similar conduct, she had the burden to bring forth evidence to show why. *See White v. Gen. Motors Corp.,* 908 F.2d 675, 685 (10th Cir. 1990). Not only did counsel fail to point to any such evidence, but her conduct definitively establishes that the *meager* $10,000.00 sanction would have no deterrent effect.

The Court must therefore determine what amount is sufficient to deter counsel's conduct. The Court observes that Congress has concluded in the context of frivolous filings in the Tax Court that financial penalties up to $25,000.00 may be appropriate. *See* 26 U.S.C. § 6673(a)(1). The Eleventh Circuit has affirmed a $10,000.00 sanction against an attorney for conduct far less egregious than Ms. Taitz's conduct. *See Riccard v. Prudential Ins. Co.,* 307 F.3d 1277, 1294-96 (11th Cir. 2002); *see also Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (affirming $50,000 sanction against attorney based on court's inherent authority to discipline attorney misconduct). Under the circumstances in this case and based upon the factors considered above, the Court finds that the Court's previously contemplated financial sanction of $10,000.00 is not adequate to deter future misconduct and that a monetary penalty of $20,000.00 is the minimum amount necessary to deter counsel's misconduct.[8]

---

[8]Counsel will likely respond that this sanction exceeds the statutory maximum fine for the offense of criminal contempt, 18 U.S.C. § 402, a petty misdemeanor which has a maximum fine of $1,000. The Court finds counsel's conduct here to be more egregious than simple disobedience of

B.    Constitutionality of Sanction

To make it clear that the Court has carefully considered the due process protections to which Ms. Taitz is entitled, the Court finds it appropriate to set forth those considerations in this Order. Attorneys facing discipline under Rule 11 "have interests qualifying for protection under the Due Process Clause." *Donaldson,* 819 F.2d at 1558.  Procedural due process requires notice and an opportunity to be heard.  *Id.*  "Determining what process is due in a Rule 11 case simply requires an application of familiar principles of due process[.]"  *Id.*  The timing and content of the notice and the nature of the hearing depend upon an evaluation of the circumstances on a case-by-case basis.  *Id.*  Several factors influence the due process requirements in a particular case.  These factors include:

> the interests of attorneys . . . in having a specific sanction imposed only when justified; the risk of an erroneous imposition of sanctions under the procedures used and the probable value of additional notice and hearing; and the interests of the court in efficiently monitoring the use of the judicial system and the fiscal and administrative burdens that additional requirements would entail.

*Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

Considering these factors, it is clear that counsel has been provided with due process prior to the imposition of sanctions in this case.  As an attorney, she had notice of what Rule 11 required prior

---

a court order.  Moreover, criminal contempt would also authorize a prison sentence up to six months.  *Id.*  The Court observes that half a year's legal fees earned by an average lawyer would far exceed the sanction the Court imposes against Ms. Taitz.

to filing the first pleading in this Court.  After she filed her first frivolous pleading, the Court cautioned her not to continue conduct that violated Rule 11.  Counsel ignored this admonition and continued her misconduct.  In response, the Court notified her that her conduct was sanctionable under Rule 11 and provided her with notice of the specific misconduct that the Court found sanctionable.  The Court also provided her with an opportunity to show cause why a monetary penalty of $10,000 should not be imposed upon her as a sanction for her misconduct.  Counsel did not take advantage of this opportunity but instead continued her misconduct by filing frivolous motions and using those motions for an improper purpose.  Under these circumstances, the sanction imposed is clearly justified.  There is no risk that the imposition of the sanction is erroneous under the procedures used, and additional notice and hearing would have no value.  Requiring additional procedures would result in an unjustifiable disregard of the Court's interest in efficiently monitoring and using judicial resources, with no measurable benefit to the legitimate interests of counsel.  The Court finds that the imposition of the sanction here complies with the requirements of constitutional due process.

The Court fully appreciates its obligation to consider carefully the imposition of sanctions, particularly when sanctions are imposed *sua sponte*.  The Court understands that such action by the Court is "akin-to-contempt," and thus while criminal due process procedures may not be necessary, the Court must make sure that counsel's due process

39

rights have been protected.  *See Kaplan v. DaimlerChrysler, A.G.,* 331 F.3d, 1251, 1255-56 (11th Cir. 2003).  The Court is also aware that under certain circumstances, sanctions that are imposed solely to punish and deter the sanctioned party may be so severe that the sanctioned party may be entitled to the full panoply of rights under the due process clause, including a jury trial.  *See In re E.I. duPont de Nemours & Co. Benlate Litig.,* 99 F.3d 363, 368-69 (11th Cir. 1996).[9]

As previously explained, the Court finds that Ms. Taitz is not entitled to that full panoply of rights under the circumstances of this case.  The process used in this case protected Ms. Taitz's rights to the extent required by constitutional due process.  The sanctions imposed here are not of such a criminal nature that they require more than the notice and opportunity to be heard that counsel received. As emphasized by the Eleventh Circuit in *Donaldson,* the punitive nature of a Rule 11 monetary sanction does not fix the proceeding as one of criminal contempt.  *Donaldson,* 819 F.2d at 1558.  The *Donaldson* court noted that it would be "counterproductive" and contrary to the goals of Rule 11 to require criminal contempt procedures whenever a judge contemplated imposing sanctions under Rule 11.  *Id.* at 1559.

---

[9]In *duPont*, the Eleventh Circuit concluded that the district court's sanctions against a *party* of more than $13 million for discovery abuses and $100 million for "civil contempt" were criminal in nature because they were imposed against a party for flouting the district court's authority and were so enormous that they bore no rational relation to the case or the impact of the party's misconduct.  99 F.3d at 369.  Accordingly, the Eleventh Circuit found that the district court had to follow all of the requirements of criminal contempt proceedings in imposing such sanctions.

The key is whether the party had adequate notice and opportunity to be heard under the circumstances. *Id.* When the attorney fails to present support for her claims despite being given the opportunity to do so, a hearing is a "waste of judicial resources" and thus unnecessary to satisfy due process concerns. *See id.* at 1558, 1560-61. It would be particularly troublesome if a court were required to provide all of the protections to which a criminal defendant is entitled every time that it sought to impose serious sanctions upon an *attorney* for Rule 11 violations. Such a burdensome requirement would make it practically difficult to discipline attorneys whose conduct requires swift and serious attention by the court. The Court does not suggest that additional due process protections may not be appropriate in other cases depending upon the circumstances, but the Court is convinced that Ms. Taitz has been provided all the process that she is due.

CONCLUSION

The Court takes no joy in reaching the conclusions it has reached in today's Order. As correctly observed by Judge William Schwarzer from the Northern District of California:

> Of all the duties of the judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more

41

misconduct and those who might seek relief against abuse will instead resort to it in self-defense.[10]

While the Court derives no pleasure from its imposition of sanctions upon counsel Orly Taitz, it likewise has no reservations about the necessity of doing so. A clearer case could not exist; a weaker message would not suffice.

As explained above, counsel's Motion to Recuse (Doc. 24) and Motion for Enlargement of Time to Respond to the show cause order (Doc. 25) are denied. Counsel Orly Taitz is hereby ordered to pay $20,000.00 to the United States, through the Middle District of Georgia Clerk's Office, within thirty days of the date of this Order as a sanction for her misconduct in violation of Rule 11 of the Federal Rules of Civil Procedure.[11]

The Court further directs the Clerk of this Court to send a copy of this Order to the State Bar of California, 180 Howard Street, San Francisco, CA 94105, for whatever use it deems appropriate.

---

[10]William W. Schwarzer, *Sanctions Under the New Rule 11—A Closer Look*, 104 F.R.D. 181, 205 (1985).

[11]The Court wishes to explore the possibility of directing the financial penalty to the National Infantry Foundation at Ft. Benning, Georgia, which has as part of its mission the recognition of our brave soldiers who do their duty regardless of the personal sacrifice required and their own personal political beliefs. The Assistant U.S. Attorney shall file within thirty days of today's Order a short brief outlining the position of the United States as to whether such a monetary sanction can be used for this intended purpose. The Court emphasizes that the Court is ordering the penalty be paid to the United States as required under Rule 11 and not to a third party, but the Court seeks to determine whether the Court is authorized to subsequently order that the proceeds be paid by the United States to the Foundation.

IT IS SO ORDERED, this 13th day of October, 2009.

                                    S/Clay D. Land
                                 CLAY D. LAND
                         UNITED STATES DISTRICT JUDGE